___ FILED        ✗ LODGED
___ RECEIVED ___ COPY

OCT 1 2 2010

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

LEONARD G. HOROWITZ, Pro Se
13-3775 Kalapana Highway
Pahoa, HI 96778
Phone: 808-965-2112
E-mail: len15@mac.com

## IN THE UNITED STATES DISTRICT COURT,
## FOR THE DISTRICT OF ARIZONA

DON WOLF, a single man,
Plaintiff,

and

LEONARD GEORGE HOROWITZ,
Intervener

v.

AMBAYA PILAR MARTIN, a
single woman, SACRED
HEALTH, LLC, an Arizona
limited liability
company; AMBAYA GOLD
HEALTH PRODUCTS,LLC, an
Arizona limited
liability company,
11-ELEMENTS, LLC, an
Arizona limited
liability company, UNI-
VERSE DRAVYA DHARMI,
LLC, an Arizona
limited liability
company, ELECTRO -
ENERGETICS, LLC, an
Arizona limited
liability company,
Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL NO 3:10-CV-08163

(BREACH OF CONTRACT)


THE HONORABLE
JUDGE DAVID CAMPBELL

Evidentiary Hearing:
Thurs. Oct. 7, 2010


ANSWER IN INTERVENTION OF
LEONARD GEORGE HOROWITZ
AS INTERVENER AND LIMITED
PARTNER OF PLAINTIFF AND
DEFENDANT; CERTIFICATE OF
SERVICE

_____

**ANSWER IN INTERVENTION OF LEONARD GEORGE HOROWITZ AS
INTERVENER AND LIMITED PARTNER OF PLAINTIFF AND DEFENDANT**

4

**ANSWER IN INTERVENTION OF LEONARD GEORGE HOROWITZ AS INTERVENER AND LIMITED PARTNER OF PLAINTIFF AND DEFENDANT**

1 . NOW COMES Intervener, Co-Plaintiff, LEONARD GEORGE HOROWITZ (hereinafter referred to as "Intervener") alleges the following against Defendants, AMBAYA PILAR MARTIN ("Ms. Martin"), SACRED HEALTH, LLC ("Sacred Health"), AMBAYA GOLD HEALTH PRODUCTS, LLC ("Ambaya Gold"), 11-ELEMENTS, LLC, UNI-VERSE DRAVYA DHARMI, LLC, ELECTRO-ENERGETICS, LLC (collectively referred to as "Defendants").

2 . Intervener acknowledges the Parties, jurisdiction, and venue of this case, as described in Plaintiff's VERIFIED COMPLAINT.

3. Plaintiff and Defendant and Intervener have a partnership based on agreements made as described below.

4. Plaintiff is the inventor, creator, developer and discover of numerous formulas and products that Plaintiff and Defendant agreed to private label for Intervener' affiliated companies (Healing Celebrations, LLC and/or Healthy World Distributing, LLC, –Idaho-based Internet businesses that Intervener officiates as Overseer and Managing Member.

5. As a celebrity Doctor of Medical Dentistry, Doctor of Naturopathic Medicine (hon.), and a world-renowned public health expert and health scientist, Intervener has developed and co-developed products manufactured for said corporations for more than a decade.

6. Due to Intervener's success and popularity as a Harvard-degreed, award-winning, author of three American bestsellers, dozens of DVD presentations, and three documentary films, Intervener is a person of note, particularly in the field of alternative medicine, FDA and pharmaceutical industry whistleblowing, and the suppressed field of energy (resonance) medicine.

7. Sometime in the Fall of 2007, Intervener met Plaintiff and Ms. Martin at their exhibit booth at the Raw Spirit Festival in Sedona, Arizona,

8. Due to common fields of interest and business objectives, the three Parties quickly developed a friendship and business agreement.

9. Ms. Martin described herself as "businesswoman," who is "Mexican by birth, American by culture, Hindi by heart and Native American by destiny."

10. Intervener became aware that prior to meeting Plaintiff, Ms. Martin had no formal training or background which prepared her to produce, invent or create the Medicine Wolf Products or anything similar.

11. Intervener became aware that Ms. Martin had a business called "Neuro Magic," offering "brain training" by way of electrical technology; and she

5

acknowledged to me that Medicine Wolf exclusively produced formulas that she said was helping her clients.

12. At the time, Ms. Martin induced my limited partnership with her and Plaintiff by claiming her 50/50 partnership with Medicine Wolf, operating under the corporate umbrella called, SACRED HEALTH; and contracted to private label products that Medicine Wolf exclusively formulated with the addition of 528Hz frequency resonance, and/or co-formulate products with Intervener based on Plaintiff and Intervener's combined knowledge, intellectual property, and assets.

13. Ms. Martin and Intervener agreed to developed a business arrangement whereby she and Medicine Wolf, exclusive partners in SACRED HEALTH, LLC, formed a limited partnership with Intervener and related entities to manufacture and market a New Product Line.

14. SACRED HEALTH, LLC began to exclusively manufacture this New Product Line derived from formulas exclusively conceived and prepared by Medicine Wolf and/or Intervener with Medicine Wolf containing 528Hz frequency, making products very special, according to Intervener's research; and Healing Celebrations, LLC, private labeled these formulas at great expense, began to advertise and market this New Product Line, invested in extensive expensive Internet methods and materials for mass distribution of the New Product Line through a natural healing referral cooperative, HealthyWorldAffiliates.com, creating a web-based business to advance the New Product Line and the Parties' limited partnership.

15. Over several months of planning, communications, and marketing investments, the limited partnership of the Parties advanced five new products formulated exclusively by Medicine Wolf for Healing Celebrations, LLC. Another new product called, LIQUID DENTIST, (a.k.a., DENTIST IN A BOTTLE; hereinafter called the "Dental Product"), was conceived of, and initially researched by, Intervener. Then, through discussions and transfer of said research and intellectual property from Intervener to Plaintiff, the Dental Product was formulated to be *exclusively* made for Intervener's affiliates.

16. Now it should be known that this Dental Product was conceived and requisitioned by Intervener, a leading American dental self-care authority and author, based on his research of scientific publications that advance medical ozonation of decayed teeth, followed by remineralization of tooth structure, as proven methods of arresting and reversing tooth decay. This obviously valuable contribution to dental public health for the natural prevention and treatment of dental caries hold great commercial value; and parties agreed it would feature the Intervener's branded pioneering discovery of 528Hz frequency, a central energy sustaining biology according to extensive research by Intervener. This intellectual property, featuring 528Hertz frequency energy electron resonance for hydrosonic delivery of beneficial affects, was agreed by Plaintiff and Ms. Martin to be central to the manufacturing, marketing, and advertising of the new Dental Product and the New Product Line.

6

17. The Parties made a business agreement regarding the manufacture and distribution of this Dental Product that promised Intervener that subject property would not be sold, under any label or alternative formulation, to any third party; giving Intervener and Healing Celebrations, LLC, the exclusive worldwide distribution right for the Dental Product.

18. Immediately following manufacture of Dental Product, however, Ms. Martin began selling Dental Product to her clients and other third parties under the brand name "Dentist in a Bottle," violating her agreement and Intervener's interests in the Dental Product, and jeopardizing the goodwill and partnership.

19. Intervener protested by e-mail and telephone this breach of contract at which time Ms. Martin apologized to Intervener, claimed this activity would cease; or else Intervener would be paid a reasonable royalty. It was generally agreed that Healing Celebrations, LLC would continue to pay the Defendant SACRED HEALTH, and later AMBAYA GOLD, fixed fees for bulk purchases of bottled, private-labeled, Medicine Wolf Products and the Dental Product potentially under a separate royalty agreement that Intervener demanded to receive in writing.

20. On or about September 28, 2007, when AMBAYA MARTIN organized Defendant SACRED HEALTH, LLC with the Arizona Corporation Commission, Intervener was unaware Ms. Martin failed to list Plaintiff as a Member of SACRED HEALTH, despite Intervener's understanding that Plaintiff was an equal partner in this entity.

21. Even though Ms. Martin failed to list Plaintiff as a Member of SACRED HEALTH, she acknowledged to Intervener the Plaintiff's co-ownership of SACRED HEALTH, and that this business partnership with Plaintiff was an equal partnership.

22. Largely as a result of Intervener's celebrity and business investments in marketing the name Medicine Wolf and Medicine Wolf Products to build success of the partnership through increasing sales, Defendants' businesses began to grow rapidly, attracting a dedicated following of cliental and attention from other distributors.

23. On or about September 8, 2008, Ms. Martin organized Defendant AMBAYA GOLD with the Arizona Corporation Commission, telling Intervener that she was doing this "to protect" herself and her investments, her home property used as a clinic and manufacturing facility, as well as limit her tax and regulatory agency liabilities and risks, respectively.

24. Around that time Ms. Martin incorporated AMBAYA GOLD, she began encouraging Intervener to remove all mention of Medicine Wolf's name from Healing Celerations, LLC, promotions and advertisements of the New Product Line. This included advertisements on all websites and YouTube published interviews generated with or by Intervener on behalf of the partnership and

7

human service; because, Defendant expressed concern that Plaintiff was subject to persecution by intelligence agents and federal agencies, especially the FDA. As time passed, these prohibitions were ordered by Ms. Martin, frequently bolstered by Defendant's chief administrator, CHRISTOPHER WARREN.

25. These communications included Plaintiff's defamation each time Intervener was directed, and later ordered, to expunge Medicine Wolf name recognition in product advertisements; and this oppression increased throughout 2009; during which time Intervener repeatedly informed Ms. Martin and Mr. Warren that not only was this request unreasonable, since many third parties had already downloaded, made copies of, and republished Intervener's popular websites, articles, and interview of Medicine Wolf, and re-published a special YouTube series featuring Plaintiff and Intervener, but that the request ran contrary to fairness, professionalism, and intellectual property rights, acknowledging Plaintiff for his contributions to the Parties' partnership in promotions of the Dental Product and the New Product Line.

26. Intervener was unaware this coercion and corporate oppression was motivated by Ms. Martin's intention to increase her share of profits by terminating her partnerships and breach her agreements with Medicine Wolf and Intervener. Thus, Defendant advanced Plaintiff's and Intervener's freeze-out from the partnership, excluding Plaintiff from any claim to fifty percent of all revenue generated from the Medicine Wolf Products, and also Intervener's exclusive sales contract, and equitable share of sales and profits from Dental Product.

27. Intervener was unaware Ambaya Gold, 11-Elements, LLC, Uni-Verse Dravya Dharmi, LLC and Electro – Energetics, LLC were created in part, as Plaintiff pleads, to: 1) transfer assets out of SACRED HEALTH; 2) divest Plaintiff out of his ownership interest in SACRED HEALTH; 3) divest Plaintiff of his interest in the Medicine Wolf Products, and Intervener of his interest in Dental Product; 4) decrease the amount of profits and returns due to Plaintiff and Intervenor; and 5) create shell entities to fraudulently insulate Defendants from creditors and liability, including claims of Plaintiff, as well as Intervener.

28. At the time, Intervener was fraudulently induced by false assurances from Ms. Martin that business was proceeding normally. She explained that SACRED HEALTH was simply changing its name to AMBAYA GOLD, that it was still the same company, that Intervener's limited partnership with Plaintiff and Defendant was being honored, and that she was advancing a written royalty agreement to reward Intervener for his rightful share of sales and profits from growing sales of the Dental Product to her clients and third parties.

29. Ms. Martin committed promissory fraud by making the aforementioned promises with no intention to keep them, as evidenced by her non-performance, and fraud in the factum contract compelled, by the Defendants (EXHIBIT 1), that omits any rights and royalties associated with Dental Product intellectual property and co-formulation.

30. On November 9, 2009, Ms. Martin admitted during telephone conference

with Intervener that she was struggling emotionally and psychologically with Plaintiff as her partner, and sought a way to terminate her partnership agreement with Plaintiff.

31. On November 9, 2009, Ms. Martin admitted she had violated terms of her limited partnership Agreement with Intervener, and Intervener's companies, by selling Dental Product to at least three third parties under the label "Dentist in a Bottle," including one person introduced to Ms. Martin and Medicine Wolf by Intervener. (EXHIBIT 2a and 2b.)

32. On November 12, 2009, Ms. Martin wrote Intervener that her breaches of contract sourced from her having, "never really gotten that anyone would want to 'truly support me or my organization.' I really don't think I have really gotten how much commitment you have to supporting the organization through the distributorship. . . . Maybe there is a self love lesson here I need to learn or something, because I definitely come from acting as a lone ranger a lot, and may not fully recognize what is offered. In doing so, [I] appear that I don't value the people offering [goodwill]. . ." (See: EXHIBIT 2c).

33. Intervener's internal e-mail of Nov. 12, 2009 records the aforementioned Breach of Contract, and concerns of staff officials overseeing HealthyWorldAffiliates.com. (See: EXHIBIT 2d).

34. Between January and February, 2010, Ms. Martin requested, personally and through AMBAYA GOLD official CHRISTOPHER WARREN, a meeting with Intervener to discuss challenges the Defendants were having with Plaintiff and a "new contract" between the parties that included a suggested 5% royalty on sales of the Dental Product being sold to third parties in violation of partnership and original partnership agreement that included exclusive distribution agreement for Dental Product with Intervenerand Healthy World Distributing, LLC.

35.   During this meeting CHRISTOPHER WARREN made it very clear that Intervenerwas no longer AMBAYA GOLD's largest account and the Defentant's contract with Intervenerwould be terminated without substantial loss to Defendant's companies, if I failed to comply with Defendant's coercive oppressive malicious demand to censor Plaintiff's involvement with Defendant and the New Product Line.

36. Forced by this extortionate threat of losing my approximately $2 million investment of money and time spent between 2007 and 2010, I conceded to accept new agreement terms, with the promise that a separate Dental Product agreement would be constructed aside from the agreement for general distribution of the New Product Line.

9

37. Based on the above, CHRISTOPHER WARREN sent Intervener a "new agreement" titled, Ambaya Gold Health Products, LLC Distributor Licensing Agreement on Feb. 2, 2010, (EXHIBIT 1) that altered original distribution agreement between Parties, demoted Intervener to simply a regular Medicine Wolf products distributor breaching original partnership agreement, co-formulation of Dental Product, and neglecting fraudulent inducement that a second agreement regarding Dental Product co-formulation royalty(ies) was forthcoming.

38.    The new extortionate agreement contained the following paragraph evidencing promissory fraud, acknowledging "referral remuneration" of "5% referral fee" to third party distributor, Healthy World Distributing, LLC, managed by Intervener, as token compensation for "referrals:"

**6.4 Referral Remuneration** – AG shall pay a 5% referral fee to HWD for AG retail customer purchases that are linked to a referral by Len Horowitz. This shall be reviewed at the end of every 3rd month, with the first review being completed after the last day of March, 2010, with payment to be sent by the 15th of April. This will be completed at the end of every third month following with payment sent by the 15th of the fourth month, under the scope of this agreement.

37. The new agreement, illegally signed under duress, oppression, coercion, extortion, threatened freeze-out, threatened termination of New Product Line, and Intervener's loss of approximately $2 million in business investments: a) violated exclusive distribution agreement and related terms of original agreements between the Parties concerning the Dental Product; b) neglected Intervener's co-ownership in the Plaintiff-Intervener co-formulation; c) neglected reasonable royalty paid to Intervener for sales of Dental Product to third parties; and d) provided unreasonably small royalty to be paid by Defendants to Intervener IF and WHEN Intervener referred other distributors to Defendant, purposefully changing exclusive distribution agreement as follows:

**6.7 Private Labeling for Liquid Dentist License** - AG agrees that Liquid Dentist will not be sold as a private label to any other entity than HWD, so long as there is a working, ongoing agreement between AG and HWD. AG reserves the right to sell Dentist in a Bottle through its regular retail, or non-private label channels. If HWD declines to distribute Liquid Dentist, or there is not an ongoing, working agreement between HWD and AG, AG maintains sole formulation and all distribution rights of Liquid Dentist under AG's Dentist in a Bottle or subsequent names that correspond to AG's dental formula.

38. The new agreement included Paragraph 6.6. that had been previously violated by Defendant with numerous alterations being made to original Dental Product formulation that was the subject of substantial financial loss, administrative time, and heated discussions that outraged Plaintiff and damaged Intervener financially. The Dental Product had been "watered down" by Defendant without Plaintiff's and Intervenor's knowledge or permission. This paragraph states:

**6.6 Formula Changes** - AG will not change formula ingredients or production methods without notice and agreement in writing from HWD.

39. As mentioned, to get Intervener to sign this unacceptable contract, CHRISTOPER WARREN, with knowledge and consent of AMBAYA MARTIN, used extortion and coercion. WARREN informed Intervener by telephone that Defendant was serving much bigger more profitable accounts, stated to threaten the Intervener's termination as a distributor for AMBAYA GOLD products.

40. The Defendants leveraged, for extortion, their knowledge that Intervener, and his companies, were completely dependent upon Defendants to supply six of eight products sold by HealthyWorldAffiliates.com, the main investments made by Intervener over a two year period to advance the limited partnership through HealthyWorldAffiliates.com. Thus, WARREN and MARTIN knew they would heavily damage Intervener; unless Intervener signed agreement as presented; extortionately compelling Intervener's signature on the new agreement. (EXHIBIT 1)

41. On or about May of 2010, Plaintiff pleads having received word of Ms. Martin's violations of contracts, becoming terrified that Ms. Martin would steal his product formulations, including the formula for the Dental Product that the Parties' partnerships and agreements with Intervener protected.

43. In an attempt to prevent litigation between Plaintiff and Defendants, according to Plaintiff, Ms. Martin and her brother drafted a licensing and royalty agreement whereby Plaintiff would grant an exclusive license to Ambaya Gold for continued use of the Medicine Wolf Products titled, "Royalty Agreement"). (See Exhibit A – Royalty Agreement, in Plaintiff's Verified Complaint).

44. To Intervener's knowledge, the Royalty Agreement neglects an equitable royalty agreement that Ms. Martin agreed to originally, to pay Intervener for sales of the Dental Product to third parties.

45. Around this time, Plaintiff left Ambaya Gold with his formulas, but Defendants improperly retained copies of all formulas, according to Plaintiff's Complaint.

46. Plaintiff alleges, and Intervener testifies and can evidence using e-mail records, that Defendants changed the formulation of the Dental Product without consent or authorization of Plaintiff and/or Intervener. (EXHIBIT 3.)

47. These unauthorized changes, manufacturing inconsistencies, damaged Intervener and Healthy World Distributing, LLC, financially and harmed Intervener's and said company's professional reputation.

48. Upon information and belief, after Plaintiff left Ambaya Gold, Intervener, like Plaintiff, has been targeted for intimidation by Ambaya Gold and/or those representing to be acting on its behalf, particularly CHRISTOPHER WARREN.

49. In attempt to freeze-out Intervener from business agreements, and terminate

11

business relationship between Defendants and Intervener; and extort unreasonable concessions to aforementioned modifications to agreements, Defendants have used financial threats, oppression, coercion, and intimidation against Intervener, including defamation of Plaintiff, and most recently, falsely claimed FDA compliance concerns and "labeling issues."

50. On or around August 11, 2010, during telephonic conference, Intervener was informed that AMBAYA GOLD was withholding Dental Product shipments, and potentially other Medicine Wolf products, until such a time that Intervener would submit to Defendants demands to remedy "labeling issues;" despite the fact that Intervener, and his company officials, had worked out all "labeling issues" with CHRISTOPHER WARREN weeks prior to this notice, and had been cooperating with FDA regulatory officials.

51. In addition, Defendants demanded advertisements that still mentioned Plaintiff's name be removed from the Internet, contrary to previous agreements and professional ethics.

52. Ambaya Gold officials stated on August 11, 2010, during teleconference that they were very concerned about any claim of using 528Hz on any label in the New Product Line, including on Intervener's co-formulated Dental Product; and bogus reasons regarding the FDA's written notice to Intervener were cited to justify Defendant's oppressive coercion and extortionate demands upon Intervenor.

53. At this time Defendants falsely alleged lacking "scientific validity" regarding 528Hz frequency, further discrediting and defaming Plaintiff and Intervener in the process of justifying Defendant's freeze-out of Plaintiff and Intervenor.

54. In fact, Defendants were fully informed that: a) Intervener has been an expert witness and leading whistleblower regarding the FDA's overstepped authority, as known by Ms. Martin from the beginning of the partnership; b) Intervener had effectively responded to an FDA Warning Notice regarding claims made on websites; and c) Plaintiff and Intervener held identical views on FDA politics and policies, and agreed from the beginning of the Parties' partnership that 528Hz frequency branding was fundamental to marketing the New Product Line using proper claims made based on extensive research conducted by Intervener and Plaintiff.

55. Defendants noticed HWD and Leonard G. Horowitz during telephonic conference on Aug. 11, 2010, that their commitment to supply New Product Line would no longer be honored unless Intervener removed all mention of "528" in ALL advertising and labels, including Intervener's OxySilver product that is NOT EVEN MANUFACTURED by Defendants or part of their agreements with Intervener.

12

56. This extortionate demand is evidenced as malicious discrimination in view of material advertising for q-hydrate528™ produced by Defendant for competing company, yet heralding Intervenor's pioneering branding of 528 that is active in healing. (See: EXHIBIT 4).

54. Thus, Defendant's clear intention was to maliciously extort unreasonable and intentionally damaging concessions to sabotage the partnership and terminate agreements that would increase Defendant's profits at the expense of Plaintiff and Intervenor.

55. Defendant used their product supply, threatening financial losses, as leverage against Intervenor; to force Intervener to sign a damaging contract, and making unreasonable, unethical, and damaging changes and claims in marketing and advertising.

56. During the Aug. 11, 2010 telephone conversation, AMBAYA GOLD officials also served Intervener notice that Medicine Wolf and/or his new company, was being "enjoined" by Defendants, and would not be able to supply Intervener with his products, in a fraudulent attempt to separate Intervenerfrom Plaintiff, and prevent circumvention.

57. During Aug. 11, 2010, telephonic conference, Intervener rejected Defendant's demand for censoring "528" advertising and product manufacturing that included imparting 528Hz frequency into New Product Line, and demanded to have Plaintiff's contact information, which Defendants refused to provide.

58. Intervener also informed Defendants that their demands represented extortionate threats, contract breaches, and litigation liabilities given the multi-million dollar investment Intervener had made to establish HealthyWorldAffiliates.com as the exclusive "distribution arm" of the partnership formed between Plaintiff, AMBAYA MARTING, and Intervenor, to advance the New Product Line and the Dental Product.

59. On or about August 27, 2010, Intervener was informed by previous AMBAYA GOLD employee, Michele Groux, now working with Medicine Wolf, that she was told by CHRISTOPHER WARREN that a product called "Dentist in a Bottle," was 30% more effective than Intervener's brand name product, "Liquid Dentist," that if true, represents another Breach of Contract, and if false, reflects false advertising and a Breach of Contract as the Parties are under contract to collaborate, not undermine the Intervener's sales. WARREN's statement was made, according to Ms. Groux, following an inquiry about Liquid Dentist from an

13

AMBAYA GOLD client/customer.

60. Ms. Groux and Medicine Wolf also informed Intervener on Aug. 27, 2010, that Intervener's New Product Line formulations were being weakened without Interveners and Plaintiff's consent to alter formulations, including Liquid Dentist. The Parties are under contract not to compete in the marketplace with Dental Product, especially since Dental Product was conceived, and co-formulated, by Plaintiff and Intervener, and Defendants owe exclusive distribution rights for Dental Product to Intervener, based on original agreements made by MARTIN with Intervener and Plaintiff.

61. Based on the aforementioned information and personal experience using Liquid Dentist daily, Intervener concludes Defendants have changed the formula, manufacturing a sub-standard product for Healing Celebrations, LLC that, as a form of industrial espionage and sabotage, would cause customers to switch products from Liquid Dentist to Dentist in a Bottle, to put Intervener out of business.

62. The aforementioned acts of Defendant obviously violate original partnership agreements, commitments verified by recorded history, monies paid for manufacturing services rendered, evidencing contractual obligations in their limited partnership that was advanced in good faith between Plaintiff, Defendant, and Intervenor. This partnership has been violated exclusively by Defendants' unilateral actions, damaging Plaintiff and Intervener financially and emotionally. Defendants are in breach of contract, and accountable for causing financial losses damaging Intervener. In addition, said breaches have also caused Intervener severe emotional distress.

## COUNT I: VIOLATION OF LANHAM ACT

63. Intervener, like Plaintiff, alleges and incorporates by reference all paragraphs above.

64. Defendants are in violation of 15 USC §§ 1051 *et al*, also known more commonly as the "Lanham act," which gives rise to civil claims.

65. Defendants have defrauded Intervener by making false claims, false or misleading descriptions of fact; false or misleading representation of fact; which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Intervener in established partnership, ownership of Dental Product, or as to the origin, sponsorship, or approval of the Dental Product and New Product Line featuring 528Hz.

66. Defendants have made a false designation of origin, false or misleading

14

description of fact, or false or misleading representation of fact which in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of the Parties' goods, services, or commercial activities.

67. Defendants have caused other violations of the Lanham Act giving rise to civil liability.

68. Intervener has suffered damages as a result of these violations of the Lanham Act.

**WHEREFORE, Intervener prays for:**

(A) Judgment against Defendants in the amount of actual damages, lost profits and punitive damages, plus interest to be determined by this Court;
(B) Costs and attorneys' fees;
(C) Injunctive relief; and
(D) Such other further relief as this Court deems appropriate.

## COUNT II: BREACH OF FIDUCIARY DUTIES

69. Intervener realleges and incorporates by reference all paragraphs above.

70. Defendants owe a fiduciary duty to Intervener.

71. Defendants have a fiduciary duty to act in good faith, to show care and loyalty to each other, and to conserve company property, refrain from self-dealing and protect the interests and investments of Intervener.

72. Defendants have breached their fiduciary duties to act in good faith and loyalty, care, refrain from self-dealing and to protect the interests and investments of Intervener by, among other things, entering into a purported agreement whereby SACRED HEALTH would transfer all assets and real property to AMBAYA GOLD, and/or other Defendants, as a ploy to breach partnership agreements and damage Intervener, his professional reputation, and harm his associated companies, financially.

73. Defendants were, or should have been, aware that they had no legal basis for entering into any agreement regarding Dental Product, without the explicit consent of Intervener and Plaintiff, that would damage partners.

74. Defendants have also engaged in acts of self-dealing by entering into agreements with, and amongst, themselves and third parties for the purpose of "squeezing out," "freezing out," and circumventing Intervener.

75. Defendants' actions are for the purpose of achieving a financial gain at the expense of the Intervener.

15

76. Thus, Defendants' actions have amounted to a breach of their respective fiduciary duties to Intervener, and indebt Defendants to Intervener for earned royalties never paid, plus interest.

77. Intervener has, and will continue to, suffer damages as a result of Defendants actions.

**WHEREFORE, Intervener prays for**:
(A) Judgment against Defendants in the amount of actual damages, lost profits and punitive damages, plus interest to be determined by this Court;
(B) Costs and attorneys' fees;
(C) Injunctive relief; and
(D) Such other further relief as this Court deems appropriate.


## COUNT III: FRAUDULENT TRANSFER

78. Intervener realleges and incorporates by reference all paragraphs above.

79. Defendants' transfer of assets of SACRED HEALTH to Ms. Martin, Ambaya Gold 11-Elements, LLC, Uni-Verse Dravya Dharmi, LLC and/or Electro-Energetics, LLC, was a fraudulent transfer.

80. Said transfer of assets was done with intent to defraud, without receipt of adequate value, Plaintiff and Intervener.

81. SACRED HEALTH became insolvent as a result of the obligation and/or transfer of said assets.

82. Upon information and belief, the obligation and/or transfer was done, among other reasons, for the purposes of: a) causing damage to Plaintiff and Intervener; b) gaining leverage over Plaintiff and Intervener in any licensing or buyout negotiations; c) depriving Plaintiff and Intervener of the benefit of investment in SACRED HEALTH and the product line; d) circumventing exclusive manufacturing, distributing, and royalty agreements concerning the Dental Product; and e) the exclusive financial gain of Defendants.

83. Intervener has suffered damages as a result of Defendants' fraudulent transfers.


**WHEREFORE, Intervener prays for**:
(A) Judgment against Defendants in the amount of actual damages, lost profits and punitive damages, plus interest to be determined by this Court;
(B) Avoidance of the transfer and breach of contract;
(C) Injunctive relief;
(D) Appointment of Receiver to administer the assets of Ambaya Gold;
(E) Attachment of the fraudulently transferred assets;

16

(F) Costs and attorneys' fees; and
(G) Such other further relief as this Court deems appropriate.

## COUNT IV: BREACH OF CONTRACT

84. Intervener realleges and incorporates by reference all paragraphs above.

85. Intervener and Defendants entered into an agreement(s) related to compensation for use of the Dental Product.

86. Defendants have breached the agreement(s) by, among other things, failing to adequately compensate Intervener.

As a result of this breach, Intervener has incurred damages.

**WHEREFORE, Intervener prays for:**
(A) Judgment against Defendants in the amount of actual damages, lost profits plus interest to be determined by this Court;
(B) Recession of any agreement, if such an agreement exists, purporting to grant Defendants a right to use the Medicine Wolf Products;
(C) Costs and attorneys' fees; and
(D) Such other further relief as this Court deems appropriate.

## COUNT V: UNJUST ENRICHMENT

87. Intervener realleges and incorporates by reference all paragraphs above.

88. Defendants have been unjustly enriched by, among other things, use of Plaintiff and Intervener co-developed Dental Product.

89. Intervener has been financially harmed at the expense of Defendants' enrichment.

90. To the extent no valid contract or agreement is found to exist, a finding of unjust enrichment would be appropriate.

**WHEREFORE, Intervener prays for:**
(A) Judgment against Defendants for actual damages and restitution damages plus interest to be determined by this Court;
(B) Costs and attorneys' fees; and
(C) Such other further relief as this Court deems appropriate.

## COUNT VI: PROMISSORY ESTOPPEL

91. Intervener realleges and incorporates by reference all paragraphs above.

17

92. Defendants have made promises and assurances related to use of the the New Product Line and Dental Product, and ownership of these products in partnership with SACRED HEALTH and/or AMBAYA GOLD.

93. Intervener, like Plaintiff, has detrimentally relied on the promises and assurance of Defendants.

94. To the extent no valid contract or agreement is found to exist regarding Dental Product, a finding of promissory estoppel would be appropriate.

**WHEREFORE, Intervener prays for:**
(A) Judgment against Defendants in the amount of actual damages and restitution damages, plus interest to be determined by this Court;
(B) Costs and attorneys' fees; and
(C) Such other further relief as this Court deems appropriate.

COUNT VII: - MISAPPROPRIATION OF TRADE SECRETS

95. Intervener realleges and incorporates by reference all paragraphs above.

96. Arizona's "Trade Secrete" statutes create a private cause of action. *See* A.R.S. § 44-407.

97. The formulations used in the Medicine Wolf Products are statutorily protected "Trade Secrets" of Plaintiff; as is the formulation of the Dental Product co-developed by Plaintiff and Intervener.

98. Plaintiff and Intervener has taken reasonable and necessary steps to protect the secrecy of the Trade Secrets, including but not limited to, requiring and/or requesting that Defendants order its employees to refrain from viewing the formulas, insisting that no copies be made and using codes to describe the formulas.

99. Plaintiff's and Interveners Trade Secrets are not generally known outside the Parties' business and/or industry.

100. Upon information and belief, Defendants improperly obtained a copy of the Dental Product Trade Secrets of Plaintiff and Intervener.

101. Upon information and belief, Defendants have, among other things, incorporated the Trade Secrets into their business.

102. Defendants' use of Plaintiff's and Intervener's Trade Secrets gives Defendants an unfair competitive advantage over Plaintiff and Intervener.

103. Defendants knowingly misappropriated the Trade Secrets of Plaintiff and Intervener through improper means.

18

104. Upon information and belief, Defendants have directly benefited from their misappropriation of Plaintiff's and Intervener's Trade Secrets.

105. Upon information and belief, Defendants actions were deliberate and malicious.

Therefore, Intervener is entitled to damages.

**WHEREFORE, Intervener prays for:**
(A) Judgment against Defendants in the amount of actual damages, lost profits and exemplary damages, plus interest to be determined by this Court;
(B) Costs and attorneys' fees pursuant to A.R.S. § 12-341.01 and § 44-404;
(C) Injunctive relief;
(D) Contractual remedies;
(E) Disgorgement of money derived from misappropriated trade secrets; and
(F) Such other further relief as this Court deems appropriate.

## COUNT VIII: - PASSING OFF/UNFAIR COMPETITION

106. Intervener realleges and incorporates by reference all paragraphs above.

107. Plaintiff's and Intervener's Products, including New Product Line, have acquired a special significance with the public.

108. Defendants use of their product line is likely to cause confusion with the public with the Medicine Wolf Products, and the New Product Line developed by Intervener in partnership with the Parties.

109. Defendants are intentionally profiting from the name and goodwill created by Plaintiff and Intervener, and their Products.

110. As a result Intervener has suffered damages.

**WHEREFORE, Intervener prays for:**
(A) Judgment against Defendants in the amount of actual damages, lost profits plus interest to be determined by this Court;
(B) Injunctive relief;
(C) Costs and attorneys' fees; and
(D) Such other further relief as this Court deems appropriate.

## COUNT IX: ASSAULT AND DEFAMATION

111. Intervener realleges and incorporates by reference all paragraphs above.

112. Upon information and belief, Intervener was assaulted and defamed, verbally and in writing, by Defendants as reported below, and during and following Aug. 11, 2010 teleconference.

19

113. Intervener was verbally assaulted and defamed by CHRISTOPER WARREN in discussions with other employee(s) and/or agents of Defendants, and libeled by SHERRILL JETER in subsequent mailing. Said assaults were conducted on the premises of Defendants, at the direction of Defendants and/or within the scope of employment with Defendants. Thus, Defendants are liable under a theory of respondeat superior for the assault committed by their respective agents and employees.

114. Upon information and belief, said assaults and defamations were intentional and malicious.

115. Intervener has been damaged as a result of said character assault and defamation.

**WHEREFORE, Intervener prays for:**
(A) judgment against Defendants in the amount of actual damages, punitive damages plus interest to be determined by this Court;
(B) Costs and attorneys' fees; and
(C) Such other further relief as this Court deems appropriate.

## COUNT X: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

116. Intervener realleges and incorporates by reference all paragraphs above.

117. Upon information and belief, as a result of the malicious, outrageous and intentional conduct of Defendants, and/or Defendants agents, Intervener has suffered severe emotional distress.

118. Intervener has been damaged as a result of said emotional distress.

**WHEREFORE, Intervener prays for:**
(A) judgment against Defendants in the amount of actual damages, punitive damages plus interest to be determined by this Court;
(B) Their costs and attorneys' fees; and
(C) Such other further relief as this Court deems appropriate.

## COUNT XI – CIVIL THEFT/CONVERSION

119. Intervener realleges and incorporates by reference all paragraphs above.

120. Defendants have diverted and misappropriated to themselves funds belonging or due to Intervener.

121. Defendants knew or had reason to know that said funds belonged or were

20

due to Intervener.

122. Defendants knew or had reason to know that they were not entitled to said funds.

123. Defendants have converted said funds for its own use.

124. Intervener has been damaged Defendants' conversion.

**WHEREFORE, Intervener prays for**:

(A) Judgment against Defendants in the amount of actual damages, lost profits and punitive damages, plus interest to be determined by this Court;
(B) Their costs and attorneys' fees;
(C) Injunctive relief;
(D) Such other further relief as this Court deems appropriate.

COUNT XII: - DECLARATORY RELIEF

125. Intervener realleges and incorporates by reference all paragraphs above.

126. Intervener respectfully requests that this Court declare: 1) the Medicine Wolf Products the intellectual property of Plaintiff; and the Dental Product the intellectual property of Intervener and Plaintiff as co-formulators and limited partners; 2) Plaintiff to be a fifty percent owner of SACRED HEALTH and AMBAYA GOLD, as was originally agreed, understood, and acted upon; and 3) Intervener to be a fifty percent owner of the Dental Product that was conceived by Intervener, to have been exclusively manufactured for Intervener based upon Intervener's requisition and research, and pledged by the partners for exclusively marketing and distribution by Intervener for professional and consumer markets.

127. There exists an actual and continuing controversy regarding the ownership of the Medicine Wolf Products, SACRED HEALTH and AMBAYA GOLD– between Plaintiff and Defendants; as well as an actual and continuing controversy regarding the ownership of the Dental Product between Plaintiff and Defendants, and Intervener and Defendants.

128. Thus, there exists a justiciable controversy appropriate for declaratory relief.

**WHEREFORE, Intervener prays for**:

(A) Declaration that the Medicine Wolf Products are the intellectual property of Plaintiff; Plaintiff to be a fifty percent owner of SACRED HEALTH and AMBAYA GOLD; and Intervener and Plaintiff to be equal percent owners of Dental Product.
(B) Costs and attorneys' fees; and
(C) Such other further relief as this Court deems appropriate.

21

## COUNT XIII – INJUNCTIVE RELIEF

129. Intervener realleges and incorporates by reference all paragraphs above.

130. Intervener respectfully requests that this Court, pursuant to the Lanham Act, A.R.S. § 44–402; A.R.S. § 44–1007; A.R.S. § 12–1801 and any other relevant authority, issue a temporary restraining order; preliminary injunction and permanent injunction, enjoining Defendants from either directly or indirectly: 1) promoting, manufacturing, or selling the Medicine Wolf Products or the New Product Line; 2) disseminating Plaintiff's and Intervener's Trade Secrets; 3) pledging, selling or otherwise divesting AMBAYA GOLD of its assets or real property; and 4) to appoint a Receiver to oversee the assets of AMBAYA GOLD.

131. Intervener respectfully requests any other equitable relief this Court deems appropriate.

**WHEREFORE, Intervener prays for:**
(A) Injunctive relief;
(B) Costs and attorneys' fees; and
(C) Such other further relief as this Court deems appropriate

DATED this 6th day of September, 2010.

LEONARD GEORGE HOROWITZ
Intervener, Pro Se

## HAWAII ALL-PURPOSE ACKNOWLEDGMENT H.R.S 502-41

State of Hawaii

County of Hawaii

Third Judicial Circuit

}ss.

Document Description: Civil NO. 3:10-CV-08163
Breach of Contract

Document Date: No Date No. Pages: 25

On this 6th day of October 20 10

before me personally appeared

(1) Leonard George Horowitz

and

(2)

to me personally known, who, being by me duly sworn or affirmed, did say that such person(s) executed the foregoing instrument as the free act and deed of such person(s), and if applicable in the capacity shown, having been duly authorized to execute such instrument in such capacity.

Notary's Signature    10/10/10    Date

Maraiah K. Yamamoto
Notary's Printed Name

My commission expires: 50   2013

**LIST OF EXHIBITS:**

1 CONTRACT COMPELLED BY EXTORTION, OPPRESSION AND COERCION.

2) E-Mail Correspondence Regarding Breaches of Contract and Calling for Written Distribution Agreement from Ambaya Martin.

3) NOTICE OF REPEATED CHANGES IN DENTAL PRODUCT FORMULATION.

4) Defendant's "q-Hyrdate528" Product Advertisement

23

LEONARD G. HOROWITZ, Pro Se

13-3775 Kalapana Highway
Pahoa, HI 96778
Phone: 808-965-2112
E-mail: len15@mac.com

# IN THE UNITED STATES DISTRICT COURT,
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| DON WOLF, a single man, Plaintiff, ) | CIVIL NO 3:10-CV-08163 |
| ) | |
| and ) | (BREACH OF CONTRACT) |
| ) | |
| LEONARD GEORGE HOROWITZ, Intervener ) | THE HONORABLE |
| ) | JUDGE DAVID CAMPBELL |
| v. ) | |
| ) | Evidentiary Hearing: |
| AMBAYA PILAR MARTIN, a single woman, SACRED HEALTH, LLC, an Arizona limited liability company; AMBAYA GOLD HEALTH PRODUCTS,LLC, an Arizona limited liability company, 11-ELEMENTS, LLC, an Arizona limited liability company, UNI-VERSE DRAVYA DHARMI, LLC, an Arizona limited liability company, ELECTRO - ENERGETICS, LLC, an Arizona limited liability company, Defendants. ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Thurs. Oct. 7, 2010

CERTIFICATE OF SERVICE |

24

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document will be served by US Mail, postage prepaid, upon the party's counsel at the addresses below, upon the filing of this document.

**LAW OFFICES OF DONALD W. HUDSPETH, P.C.**
**Donald W. Hudspeth (012198)**
**Kristopher K. Rezagholi (025710)**
**3030 N. Central Ave, Suite 604**
**Phoenix, Arizona 85012**
**(602) 265-7997 - Telephone**
**(602) 265-6099 – Fax**
**KKR@azbuslaw.com**

**AMBAYA MARTIN,**
**AMBAYA GOLD, et al.**
**105 Navajo Drive**
**Sedona, AZ 86336**
**928 282 1756**

_____.

602 322 7200 Court

U.S. District Court of Arizona -
Phoenix Clerk's Office
Sandra Day O'Connor U.S. Courthouse
401 W. Washington St, Suite 130,
SCI
Phoenix, AZ 85003-2118

## Ambaya Gold Health Products, LLC
## Distributor Licensing Agreement

THIS LICENSING AGREEMENT ("Agreement") is entered into as of the 12th day of February, 2010 by and between

**Ambaya Gold Health Products: Ambaya Gold Health Products, LLC,** ("AG") having its principal offices at 105 Navajo Drive, Sedona, AZ 86336.

AND

**Healthy World Distributing: Healthy World Distributing, Inc.** ("HWD" or "Distributor") an Idaho Corporation whose principal business address is 217 Cedar Street, Suite 326, Sandpoint, ID 83864

# RECITALS

**WHEREAS:**

1.  AG is a company that produces mineral based supplement formulas. It has existing proprietary formulas and is willing and able to produce and license those existing and new formulas for distribution into various markets;

2.  And HWD wishes to license AG formula(s) with a Healthy World Distributing private label set forth in Exhibit A, Sections A and B hereto for to be appointed as a **Distributor** for the purpose of distributing AG products with a Healthy World Distributing private label to End-users in accordance with the terms and conditions of this Agreement;

**NOW THEREFORE,** in consideration of the covenants set forth in this Agreement, the parties, each intending to be legally bound hereby, Agree as follows:

## 1.   DEFINITION OF TERMS

As used herein, unless otherwise defined:

**1.1.   "Affiliate or affiliate"** means (i) any corporation, limited liability company or other organization of which Partner Name and / or parent of HWD ("Parent"), is directly or indirectly the beneficial owner of ten percent (10%) or more of any class of equity securities or financial interest therein or (ii) that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, HWD.

**1.2.   "Confidential Information"** means trade secrets, intellectual property, proprietary or confidential information or materials belonging to either party, including but not limited to customer lists, technical or manufacturing know-how, formulas, ongoing or future projects, vendor relationships, business plans, price lists, or other financial information.

**1.3.   "Formulas"** refers to the bottled and labeled formulas more specifically described in Exhibit A, Section A and B hereto, and any related research, developmental, production processes, information, or technologies related to the formulas provided to HWD by or on behalf of AG.

**1.4.   "Effective Date"** means the date of the final signature on this Agreement.

**1.5.   "End-user"** means an entity such as an individual or other person, business or government agency which purchases Products from HWD for its own use, not for resale or redistribution.

**1.6.   "Wholesale"** means an entity that is buying from HWD, formulas purchased by HWD from AG, and that entity is not an end-user, but instead is a license wholesaler of HWD's product catalog and who is purchasing products at a reduced price from HWD, with the intent to sell to its own end-users.

EXHIBIT 1.

## 2.  APPOINTMENT

**2.1.**  Upon mutual signature hereto indicating Agreement with the terms and conditions of this Agreement, AG hereby appoints HWD as an authorized **Distributor** of the Formulas specifically described in Exhibit A, Sections A and B.

**2.2.**  With this appointment, AG grants to HWD, subject to the terms and restrictions of this Agreement, a right and license to distribute the specified Formulas in Exhibit A, Section A under a HWD Private Label. The license granted hereunder shall be granted to HWD and its subsidiaries and affiliates, provided that such subsidiaries and affiliates Agree to be bound by the restrictions and terms hereof.

## 3.  ORDERS AND PRODUCTION OF BOTTLED AND LABELED FORMULAS

**3.1.**  AG shall produce and supply HWD Labeled and Bottled Formulas to HWD, as specified in Exhibit A, Sections A and B.

## 4.  PRICING AND PAYMENTS

**4.1.**  Subject to acceptance by HWD of this Agreement, HDW Agrees to pay AG in accordance with the payment terms stipulated in Exhibit A, Section C hereto the amounts as calculated using the Distributor pricing levels Exhibit A, Section B.

## 5.  DISTRIBUTOR RESPONSIBILITIES

**5.1.  Marketing** – HWD shall use its best efforts at its own expense to publicize, promote, market and sell the Formulas to End-users.  Marketing materials that reference AG products may be subject to approval by AG. AG requests that HWD not use Medicine Wolf for any aspect of its marketing and/or promotional activities.

**5.2.  Reputation** - HWD shall refrain from making any derogatory and knowingly false or misleading statements or representations about the Formulas created by AG.

**5.3.  Taxes** - HWD Agreements to be responsible for any and all sales and/or use taxes arising from Distributor's sale of the Formulas related to this Agreement.

## 6.  AG RESPONSIBILITIES

**6.1.  Production** - AG shall produce and deliver the Formulas in accordance with the terms of this Agreement.

**6.2.  Reputation** – AG shall refrain from making any derogatory or knowingly false or misleading statements or representations about the Formulas or HWD.

**6.3.  Product Support** - AG shall devote its best efforts to answer HWD, or its End-user questions delivered through HWD to AG, about the characteristics of the Formulas.

**6.4.  Referral Remuneration** – AG shall pay a 5% referral fee to HWD for AG retail customer purchases that are linked to a referral by Len Horowitz. This shall be reviewed at the end of every 3rd month, with the first review being completed after the last day of March, 2010, with payment to be sent by the 15th of April. This will be completed at the end of every third month following with payment sent by the 15th of the fourth month, under the scope of this agreement.

**6.5.  Drop Shipping** - AG will, whenever possible, drop ship for HWD with return address labels indicating HWD as the shipping entity.

**6.6.  Formula Changes** - AG will not change formula ingredients or production methods without notice and agreement in writing from HWD.

**6.7. Private Labeling for Liquid Dentist License** - AG agrees that Liquid Dentist will not be sold as a private label to any other entity than HWD, so long as there is a working, ongoing agreement between AG and HWD. AG reserves the right to sell Dentist in a Bottle through its regular retail, or non-private label channels. If HWD declines to distribute Liquid Dentist, or there is not an ongoing, working agreement between HWD and AG, AG maintains sole formulation and all distribution rights of Liquid Dentist under AG's Dentist in a Bottle or subsequent names that correspond to AG's dental formula.

## 7.  RESTRICTIONS

**7.1.**  HWD Agrees that this Agreement and the terms found herein are confidential information and further Agrees not to make such information known to any third party.  Excluded from this clause is information which HWD is legally required or compelled to disclose.

**7.2.**  HWD shall not license or sublicense the formulas, or any Derivative Products substantially similar to the formulas to any end users or third parties without prior written permission from AG.

## 8.  OWNERSHIP OF PRODUCTS, FORMULAS, AND TRADEMARK

**8.1.**  All right, title and interest in and to the Products, Formulas, and the AG Trademark shall be owned exclusively by AG.

## 9.  TERM OF AGREEMENT

**9.1.**  This Agreement shall commence on the date hereof and may be terminated only in accordance with Section 10.

## 10. TERMINATION

**10.1.** AG shall have the right to terminate this Agreement within 30 days upon their discretion with written notice or upon the following:

**10.2.**   (i) if HWD is in material default of any term and condition of this Agreement (other than default in the payment of license fees) and fails to cure and remedy such default within 30 days of receipt on notice of such default describing the default in reasonable detail and identifying the actions requested to cure or remedy such default; or

(ii) if HWD defaults in the payment of the formula fees set forth in Exhibit A, Section B and fails to cure any such default within ten (10) business days after HWD has received specific written notice thereof from AG.

**10.3.** HWD shall have the right to terminate this Agreement pursuant to Section 6.1 or if AG is in material default of any term and condition of this Agreement and fails to cure and remedy such default within 30 days of receipt on notice of such default describing the default in reasonable detail and identifying the actions requested to cure or remedy such default. This clause does NOT remove any obligation of the HWD to compensate AG for expenditures related to the fulfillment of an order placed by the HWD with AG.

**10.4.** This Agreement is automatically terminated if either party ceases to function as a going concern or if receivership, bankruptcy or insolvency proceedings are initiated.  This clause does NOT remove any obligation of the HWD to compensate AG for expenditures related to the fulfillment of an order placed by HWD with AG.

## 11.  EFFECTS OF TERMINATION

**11.1.** If this Agreement is terminated by AG pursuant to Section 10.1 above or by HWD pursuant to Section 6.1, then the HWD Agreements to:

    (a)    immediately stop presenting itself to End-users as a distributor of the Formulas.

    (b)    pay to AG all payments due or accrued under this Agreement.

    (c)    provide an affidavit signed by an officer of the HWD attesting to the performance of all elsewhere in this Agreement terms in Section 11.1 and acknowledging the continuing obligations of confidentiality as stated.

**11.2.** In addition to any other rights and obligations set forth in Section 11.2, the rights, duties and obligations set forth in Sections 7, 8, and 11 through 21 of this Agreement shall survive the termination of this Agreement.

## 12.  DISCLAIMER

**12.1.** AG provides its Formulas on an "AS-IS" basis. There are NO express or implied warranties of fitness or merchantability given in connection with the sale or use of this product, even if AG was advised of such purpose. Any and all warranties, representations or guarantees with respect to the Formulas whether written, orally given or implied are hereby overridden and disclaimed. AG's liability with respect to the use of any Formulas shall in any case be limited to the cost of replacement of the originally ordered Formula. In no event will AG be liable for any damages, either direct, indirect, special or consequential including lost profits, resulting from any defect in the Formulas or their use.

## 13.  CONFIDENTIALITY

**13.1.** AG and HWD mutually acknowledge that by reason of their relationship with one another, each may have access to certain Confidential Information and materials of the other's business, plans, customers, formulas, technologies, and products/programs. The parties hereby Agreement that each will not use in anyway for its own account or for any third party, nor disclose to any third party, any such Confidential Information revealed to it by the other. Each party shall take every reasonable precaution to protect the confidentiality of such information. Before releasing any information, the disclosing party shall advise whether or not it considers any such information to be confidential. The receiving party shall not publish any technical description of the disclosing party's products/programs beyond the description provided by the disclosing party. Notwithstanding any provision in this Agreement to the contrary, either party may disclose Confidential Information if such disclosure is compelled or required by applicable laws, statutes or regulations.

## 14.  RELATIONSHIP BETWEEN PARTIES

**14.1.** Nothing in this Agreement shall be deemed to place the parties in a relationship of partners or joint ventures or agents of the other, and neither party shall have the power to obligate or bind the other in any manner whatsoever. The common enterprise between the parties shall be limited to the expressed provisions of this Agreement.

## 15.  NOTICES

**15.1.** Any formal notice required to be sent to a party shall be sent by courier, personal delivery, facsimile confirmed by regular mail or by certified or registered mail, return receipt requested, address as follows:

To HWD:

HWD : Healthy World Distributing
217 Cedar Street, Suite 326
Sandpoint, ID 83864
Attention: Dr. Len Horowitz


To AG:

AG : Ambaya Gold Health Products, LLC
105 Navajo Drive
Sedona, AZ  86336 USA
Attention:  Ambaya Martin

Any notice sent by personal delivery or by courier shall be deemed received on the date delivered to the receiving party's offices; if sent by facsimile, notice shall be deemed to have been received on the first business day on or after which the facsimile was sent and confirmation of receipt was received at the sender's facsimile; and if sent by certified or registered mail, on the fifth business day following the date on which it was sent.

## 16.  ASSIGNMENT

**16.1.** Neither party shall assign this Agreement in whole or in part or any right hereunder without the expressed written consent of the other party, not to be unreasonably withheld; provided, however, the assignment of this Agreement is expressly permitted in connection with the sale of substantially all of the assets of such party, or an operating division of such party.

## 17.  ENTIRE AGREEMENT

**17.1.** This Agreement and any exhibits, appendices, schedules or attachments hereto shall constitute the entire Agreement between the parties pertaining to the subject matter hereof, and all other proposals, negotiations, Agreements, understandings, representations, warranties, and writings are superseded hereby. All exhibits, appendices, schedules and attachments referred to herein and attached hereto are incorporated herein by reference. Any contrary provision in any purchase order or other communication by AG is expressly rejected.  Any amendment to this Agreement shall only be effective if reduced to writing and executed by authorized officers of the parties.

## 18.  SEVERABILITY

**18.1.** If any provision hereof is invalid, illegal, or unenforceable under any applicable statute or rule of law, it is to that extent to be deemed omitted.  The remainder of the Agreement shall be valid and enforceable to the maximum extent possible.

## 19.  AUTHORITY TO SIGN

**19.1.** The undersigned individual signing this Agreement on behalf of AG represents and warrants to HWD that he or she is duly authorized to execute the Agreement on behalf of AG, and that this Agreement is the valid, binding and enforceable obligation of AG in accordance with its terms.

**19.2.** The undersigned individual signing this Agreement on behalf of HWD represents and warrants to AG that he or she is duly authorized to execute the Agreement on behalf of HWD, and that this Agreement is the valid, binding and enforceable obligation of HWD, in accordance with its terms.

## 20.  GOVERNING LAW

**20.1.** This Agreement and any and all claims that may arise related to this Agreement shall be governed by, construed and enforced in accordance with the laws of the State of Arizona, USA.

## 21.  DISPUTE RESOLUTION

If a dispute arises out of or relates to this Agreement, or a breach thereof, and if the dispute cannot be settled through negotiation, the parties Agreement first to try in good faith to settle this dispute by mediation administered in the state of Arizona.

**IN WITNESS WHEREOF**, the parties have executed this Agreement by their duly authorized representatives.

**Amabya Gold Health Products, LLC**                **Healthy World Distributing, LLC**

By: _____                By: _____

_____                Leonard G. Horowitz, Overseer, Managing
Membet
Title:                                                            Title:

_____                ___Feb. 12, 2010_____
Date:                                                             Date:

## EXHIBIT A
## PROVIDED FORMULAS DESCRIPTIONS AND FEES

<u>Section A –Provided Bottled and Labeled Formulas</u>

AG will manufacture and license the following Healthy World Distributing labeled Formulas:

PrimoLife
Zeolife
Liquid Dentist
ElectrOEnzymes
Love Minerals
OxyAdvantage

<u>Section B – Fees</u>

| Formula Name | Size | Price | Minimum Quantity Order |
|---|---|---|---|
| PrimoLife | 32 oz | $14.82 | 148 Bottles |
| ZeoLife | 8 oz | $7.95 | 122 Bottles |
| Liquid Dentist | 16 oz | $14.95 | 211 Bottles |
| ElectrOEnzymes | 16 oz | $12.95 | 132 Bottles |
| Love Minerals | 8 oz | $9.95 | 168 Bottles |
| OxyAdvantage | 1 oz | $6.95 | 156 Bottles |

Pricing includes:
Formula ingredients and production
Bottles
Label Application (labels provided by HWD)
Boxing

Pricing does not include:
Any Applicable Shipping Fees
Any Applicable Taxes

**Minimum Order Requirements:**
HWD agrees to order formulas in the minimum quantities specified in Exhibit A, Section B

**Pricing Reviews:**
Due to fluctuations in ingredient costs, AG will review current formulation costs on a 120 day basis. If it is deemed necessary to change any current pricing, AG will notify HWD in writing of any price adjustments which will take effect 30 days after notification by AG to HWD and approval by HWD in writing to AG.

<u>Section C - DISTRIBUTOR PAYMENT TERMS</u>

Total cost of each of the formulas ordered by HWD to be paid before product manufacturing and bottling commences.

AG will ship the formulas within 16 business days from the day of ordering by Health World Distributing.

Any cancelled orders after production commences for any current orders must be paid in full by HWD.

Shipping and taxes are not included in the formula purchase prices.

**From:** tetra@tetrahedron.org
**Subject:** **Re: URGENT from Len**
**Date:** November 9, 2009 6:27:37 PM HST
**To:** Leonard Horowitz <len15@mac.com>

That really bothers me to hear this.
I believe they might be selling to John Kreitzer as well. ZeoLife??
I am also a little disgusted at WE for not contacting us. I gave them
bottles of product and we discussed them carrying our products. We
purchased 75 of 3 CDs of theirs. That was an over $2000 purchase that she
has not reciprocated.

Jackie

RE: Need Exclusive Written Distributorship Agreement

Ambaya,

First, before, I get into the heart of this mail, I never got a reply
from you regarding a mail I sent to you on Nov. 3 regarding another
Liquid Dentist complaint we received from one of our affiliates.
Perhaps you have been consumed by your moving, and will get to it. I
was looking for reassurances that the formula had not changed again
because the customer complained about the inconsistency. I have not
been able to reply to this affiliate because you have not replied to
me with information to comfort them.

Today I had a VERY revealing and saddening conversation with our
Sister White Eagle, who just happened to mention her company was
purchasing MW's products. I am very, very hurt and disappointed that
you would not have instructed her to contact me to work out a
wholesale distributorship through Healthy World Distributing, LLC,
since I introduced you and hosted your meeting in Hawaii. (I handle
WE's CDs and DVDs in our store, and I have been promoting her as I
have been promoting MW's work.) So it feels like a real stab in the
back that my love and business support was completely neglected by you
in negotiating WE's wholesale account.

You could have kindly said, "Thank you so much for your interest in
carrying MW's products, however, Len introduced us, his company
handles our products, he is setting up affiliates and wholesale
accounts that provide between 40 and 50% discount to distributors, so
let's bring Len into this conversation."

Instead, you chose to completely neglect me, and this was not the
first time you have done this. Christopher Chabot was my contact as
well that you felt compelled to neglect noticing me, or including me,
in your sales agreements with Christopher. I complained about this
insensitivity previously to you, but you never gave me any tangible
reassurances that you would remedy that matter, and now you do it again.

EXHIBIT 2a.

We spoke, you and I, about a month ago, after I met another of your distributors who was selling Liquid Dentist, a product that I encouraged MW to formulate after sending him wonderful research that I had done to propose the great product. I worked for weeks developing that research and product concept, and then labored very long and hard developing the website and marketing copy to promote the product. My celebrity and name is out in the marketplace widely promoting this product, and I have very large plans to increase sales dramatically. So, I do not deserve to be disregarded in this way.

I am clear I need to have an exclusive on Liquid Dentist, and to have you refer people to Healthy World Distributing, LLC to administer the wholesale and retail accounts.

I am also clear that when I refer people to you, or that when people come to you because of the publicity I have generated on our mutual behalf, it is appropriate that those people bless our companies, financially and potentially in other ways, unlike what is happening now.

We need a written agreement detailing our responsibilities for manufacture and distribution, pertaining to wholesale and retail accounts, especially on Liquid Dentist, so that I have collaborators, not competitors, in a market that I am seriously investing in to co-create.

I understand that you are financially and administratively challenged and have not been able to implement what you told me was your goal when I began working with you and MW, that is, for you to be a manufacturer exclusively, and not a wholesaler or retailer. I understood, when we first began working together, that you intended for me to handle your distribution, and you said my alliance would enable you and MW to focus on manufacturing and formulating. You encouraged me then to be your main distributor. If this is still your position, then we need a written agreement for me to feel secure in light of being repeatedly neglected in sales agreements sourcing from my referrals and advertisements.

In the past, I mentioned to you contracting with me as your exclusive distributor, but I never pushed it because I honor your need for money coming into your company, and blessings of the products getting out to people in need, including Charles Holmes and others. However, I cannot continue to place a major share of my company's primary product line at risk of being undermined by competition you are creating that is freely using my endorsements and advertising copy to promote your/ their competing products.

This mail comes synchronous with our company launching www.healthyworldaffiliates.com

If you go online to this address you will see that 4-of-6 products

featured on the home page are yours. The
www.healthyworldambassador.com program that we are planning to launch
early in the New Year has an even greater percentage of your products
in the ambassador line.

Suffice it to say that I have been operating without a contract, based
on a handshake, and now realize that we need an agreement in writing
that reflects highest level sensitivity and integrity in our
relationship. Otherwise, we will both be disappointed and unable to
continue doing business.

If you would please reply to this mail in a timely fashion, because I
have hired additional staff to help implement sales campaigns
featuring your products, and this energy of disharmony is
inappropriate for the tasks before us.

Finally, we have a history of inconsistencies regarding MW's
visibility with me on the Internet. I initially was told by MW that he
"came out of hiding" because of me, and that he was bravely advancing
in the light of LOVE not fear. From this I felt most comfortable
openly promoting MW on my created websites and more. . . . When I
visited you in Sedona, you had a film crew that filmed me interviewing
MW, that they posted those 6 segments on YouTube. Those segments were
most favorably viewed by thousands of people who wrote very wonderful
things about MW and me together. I just went to locate those YouTube
clips and they were removed by someone, I assume, at your request. I
wish I had been informed of this, because I have been routinely
sending people to YouTube to view these segments to become familiar
with how wonderful MW is. Furthermore, many many other people have
been sending people to these segments too. Check this out:
http://www.worldviewzmedia.net/video/dr-len-horowitz-and-medicine
The man build a web page around part 1 and now it no longer plays.

Please call me at your earliest convenience, because these are matters
of great urgency to me and our company substantially impacting our
plans and my schedule. I am scheduled to film product infomercials
featuring several of your products over the next few days, that I am
now unsure I should do.

I am at 949-715-1520.

Much LOVE in 528,

Len

From: tetra@tetrahedron.org
Subject: **Re: URGENT from Len**
Date: November 10, 2009 1:01:03 PM HST
To: Leonard Horowitz <len15@mac.com>

jUST A COMMENT HE MADE a while ago. I let it go, but with WE and Chris chabot I remembered it.

J

What makes you think John is buying ZeoLife from them as well?

I am EXTREMELY UPSET. How incredible that people so close to us, who are supposedly so "conscious," and "loving," would stab us in the back like this. It blows my mind and seriously hurts my heart. I was so depressed yesterday after hearing this, I prayed for Ambaya, and then felt like crying all night. I went out with Aria and Sherry and ordered a margarita to help ease the pain.

Len

On Nov 9, 2009, at 8:27 PM, tetra@tetrahedron.org wrote:

That really bothers me to hear this.
I believe they might be selling to John Kreitzer as well. ZeoLife??
I am also a little disgusted at WE for not contacting us. I gave them bottles of product and we discussed them carrying our products. We purchased 75 of 3 CDs of theirs. That was an over $2000 purchase that she
has not reciprocated.

Jackie

RE: Need Exclusive Written Distributorship Agreement

Ambaya,

First, before, I get into the heart of this mail, I never got a reply from you regarding a mail I sent to you on Nov. 3 regarding another Liquid Dentist complaint we received from one of our affiliates. Perhaps you have been consumed by your moving, and will get to it. I was looking for reassurances that the formula had not changed again because the customer complained about the inconsistency. I have not been able to reply to this affiliate because you have not replied to me with information to comfort them.

Today I had a VERY revealing and saddening conversation with our Sister White Eagle, who just happened to mention her company was purchasing MW's products. I am very, very hurt and disappointed that you would not have instructed her to contact me to work out a

EXHIBIT 2b.

wholesale distributorship through Healthy World Distributing, LLC,
since I introduced you and hosted your meeting in Hawaii. (I handle
WE's CDs and DVDs in our store, and I have been promoting her as I
have been promoting MW's work.) So it feels like a real stab in the
back that my love and business support was completely neglected by
you
in negotiating WE's wholesale account.

You could have kindly said, "Thank you so much for your interest in
carrying MW's products, however, Len introduced us, his company
handles our products, he is setting up affiliates and wholesale
accounts that provide between 40 and 50% discount to distributors, so
let's bring Len into this conversation."

Instead, you chose to completely neglect me, and this was not the
first time you have done this. Christopher Chabot was my contact as
well that you felt compelled to neglect noticing me, or including me,
in your sales agreements with Christopher. I complained about this
insensitivity previously to you, but you never gave me any tangible
reassurances that you would remedy that matter, and now you do it
again.

We spoke, you and I, about a month ago, after I met another of your
distributors who was selling Liquid Dentist, a product that I
encouraged MW to formulate after sending him wonderful research
that I
had done to propose the great product. I worked for weeks developing
that research and product concept, and then labored very long and
hard
developing the website and marketing copy to promote the product. My
celebrity and name is out in the marketplace widely promoting this
product, and I have very large plans to increase sales dramatically.
So, I do not deserve to be disregarded in this way.

I am clear I need to have an exclusive on Liquid Dentist, and to have
you refer people to Healthy World Distributing, LLC to administer the
wholesale and retail accounts.

I am also clear that when I refer people to you, or that when people
come to you because of the publicity I have generated on our mutual
behalf, it is appropriate that those people bless our companies,
financially and potentially in other ways, unlike what is happening
now.

We need a written agreement detailing our responsibilities for
manufacture and distribution, pertaining to wholesale and retail
accounts, especially on Liquid Dentist, so that I have collaborators,
not competitors, in a market that I am seriously investing in to co-
create.

I understand that you are financially and administratively challenged

and have not been able to implement what you told me was your goal
when I began working with you and MW, that is, for you to be a
manufacturer exclusively, and not a wholesaler or retailer. I
understood, when we first began working together, that you intended
for me to handle your distribution, and you said my alliance would
enable you and MW to focus on manufacturing and formulating. You
encouraged me then to be your main distributor. If this is still your
position, then we need a written agreement for me to feel secure in
light of being repeatedly neglected in sales agreements sourcing from
my referrals and advertisements.

In the past, I mentioned to you contracting with me as your exclusive
distributor, but I never pushed it because I honor your need for
money
coming into your company, and blessings of the products getting out
to
people in need, including Charles Holmes and others. However, I
cannot
continue to place a major share of my company's primary product line
at risk of being undermined by competition you are creating that is
freely using my endorsements and advertising copy to promote your/
their competing products.

This mail comes synchronous with our company launching
www.healthyworldaffiliates.com
.
If you go online to this address you will see that 4-of-6 products
featured on the home page are yours. The
www.healthyworldambassador.com program that we are planning to launch
early in the New Year has an even greater percentage of your products
in the ambassador line.

Suffice it to say that I have been operating without a contract,
based
on a handshake, and now realize that we need an agreement in writing
that reflects highest level sensitivity and integrity in our
relationship. Otherwise, we will both be disappointed and unable to
continue doing business.

If you would please reply to this mail in a timely fashion, because I
have hired additional staff to help implement sales campaigns
featuring your products, and this energy of disharmony is
inappropriate for the tasks before us.

Finally, we have a history of inconsistencies regarding MW's
visibility with me on the Internet. I initially was told by MW that
he
"came out of hiding" because of me, and that he was bravely advancing
in the light of LOVE not fear. From this I felt most comfortable
openly promoting MW on my created websites and more. . . . When I
visited you in Sedona, you had a film crew that filmed me

interviewing
MW, that they posted those 6 segments on YouTube. Those segments were
most favorably viewed by thousands of people who wrote very wonderful
things about MW and me together. I just went to locate those YouTube
clips and they were removed by someone, I assume, at your request. I
wish I had been informed of this, because I have been routinely
sending people to YouTube to view these segments to become familiar
with how wonderful MW is. Furthermore, many many other people have
been sending people to these segments too. Check this out:
http://www.worldviewzmedia.net/video/dr-len-horowitz-and-medicine
The man build a web page around part 1 and now it no longer plays.

Please call me at your earliest convenience, because these are
matters
of great urgency to me and our company substantially impacting our
plans and my schedule. I am scheduled to film product infomercials
featuring several of your products over the next few days, that I am
now unsure I should do.

I am at 949-715-1520.

Much LOVE in 528,

Len

From: Ambaya Martin <ambaya@sacredhealth.net>
Subject: **Thanks!**
Date: November 12, 2009 5:57:19 PM HST
To: 'Leonard Horowitz' <len15@mac.com>

Hi Len,

I just wanted to say I am glad we talked yesterday and enjoyed getting clarity and re-connecting. I am always empowered by your ability to move with clear understanding and request it when necessary. I know that no matter what we deal with, the bottom line is relating and sound relationships.

*Going over our conversation last night with myself, I noticed that I may have never really gotten that anyone would want to "truly support me or my organization". I really don't think I have really gotten how much commitment you have to supporting the organization through the distributorship" Maybe there is a self love lesson here I need to learn or something, because I definitely come from acting as a lone ranger a lot, and may not fully recognize what is offered. In doing so, appear that I don't value the people offering. Strange, but maybe real since, I definitely feel deep love for you and Jackie, and yet by my keeping myself so busy and trying to do everything myself, I may not give the full possibility of each other's empowerment in a more efficacious way. Anyway, that is what I can see for now for myself along with everything else we talked about regarding and honoring the personal preferences and perceived necessities in which we run our business. I also know our "love affair" is not over and that we can learn and contribute to each other greatly through the opportunities we create for each other, which I very much look forward to.*

I also want to say thanks for the orders. We worked on Primo Life and Zeolife today, so we should have them out fast.

I look forward to meeting again, I don't know that the Denver date will work yet. I am trying to take MW with me to Boulder. If so it will be a lot easier to meet there, since I don't know if I will be in Sedona from the 28th to the 3rd. Let's keep in touch. Thank you also for the Hawaii invitation.

Please share this with Jackie, I don't know if she is the only one who receives her mail at her e-mail address.

Love to you and the family,
Ambaya


**Ambaya G. Martin**
**President**
**Ambaya Gold, LLC**

EXHIBIT 2c.

From:   tetra@tetrahedron.org
Subject:   **Ambaya what's going on there?**
Date:   November 14, 2009 5:51:23 AM HST
To:   len15@mac.com

What did Ambay say about White Eagle purchasing from them? About the Liquid Dentist competitor, etc.?

I asked Ambaya several times in the past for ingredients lists for the products we get from them to post on our site.
I found this on ambayagold website for Dentist in a Bottle:

Ingredients: monatomic activated fulvic, monatomic zeolite, monatomic silver (2000 ppm), proprietary essential oil blend (clove, cinnamon, eucalyptus, peppermint, thyme, lemon, wintergreen), stabilized oxygen concentrate, vegetable glycerin, lecithin, methylsulfonylmethane (pure MSM), plant-based phytonutrients, purified bio-photon restructured water, plant-based enzyme phytonutrients, himalayan crystal minerals, and 105 minerals, elements and amino acids - actinium, antimony, naturally occurring and beneficial arsenic, astat, barium, beryllium, bismuth, boron, bromine, cadmium, calcium carbonate, carbon, cerium, cesium, chloride, chromium, cobalt, copper, dysprosium, erbium, europium, naturally occurring and beneficial fluoride, fluorine, francium, gadolinium, gallium, germanium, gold, hafnium, holmium, hydrogen, indium, iodine, iridium, iron, lanthanum, lithium, lutetium, magnesium chloride, manganese, monatomic molybdenum, neodymium, neptunium, nickel, niobium, nitrogen, osmium, oxygen, palladium, phosphorous, platinum, plutonium, polonium, potassium, praseodymium, protactinium, promethium, radium, rhenium, rubidium, ruthenium, rhodium, samarium, scandium, selenium, silicon, silver, sodium, strontium, sulfur, tantalum, technetium, tellurium, terbium, thallium, thorium, thulium, tin, titanium, tungsten, uranium, vanadium, wolfram, ytterbium, yttrium, zinc, zirconium, plus the other elements found in sea water, alanine, arginine, aspartic acid, cystine, glutamic acid, glycine, histidine, isoleucine, leucine, lysine, methionine, phenylalinine, proline, serinine, threonine, tryptophan, tyrosine, valine.

Jackie

EXHIBIT 2d.

From: Christopher Warren <cwarren@ambayagold.com>
Date: January 21, 2010 3:24:31 PM PST
To: 'Leonard Horowitz' <len15@mac.com>, 'Ambaya Gold' <info@ambayagold.com>, 'Jackie Lindenbach'
<tetra@tetrahedron.org>
Cc: 'Sherri Kane' <sherrikane@gmail.com>, 'Art Thompson' <artthompson1@gmail.com>, 'Rhonda Goade'
<hwd8085@yahoo.com>, 'Pilar Martin' <ambaya@ambayagold.com>
Subject: **RE: Liquid dentist changed again**

Hi Len,

This morning I was swigging an extra bottle of Liquid Dentist from the 12-8
batch and thinking how good the formula was and your email popped up. I love
the synchronicity stuff but not with a headline like this one:).

I checked with MW and Ambaya today and they're emphatic that there's no
difference in the ingredients of the Liquid Dentist formulas. Ambaya and MW
work together on all the Liquid Dentist catalysts and have made sure to
maintain the formula as per spec.

Now, there may be some slight "taste" deviation from batch to batch due to
the nature of the ingredients - maybe on the new Liquid Dentist labels you
could state that?

There's an additional ingredient that can be added which will take the
lysozyme protection to the next level. I think it was suggested back in the beginning
formulation stages but there was a cost consideration? It will add slightly
to the cost of the formula, but will kick up the lysozyme protection. We can
discuss this early next week?

Also I that there might be a miscommunication about the OxyAdvantage. The
formula self adjusts to the body's PH and works to dramatically raise the
Oxygen levels in the body, but isn't an alkalizing formula. Concurrently, we
do have an Alkalizing formula that was created a few months ago that would
be a great addition to you line?

OK - looking forward to talking with you in more detail regarding all the
above.

Thank you,

Christopher Warren
928-282-1756
602-828-4910 Cell
cwarren@ambayagold.com
ambayagold.com


-----Original Message-----
From: Leonard Horowitz [mailto:len15@mac.com]
Sent: Thursday, January 21, 2010 10:04 AM
To: Ambaya Gold; Christopher Warren; Jackie Lindenbach
Cc: Sherri Kane; Art Thompson; Rhonda Goade
Subject: Liquid dentist changed again

Folks,

Liquid dentist changed again. (Now about 5 or 6 times.)

The new shipment tastes good, perhaps the best it has ever tasted--
subtle minty flavor.

But it definitely is not as powerful in terms of the feeling you get
on your teeth. The smoothness on your teeth, that lysozyme protection
that MW informed me about, seems to be about 40 percent less active.
Maybe 50%.

EXHIBIT 3.

Please respond to this concern as well as yesterday's mail regarding need for more OxyAdvantage info of pH dynamics.

Our sales team needs this.

And you really need to stop changing the formulations IF we are going to mutually prosper through growing markets. It occurs to me that God is GREAT, and all this changing formulation business reflects God's Grace in that we will not be prepared to serve large accounts IF we are unable to maintain consistency in formulations and quality control.

I have been wondering why we have not attracted large foreign accounts. This may be a prime spiritual reason... Protection. . . . Until we get it right and stop fixing what is not broken.

Aloha,

Len

Case 3:10-cv-08163-DGC   Document 33   Filed 10/12/10   Page 41 of 42



INSTITUTE FOR VIBRANT LIVING
IVL
PRODUCTS

Search

Sign In | Register
Checkout | Order Status

**1 (800) 720-1245**
24/7 Customer Support & Order Line
**Free Shipping on orders over $125!**

HOME    BEST SELLERS    NEW PRODUCTS    ALL PRODUCTS    OVERSTOCK    CUSTOMER SERVICE

Browse

by Brand

**Categories**

Blood Sugar

Bone Health

Brain Health

Detoxification

Digestive Health

Energy

Homeopathic - European Health

Ears|Eyes|Nose|Throat

Heart Health

Immune Health

Joint Health

Liquid Nutrition

Mens Health

pH Balance

Weight Management

All Products → q-hydrate528™- Rehydrate and Detoxify

### Get to the Vibrant Health You Want

q-hydrate528™ is a powerful combination of monatomic fulvic acid and zeolite that provides your body with all the trace minerals in their most perfect, readily absorbable form. These trace minerals include the important platinum group metals in association with the macro minerals such as magnesium and potassium. The fulvic acid, quickly and efficiently, carries the zeolite systemically throughout your body so it can start its vital detoxifying work.

View larger image

With the 1-2 punch of fulvic acid and zeolite, q-hydrate528™ may effectively detoxify, hydrate and nourish your entire body – not in hours, not in minutes but immediately!

**q-hydrate528™ benefits may include:**

* Enhance nutrient absorption
* Promote an electrical balance
* Remove toxic metals and acid waste
* Balance ph and clear your blood of acid waste

**Try q-hydrate528™ Risk Free Today!**

sign up for our newsletter

my email

go!

Need Help?
CHAT OFFLINE ›

YOUR SHOPPING CART

Your shopping cart is currently empty.

**Are you signed-up to receive Healthy Watch our newsletter?**

○ Yes
○ No

Vote

View Results   Share This

| Price Deals | Supplement Facts | Product Rating | Other Information |
|---|---|---|---|

| Deals | SKU | Price | Order | | |
|---|---|---|---|---|---|
| Order a 16 Month Supply (You save $340.20) | QH04 | **$299.00** ($18.69 each) | Qty: 1 | add to cart | |
| Order a 8 Month Supply (You Save $120.60) | QH03 | **$199.00** ($24.88 each) | Qty: 1 | add to cart | |
| Order a 3 Month Supply Plus Get 1 Month Free | QH02 | Regular Price: $159.80 On Sale For: $119.85 | Qty: 1 | add to cart | |
| Try a Risk Free Trial Offer (30 Day Supply -1 8oz. Bottle) | QH01 | **$39.95** | Qty: 1 | add to cart | |
| Autoship - Every 2 Months | QH01 | **$59.92** ($29.96 each) | Qty: 2 | add to cart | |

**Related Products**



**All Day Energy Greens™** - High Octane Energy for Health
Price: $39.95



**Go Ruby Go™** - Super Fruit Energy Drink
Price: $39.95

EXHIBIT 4

    

Home | FAQs | Return Policy | Privacy Policy | Contact Us | Site Map

These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat or cure any disease. You should always seek the advice of a healthcare professional before beginning the use of any treatment. KEEP OUT OF REACH OF CHILDREN.

Products containing secretagogue are not recommended for use by pregnant or nursing women, women trying to conceive, people taking prescription steroid drugs, anyone suffering from autoimmune disease, or anyone with a current or prior diagnosis of cancer.

IVL Products - Institute for Vibrant Living

Copyright © 2003-2010. All Rights Reserved.