UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| **Don Medicine Wolf,** | ) | |
| | ) | |
| Plaintiff, | ) | **CV 10-08163-PCT-DGC** |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | October 7, 2010 |
| **Ambaya Pilar Martin**, et al., | ) | |
| | ) | |
| Defendants. | ) | |

_____)

BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE

<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>

<u>TEMPORARY RESTRAINING ORDER HEARING</u>

Official Court Reporter:
Patricia Lyons, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 41
Phoenix, Arizona  85003-2150
(602) 322-7257

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                       **A P P E A R A N C E S**

2

3    For the Plaintiff:

4            Law Offices of Donald W. Hudspeth, PC
             By: **DONALD W. HUDSPETH,** ESQ.
5            By: **KRISTOPHER K. REZAGHOLI,** ESQ.
             3030 N. Central Ave., Ste 604
6            Phoenix, AZ  85012

7

             Law Office of Brian K. Stanley
8            By: **BRIAN K. STANLEY,** ESQ.
             1422 N. 44th St., Ste 111.
9            Phoenix, AZ  85008.

10

11

12   For the Defendants:

13           David R. Appleton Attorney at Law
             By: **DAVID R. APPLETON,** ESQ.
14           8711 E. Pinnacle Peak Rd., Ste 109
             Scottsdale, AZ  85255
15

16

17

18

19

20

21

22

23

24

25

13:35   1                              **I N D E X**

        2                           <u>**EXAMINATION**</u>

        3       <u>**WITNESS**</u>                                          <u>**PAGE**</u>

        4       LEONARD G. HOROWITZ (telephonically)

13:35   5               Direct Examination By Mr. Stanley           17

        6               Cross-Examination By Mr. Appleton           27

        7               Redirect Examination By Mr. Stanley         32

        8       DON MEDICINE WOLF

        9               Direct Examination By Mr. Stanley           34

13:35  10               Cross-Examination By Mr. Appleton           63

       11               Redirect Examination By Mr. Stanley         94

       12       SABRINA BARNETT

       13               Direct Examination By Mr. Stanley           98

       14               Cross-Examination By Mr. Appleton          101

13:35  15       KRISTEN WAKEMAN

       16               Direct Examination By Mr. Rezagholi        104

       17               Cross-Examination By Mr. Appleton          113

       18       AMBAYA MARTIN

       19               Direct Examination By Mr. Appleton         121

13:35  20               Cross-Examination By Mr. Stanley           126

       21                            <u>**EXHIBITS**</u>

       22       <u>**NUMBER**</u>      <u>**DESCRIPTION**</u>                       <u>**PAGE**</u>

       23        4          Criminal Docket Sheet                   82
                            Expanded
       24
                 6          Affidavit of FDA Investigator           82
13:35  25

# P R O C E E D I N G S

THE COURTROOM DEPUTY:  Civil case 10-8163, Don Medicine Wolf versus Ambaya Pilar Martin.  This is the time set for preliminary injunction hearing.

Please announce your presence for the record.

MR. STANLEY:  Brian Stanley for the plaintiff.

MR. REZAGHOLI:  Kris Rezagholi for the plaintiff.

MR. HUDSPETH:  Don Hudspeth for the plaintiff.

MR. APPLETON:  Good afternoon, Your Honor.  Dave Appleton representing the defendants.  Just wanted to note that Mr. Stanley has not filed a notice of appearance with the clerk's office at this time.

(The Court and the courtroom deputy confer.)

THE COURT:  Mr. Stanley, you cannot file this notice of appearance with us.  Is there a reason you didn't file it with the clerk before the hearing today?

MR. STANLEY:  I was -- I have to admit that the whole electronic filing regime is new enough to me that I simply forgot that they no longer hand file anything.  Actually, I'm not sure that that's true in all divisions.  But I had no idea that there would be a problem hand filing this and having the clerk scan it.  I don't know whether we can log onto the Internet with our laptop here and scan it and send it.

THE COURT:  Well, why is it you waited until today to

13:36    1    do this?

         2          MR. STANLEY:  Well, I was only brought in on the case

         3    last Friday, Your Honor.  I've been very -- I put that off as

         4    something I could do at the hearing because of the fact that

13:37    5    that's what was done in the past.

         6          THE COURT:  Are you admitted to practice in this

         7    court?

         8          MR. STANLEY:  I certainly am.

         9          THE COURT:  All right.  Well, I'm going to have you

13:37   10    file this electronically after the hearing today.

        11          MR. STANLEY:  Certainly, Your Honor.

        12          THE COURT:  We'll allow you to go forward.

        13          MR. STANLEY:  My oversight.  Not up to speed enough on

        14    all of the electronic things to realize it would be a problem.

13:37   15          THE COURT:  Okay.  Well, please get it filed after the

        16    hearing.

        17          MR. STANLEY:  Certainly.

        18          THE COURT:  All right.  Our purpose today is for a

        19    preliminary injunction hearing in this matter.  We previously

13:37   20    held a temporary restraining order hearing, at which time I

        21    heard some testimony.  But we're back today for consideration

        22    of the preliminary injunction.

        23          Mr. Stanley, am I to understand from where you're

        24    seated that you're going to be handling most of the matters

13:37   25    for the plaintiff?

13:38   1                    MR. STANLEY:  Yes, Your Honor.

        2                    THE COURT:  All right.  Why don't you tell me what it

        3        is you propose to do today in support of the preliminary

        4        injunction.

13:38   5                    MR. STANLEY:  Do you want an opening statement, Your

        6        Honor?

        7                    THE COURT:  Well, not yet.  Just tell me what it is

        8        you want to present or do today.

        9                    MR. STANLEY:  We want to present our evidence.  We

13:38   10       want to present the amended form of order that we're going to

        11       be proposing to the Court.  I guess we want to put on our

        12       evidence in support of a preliminary injunction.

        13                   THE COURT:  What is the evidence you wish to present?

        14                   MR. STANLEY:  We have five witnesses and not a whole

13:38   15       lot of exhibits, about seven or eight exhibits.

        16                   THE COURT:  Who are those witnesses?

        17                   MR. STANLEY:  They are Medicine -- Don Medicine Wolf,

        18       Leonard Horowitz; Sabrina Barnett, Kristen Willner -- Wakeman,

        19       excuse me.  Kristen Wakeman.

13:39   20                   THE COURT:  Say that again, please.

        21                   MR. STANLEY:  The last one?

        22                   THE COURT:  Yeah.

        23                   MR. STANLEY:  Kristen Wakeman.

        24                   THE COURT:  How do you spell that?

13:39   25                   MR. STANLEY:  W-A-K-E-M-A-N, I believe, Your Honor.

13:39   1                    THE COURT:  All right.  I think that's four.

        2                    MR. STANLEY:  It would only be those four, Your Honor.

        3                    THE COURT:  And how long do you think it would take to

        4       present that testimony?

13:39   5                    MR. STANLEY:  About an hour.  Maybe a little over.

        6                    THE COURT:  All right.

        7                    MR. STANLEY:  Leaving out the cross-examines, I guess.

        8                    THE COURT:  You said you had some exhibits,

        9       Mr. Stanley.  Have you provided them to the clerk for marking

13:40  10       ahead of time?

       11                    MR. STANLEY:  I believe we have not, Your Honor.

       12                    THE COURT:  All right.  Have you provided copies to

       13       defendant?

       14                    MR. STANLEY:  We have.  They're -- with one exception

13:40  15       they are the same as the exhibits that were attached to the

       16       petition for preliminary injunction.

       17                    THE COURT:  All right.  Then let's do this:  Let's

       18       refer to them on the record by the way they were identified

       19       when they were attached to the petition.

13:40  20                    MR. STANLEY:  Great, Your Honor.

       21                    THE COURT:  And that way we'll have a record of

       22       exactly what documents are being referred to.

       23                    MR. STANLEY:  That would simplify matters greatly,

       24       Your Honor.  Thank you.

13:40  25                    THE COURT:  All right.

13:40    1          All right, Mr. Appleton, tell me what it is you think

    2    you need to do today.

    3          MR. APPLETON:  Your Honor, should the Court wish to

    4    hear from Ambaya Martin again, she's available to testify.

13:41    5    Also, we have a Richard Brown who is available to testify.

    6          THE COURT:  All right.  Does either party wish to

    7    invoke the rule?

    8          MR. APPLETON:  Yes, Your Honor.

    9          THE COURT:  Okay.  Then I'm going to ask all witnesses

13:41   10    in the courtroom to step outside, with the exception of your

   11    first witness, Mr. Stanley, and I'm going to instruct the

   12    witnesses not to talk to each other about the testimony that's

   13    given here in the courtroom.

   14          MR. STANLEY:  Your Honor, learning that a principal

13:41   15    defendant may not be testifying today, I think I need to add

   16    another exhibit, then.

   17          THE COURT:  And what is that?

   18          MR. STANLEY:  It's the transcript of her testimony

   19    given in the proceeding in Yavapai County yesterday morning.

13:42   20          THE COURT:  Well, we can cross that bridge when we get

   21    to it.

   22          MR. STANLEY:  All right.

   23          THE COURT:  Let's start with whatever other evidence

   24    you wish to present.  Did you want to make --

13:42   25          MR. STANLEY:  I just didn't want to be accused of any

13:42   1   unnecessary surprise, Your Honor.

2           THE COURT:  That's fine.  Did you want to make a brief

3   opening statement, Mr. Stanley?

4           MR. STANLEY:  I did, Your Honor.

13:42   5           THE COURT:  Okay.  Go ahead, please.

6           MR. STANLEY:  As the Court has already noted, we're

7   here on the preliminary injunction in this case.  Our client,

8   Don Medicine Wolf, believes that there are trade names and

9   trade secrets -- the trade secrets he developed, the trade

13:42  10   names are associated with the products used, or created using

11   the trade secrets he developed.

12           We will be seeking leave of Court to amend the

13   complaint to include an express count for an oral contract --

14   excuse me, oral partnership.  But let me --

13:43  15           THE COURT:  Well, let me make clear that's not part of

16   the case today, Mr. Stanley, so we shouldn't be addressing it

17   as part of the grounds for preliminary injunction.  I can only

18   act upon what's in the complaint today.

19           MR. STANLEY:  Yeah, I believe the contract count,

13:43  20   liberally construed, would actually cover it, so I think we're

21   okay on that.  Just nailing down our theory, we will be wanting

22   to do that amendment.  But the partnership agreement is simply

23   a contract and it's arguably within the scope of the contract

24   clause that's in the current pleadings.

13:43  25           There are a number of facts about which there is no

13:43    1    real controversy in this case, Your Honor.  There is a
        2    business that has been operating out of the Sedona area since
        3    1977 [sic] conducting growing trade in the sale of mineral
        4    health supplements.  That business used initially the trade
13:44    5    name Sacred Health as the brand name for its products.  Later,
        6    because of concerns over possible infringement claims from
        7    some entities the principles had not been aware of, they
        8    chose -- when they chose the Sacred Health brand name, the
        9    business began using the name Ambaya Gold as the brand name
13:44   10    for its products.  And that is the brand name the same
       11    business is using today.
       12         The business had a product list of about a dozen
       13    products that it was selling, and each under a certain trade
       14    name when it was using Sacred Health brand name.  Under the
13:44   15    Ambaya Gold brand name it continues to sell the same or
       16    essentially the same products under the same product trade
       17    names today.  Although today it has added four additional
       18    products it was not selling under the Sacred Health brand.
       19    With respect to those additional products, we are not seeking
13:45   20    any relief here, so those don't really count.
       21         The particular products, there are actually nine in
       22    number, we'll go over the product names in due course, are the
       23    products we're here concerned with and I'll just refer to them
       24    by shorthand as the Sacred Health products.
13:45   25         I don't think there's any controversy, as I said, as

13:45  1    to those basic facts.

       2            There are some further facts of --

       3            THE COURT:  Let me interrupt you on that.  What was

       4    the date you gave for the start?  I thought you said 1997 or

13:45  5    1977?

       6            MR. STANLEY:  I'm sorry, Your Honor.  I did say -- I

       7    meant 2007.

       8            THE COURT:  All right.

       9            MR. STANLEY:  I just put that in to see if you were

13:45  10   listening, Judge.

       11           There were some further facts about which there

       12   should be no real controversy because they can establish --

       13   they can be established from the statements of the principal

       14   defendant herself.  First, the formulas and procedures used to

13:46  15   make the Sacred Health products are highly proprietary and

       16   confidential.  The precise components and exact way they're

       17   put together are special and valuable information that has

       18   been kept confidential by this business and are important to

       19   its commercial success.

13:46  20           And, second, those formulas and procedures were

       21   created through the scientific knowledge and painstaking

       22   labors of the plaintiff, Don Medicine Wolf.  They're his

       23   formulas and procedures in the sense that he created and

       24   developed them.

13:46  25           Those facts may be contested here, but they're shown

13:46   1   by the statements of the witness -- the defendant Ambaya

2   Martin, also known as Pilar Martin.

3           So that leaves us to the matters that are in

4   controversy.  We contend -- well, return for a moment to the

13:47   5   matters that aren't in controversy.  It is uncontested that

6   Don Medicine Wolf and Ambaya, also known as Pilar, Martin were

7   domestic partners.  And for some period of time they lived

8   together as man and woman, as a couple.

9           Now, plaintiff will testify that he and Ambaya were

13:47   10  life partners.  This whole business, this Sacred Health/Ambaya

11  Gold health products business grew out of that relationship;

12  they were equal partners in the whole business.  He will

13  testify they mutually agreed to be equal partners in this

14  business.

13:47   15          There's no controversy, again, that Ms. Martin has

16  also been the sole member of Sacred Health, LLC, and Ambaya

17  Gold Health Products, LLC.  Two limited liability companies

18  that she formed entirely on her own.

19          Plaintiff will testify that he has no head for

13:48   20  business matters and trusted such matters entirely to his life

21  partner, Ambaya.

22          The plaintiff contends that in addition to being the

23  creator and developer of these proprietary formulas and

24  procedures, he has always been rightfully at least a half

13:48   25  owner of the same, considered as industrial property.

13:48  1    Obviously, to the extent we succeed in showing that, he will

2    be entitled to some share of the profits from the exploitation

3    of those formulas and procedures.  That, we believe, will

4    satisfy the Court that there's a likelihood of success on the

13:49  5    merits.

6         The exact relief that the plaintiff will be

7    requesting, then, I would prefer to discuss at the closing

8    comments.

9         THE COURT:  All right.  That's fine.

13:49  10        Mr. Appleton.

11        MR. APPLETON:  Thank you, Your Honor.

12        I think Your Honor will find that this hearing will

13   flesh out in greater detail what was already begun at the TRO

14   hearing.  The plaintiffs will be unable to establish either

13:49  15   legally or factually that the plaintiff has any proprietary

16   rights to any of these alleged formulae.

17        We believe that the plaintiff is unworthy of

18   credibility; that he has a history of criminal conviction,

19   including making false declarations to a federal court and

13:49  20   making false statements to law enforcement; that plaintiff

21   will not suffer any harm if an injunction is denied, yet if an

22   injunction is granted, significant hardships will fall upon

23   defendants.  Public policy in this case favors the defendants.

24   And based on all of the facts that will be elicited, we

13:50  25   believe that it would be inappropriate for the Court to enter

13:50    1    preliminary injunction.

         2            Thank you, Your Honor.

         3            THE COURT:  All right.  Thank you.

         4            Mr. Stanley, let's call your first witness.  We're

13:50    5    going to have to move efficiently through both the direct and

         6    cross-examination in order to get this done in the next couple

         7    of hours, so I would encourage you to get right to the point.

         8            MR. STANLEY:  Yeah, Your Honor, may we know how much

         9    time was actually allotted for this hearing?

13:50   10            THE COURT:  Well, I'd like to get it done in about two

        11    hours.

        12            MR. STANLEY:  Okay, Your Honor.  Certainly do my best

        13    to move along --

        14            THE COURT:  I think that should be enough time to get

13:50   15    into all of this.

        16            Who is your first witness, Mr. Stanley?

        17            MR. STANLEY:  Don Medicine Wolf.

        18            THE COURT:  All right.  Hold on just a minute, please.

        19            (The Court and the courtroom deputy confer.)

13:51   20            THE COURT:  Mr. Stanley, have you got a witness on the

        21    phone?

        22            MR. STANLEY:  Co-counsel was just reminding me of that

        23    fact, Your Honor.  He was supposed to call in at 1:30.  I

        24    didn't realize he was supposed to call in right at the

13:51   25    beginning of the hearing.

13:51    1              THE COURT:  He's on the phone.

         2              MR. STANLEY:  We'd like to take him out of order,

         3    then, Your Honor.

         4              MR. APPLETON:  Your Honor, I'd object to telephonic

13:51    5    testimony.  First of all, it doesn't give the Court an

         6    opportunity to observe the demeanor of the individual.  I don't

         7    know if he's going to be reading from a script.  So I would

         8    feel that we're not accorded adequate opportunity to

         9    cross-examine somebody by the telephone.

13:52   10              THE COURT:  All right.  I understand that objection.

        11    I'm going to overrule it and permit the witness to testify.

        12              (The witness joined proceedings telephonically.)

        13              THE COURT:  All right, do we have Mr. Horowitz on the

        14    phone?

13:53   15              THE WITNESS:  Yes, hi.

        16              THE COURT:  All right.

        17              Mr. Stanley, I'm going to have you come to the

        18    lectern to do this because you need to be speaking right into

        19    the mike for the witness to hear what you're saying.

13:53   20              Similarly with you, Mr. Appleton.  If you make an

        21    objection or you wish to say something, make sure you talk

        22    right into the mike.  And I'll have you come to the lectern

        23    for cross-examination.

        24              The first thing we need to do is swear the witness

13:54   25    and I'm going to ask Lisa to do that.

```
13:54   1              THE COURTROOM DEPUTY:  Please raise your right hand.

        2              THE COURT:  Is your right hand raised, Mr. Horowitz?

        3              THE WITNESS:  Yes, it is, sir.

        4                      LEONARD G. HOROWITZ,

        5    called as a witness herein, after having been first duly sworn

        6    or affirmed, was examined and testified as follows:

        7              THE COURT:  Go ahead, Mr. Stanley.

        8              MR. STANLEY:  Thank you, Your Honor.

        9                 D I R E C T   E X A M I N A T I O N

13:54  10    BY MR. STANLEY:

       11    Q   Can you state your full name for the record, please, sir.

       12    A   Yes.  My name is Leonard George Horowitz.

       13    Q   What is your occupation?

       14    A   I'm an internationally known authority in public health,

13:54  15    behavioral science, and emerging diseases.

       16    Q   Do you have any degrees in any of those fields?

       17    A   Yes, sir, I do.

       18    Q   Okay.  You said you're in the field of public health?

       19    A   Yes, sir.  I have a Harvard degree in public health,

13:55  20    masters in public health following my doctorate in medical

       21    dentistry from Tufts University.

       22    Q   Okay.  But the actual field of commerce you're engaged in

       23    now is what?

       24    A   The subject matter deals with natural healing.  I'm a world

13:55  25    leading authority in advancing the variety of formulas that
```

13:55  1   involve energy resonance frequency such as 528.  I'm a -- I

2   also have a doctorate in a naturopathic medicine and I have --

3   I'm a co-author of many publications in the field.

4   Q    Okay.  Well, why we're here in court for today is -- deals

13:55  5   with commercial property, industrial property, trade secrets.

6   So we're impressed by your academic background but you're

7   involved in the field of commerce, right, Mr. Horowitz?

8   A    Yes, sir.

9   Q    Dr. Horowitz.

13:56  10   A    Yes, sir.

11   Q    And that would be the health supplements, herbal

12   supplements?  How would you characterize it?

13   A    Yes, I have a couple different companies that I oversee as

14   a managing member of LLCs, including healthyworldstore.com, and

13:56  15   healthyworlddistributing.com that involve a variety of natural

16   remedies for various health issues.

17   Q    All right.  So would it be fair to say the sale of herbal

18   supplements and mineral supplements, health supplements

19   generally, is the field you're involved in?

13:56  20   A    Yes, sir.

21   Q    And how long have you been involved in that field?

22   A    Oh, probably about 25 to 35 years, somewhere in there.

23   Q    Would you say you have nationwide scope of exposure and

24   associations in that field of industry?

13:57  25   A    I would say international.

13:57   1    Q    Okay.

        2    A    I'm -- my work is not only in North America, Europe, I've

        3    traveled extensively and been invited to speak many places.

        4    Q    Okay.  Can you tell us when you heard, first heard, about

13:57   5    Don Medicine Wolf.

        6    A    I believe it was during the 1990s, early 1990s and -- or

        7    mid 1990s.

        8    Q    Okay.  And in what connection did you hear his name?

        9    A    I frequently receive phone calls by people who talk not

13:58  10    only about industry products and what's happening that's

       11    cutting edge, but I'm also approached by people who want me to

       12    help them bring their products to market.  And there was a

       13    buzz, I can't recall exactly who it was, but I had heard the

       14    name Dr. Medicine Wolf as a native aboriginal healer and his

13:58  15    work in what's called ORMEs technology that's pretty cutting

       16    edge dealing with my area of expertise, resonance frequency and

       17    electron spin.

       18    Q    Excuse me.  For the benefit of our court reporter here, you

       19    said ORME.  Is that --

13:58  20    A    Yes.  O-R-M -- O-R-M-E-S.  It stands for orbitally

       21    rearranged mono-atomic elements.

       22    Q    Okay.  Did you also come to know about or meet Ambaya or

       23    Pilar Martin at some point in time?

       24    A    Yes, sir.

13:59  25    Q    Do you know when that was?

13:59   1    A   I believe that was in 2007, but I'd have to recheck my

        2    notes on it.  I remember it was in Sedona, Arizona at a special

        3    holistic conference and meeting.

        4    Q   Okay.

13:59   5    A   I think it was called the Raw Spirit Festival.

        6    Q   Okay.  Did you learn at that time that Medicine Wolf and

        7    Ambaya Martin or Pilar Martin were working together?

        8    A   Yes, I did.

        9    Q   And in what context did you acquire that information?  Was

13:59  10    this a business or proposed business relationship of some kind

       11    that was being talked about?

       12         MR. APPLETON:  Objection, calls for hearsay.

       13         THE COURT:  All right, you need to -- let's have you

       14    sit and say that so the witness can hear you.

14:00  15         You say this is a hearsay objection?

       16         MR. APPLETON:  Yes, Your Honor.

       17         THE COURT:  Hold on just a minute, Mr. Horowitz.

       18         Overruled.

       19         You can answer, Mr. Horowitz.

14:00  20         THE WITNESS:  It was a partnership.  I was introduced

       21    to them.  They were next to my booth.  We both had booths

       22    adjacent one another.  And Ambaya Martin came over to me,

       23    introduced herself.  I had a number of people at my booth.  I

       24    typically have a lot of people come to speak with me.  And she

14:00  25    came over.  I had never met Medicine Wolf.  She came over,

14:00    1    introduced herself, and she told me to come over to speak with

         2    her partner, and that's when I met Don Medicine Wolf.

         3    BY MR. STANLEY:

         4    Q    Okay.  Now, did there develop -- excuse me -- eventually

14:01    5    develop a business relationship between your business operation

         6    and theirs?

         7    A    Yes.  I did.  And it was really love at first meeting.  We

         8    were --

         9    Q    Okay.

14:01   10    A    We were all very much in agreement.

        11    Q    Excuse me.  Mr. -- Dr. Horowitz, our time is very limited

        12    and we need to try and just get to the point.  So if I cut you

        13    off after you've given me a yes or no answer, it's not because

        14    I'm trying to be curt; I'm just trying to move on.

14:01   15    A    I'm sorry.  Yes.

        16    Q    You -- the nature of that relationship was that you were

        17    distributing products that were produced by their business?

        18    A    Correct.

        19    Q    The -- now, was there a brand name they were using when

14:02   20    they first started selling products through your

        21    distributorship?

        22              MR. APPLETON:  Object to foundation.

        23              THE COURT:  Overruled.

        24              THE WITNESS:  Yes.

        25

14:02    1    BY MR. STANLEY:

         2    Q    What was that brand name?

         3    A    Sacred Health.

         4    Q    All right.  And so at a later date did that brand name

14:02    5    change?

         6    A    Yes.

         7    Q    And the labels started saying something else, right?

         8    A    Ambaya Gold.

         9    Q    Okay.  Did you know anything about what the reason for that

14:02   10    change was?

        11          MR. APPLETON:  Objection, calls for speculation and

        12    hearsay.

        13          THE COURT:  Overruled.

        14          THE WITNESS:  Yes.

14:02   15    BY MR. STANLEY:

        16    Q    Okay, and what is it that you knew?

        17    A    I was informed that it was a protective measure --

        18          MR. APPLETON:  Objection.

        19          THE COURT:  Hold on just a minute, Mr. Horowitz.

14:02   20          Now we're getting into hearsay, so I'm going to

        21    sustain the objection as to this answer.

        22          MR. STANLEY:  Okay.

        23    BY MR. STANLEY:

        24    Q    Now, did you feel as a distributor that -- let me back up.

14:03   25          Were you informed that there was to be any change in

14:03   1   the formulas of the products that were being sold from the time

2   it was a Sacred Health brand name to the Ambaya Gold brand

3   name?

4   A    No.  And that would be a violation of our contract.

14:03   5   Q    Now, is it your observation from your experience as a

6   distributor that the Sacred Health products have -- are salable

7   commercially?

8   A    Yes.

9   Q    And is that because of their formulation?

14:03   10  A    Absolutely.

11  Q    Okay.  And generally in the industry is the formulation and

12  the precise mode of manufacture or production important in

13  ensuring the commercial acceptability of the product?

14  A    Critical.

14:04   15  Q    Now, I'll ask you this.  If you were here in the courtroom

16  I'd try to show you a physical exhibit, but do you recall -- in

17  your work as a distributor, you saw the actual bottles that

18  were being sold, correct?

19  A    Correct.

14:04   20  Q    Do you recall whether there was a little likeness of

21  somebody on many of the Sacred Health bottles?

22         MR. APPLETON:  Object to foundation.

23         THE COURT:  Overruled.

24         THE WITNESS:  I can recall there was a logo on the

14:04   25  Sacred Health bottles.  It was a Native American symbol, I

14:04   1    believe.

2    BY MR. STANLEY:

3    Q   All right.  Well, it's a little tiny picture, we'll have

4    the exhibit later, so --

14:05   5        We'll move on from that.

6        But anyway, in the industry, was the Sacred Health

7    name associated with Don Medicine Wolf?

8    A   Yes.

9        MR. APPLETON:  Objection, leading.

14:05   10       THE COURT:  Sustained.

11   BY MR. STANLEY:

12   Q   Were there any personalities that the Sacred Health name

13   came to be associated with in the industry?

14   A   I believe Medicine Wolf and myself.  My name.

14:05   15   Q   All right.  Well, if the products that used to be sold

16   as -- let me ask you this.  The product -- let me ask you if

17   these are the trade names or the trade -- product trade names

18   of some of the products that you distributed first under the

19   Sacred Health brand name and then under the Ambaya Gold brand

14:06   20   name.

21       Ancient Beauty Toner Mist?

22   A   No.

23   Q   Brain Balance and Regeneration?

24   A   No.

14:06   25   Q   Essence of Life?

14:06    1    A    Yes.

        2    Q    ORME Oxygen+?

        3    A    Yes, under a different brand.

        4    Q    Under a different brand?

14:06    5    A    Yes.  May I make a clarification statement?

        6    Q    Sure.

        7    A    You're naming products of Medicine Wolf line that --

        8         MR. APPLETON:  I'm going to object to the narrative,

        9    that seems to be nonresponsive.

14:06   10         THE COURT:  Overruled.

       11         THE WITNESS:  -- that I took on and rebranded with a

       12    modification in formula that they impart 528 hertz frequency to

       13    create a new product line for our distribution organization.

       14    BY MR. STANLEY:

14:07   15    Q    All right.  Well, then, to your knowledge, though, let me

       16    change that question, because I realize you may have done

       17    something and then sold things under your own trade names.

       18    Were you aware that the Sacred Health/Ambaya Gold product line

       19    included these products, and I'll start reading again.

14:07   20         Ancient Beauty Toner Mist?

       21    A    I was aware that that was a Medicine Wolf product, correct.

       22    Q    Brain Balance and Regeneration?

       23    A    Yes, sir.

       24    Q    Essence of Life?

14:08   25    A    Yes.

14:08   1   Q   ORME Oxygen+?

2   A   Yes.

3   Q   ORME Probiotic?

4   A   Yes.

14:08   5   Q   ORME Zeolite?

6   A   Yes.

7   Q   Pet Health Plus?

8   A   I'm sorry, give me that again.

9   Q   Pet Health Plus?

14:08   10   A   Yes.

11   Q   Quantocyl, I may not be pronouncing that right.   Quantocyl

12   O+.

13   A   I was slightly aware of that.

14   Q   And Super-Conductive Ionic Minerals?

14:08   15   A   Yes.

16   Q   Okay.   Now, if that product line was associated in the

17   public mind or in the mind of members of the trade with

18   Medicine Wolf and the current producer of the same products

19   being sold under the Ambaya Gold brand name and the same

14:08   20   product trade names were to alter the formulation or fail to

21   follow the production procedures and produce products that were

22   less acceptable to the public as a result, would that have an

23   adverse impact on Medicine Wolf and his ability to in the

24   future compete in the industry?

14:09   25            MR. APPLETON:   Object to the form of the question.

14:09   1    Compound.

2                THE COURT:  Your objection is compound?

3                MR. APPLETON:  The question is compound.

4                THE COURT:  Overruled on that basis.

14:09   5                MR. APPLETON:  Assumes facts not in evidence.

6                THE WITNESS:  It would be a nightmare --

7                THE COURT:  Hold on, Mr. Horowitz.

8                THE WITNESS:  -- if that occurred.

9                MR. STANLEY:  Excuse me.  I will just rephrase, Your

14:09   10   Honor.

11   BY MR. STANLEY:

12   Q   What can happen to a person who is associated, whose name

13   and likeness or whose name and reputation has been -- has come

14   to be associated with a particular product line if that product

14:09   15   line isn't properly produced?

16   A   Can ruin their lives and careers.

17                MR. STANLEY:  That's all I have of this witness, Your

18   Honor.

19                THE COURT:  Cross-examination, Mr. Appleton.

14:10   20                MR. APPLETON:  Thank you, Your Honor.

21                    C R O S S - E X A M I N A T I O N

22   BY MR. APPLETON:

23   Q   Mr. Horowitz, you are currently distributing a number of

24   brands produced by Ambaya Gold, correct?

14:10   25   A   Correct.

14:10    1    Q    None of those brands use Medicine Wolf on their labeling,

2    do they?

3    A    I would like to just say no, but I would appreciate the

4    opportunity to clarify that statement.

14:10    5    Q    Well, I'm not asking for a lengthy explanation.  You get

6    the products from Ambaya Gold, do you not?

7    A    The answer is no, by Ambaya Gold's demand.

8    Q    Do you receive products from Ambaya -- any of Ambaya's

9    companies?

14:10    10    A    I do, yes.

11    Q    And you distribute those?

12    A    Yes, I do.

13    Q    And when you receive them, none of them have any labeling

14    that indicate Medicine Wolf on them, do they?

14:11    15    A    By Ambaya Gold official policy's demand.

16    Q    I'm sorry, I didn't understand your answer.

17    A    By demand.  In other words --

18    Q    I'm not asking you to tell us what you think somebody else

19    said, I'm asking you to --

14:11    20    A    No, I'm telling you what is the truth.

21    Q    I'm asking you whether or not those labels say anything

22    about Medicine Wolf.

23    A    Hold on for just a second.

24        I'm sorry for the interruption.  Give me that again,

14:11    25    please.

14:11   1   Q   Do any of the labels say Medicine Wolf?

        2   A   Any of the labels say Medicine Wolf.  No.  But, again,

        3   that's a policy that I don't agree with and yet I'm compelled

        4   to follow that policy.

14:11   5   Q   Now, you're a dentist by profession, correct?

        6   A   Yes and a naturopathic physician.

        7   Q   You indicated you're a world leading authority.  How do

        8   you -- how are you designated a world-leading authority?

        9   A   Just go into Google and search Dr. Leonard Horowitz and see

14:12  10   what is said about me all over the world.

       11   Q   So Google has enthroned you as a world-leading authority?

       12   A   How about peers.  I'm the editor in chief of Medical

       13   Veritas Journal.  If you read me CV, my curriculum vitae, I

       14   believe that I've earned that title.

14:12  15   Q   Now, do you believe Medicine Wolf is a credible source of

       16   information?

       17   A   I do.

       18   Q   Are you aware that he has claimed that he came up with a

       19   cancer treatment that is 100 percent effective?

14:12  20        MR. STANLEY:  Objection, assumes facts not in

       21   evidence.

       22        THE COURT:  Overruled.

       23        THE WITNESS:  The answer is I am aware that he has

       24   made those claims and I'm aware that there are many cures for

14:13  25   cancer.  Natural cures for cancer.

BY MR. APPLETON:

Q    Okay.  And yet you still think he's credible?

A    I not only think he's credible, I know he's credible.

Q    Okay.  Are you also aware that he has federal felony convictions?

A    I also know the game that you play to discredit the messenger rather than refuting his science and his research is an old game.

Q    So what is your answer, yes or no?

A    It would not disturb me to learn that he has a felony conviction for what you haven't told the Court.

Q    So are you aware that he has a conviction for introducing unapproved drugs into interstate commerce?

A    I applaud that because of the overstepped authority of the Food and Drug Administration and the regulatory agencies.

Q    Are you aware that he has trafficked in GHB, Gamma-Hydroxybutyric, also known as the date-rape drug?

        MR. STANLEY:  Objection, assumes facts not in evidence.

        THE COURT:  Overruled.

        THE WITNESS:  I'm not aware of that.  And I would believe, knowing Medicine Wolf as I do, that if he were engaged in any aspect of handling that substance, that it would be for humanity's benefit, for the benefit of his patients first, even before any financial considerations were made.

14:14     1   BY MR. APPLETON:

          2   Q    Are you aware that he's also trafficked in human growth

          3   hormone, Laetrile, testosterone, and Carbonylgruppen, RH-50,

          4   which is also known as fire ant extract?

14:15     5   A    I would expect him to be involved with those if he was

          6   involved in cutting-edge health science as well as having a

          7   well-stocked laboratory or resources to develop the finest

          8   products on the planet.

          9   Q    So do you believe that the FDA regulations in regard to

14:15    10   these substances are without merit?

         11   A    I believe that they're meritorious and also yet highly

         12   restrictive to freedom and health science.

         13   Q    Are you aware that -- are you aware of the aliases that

         14   Medicine Wolf has used?

14:15    15   A    I'm not, more than Don Wolf or Medicine Wolf.  I think he's

         16   commonly known and has been for as long as I've heard of him

         17   and known of him, as Medicine Wolf.

         18   Q    Are you familiar with the name Frank Dearborn?

         19   A    I'm not.

14:16    20   Q    Are you aware that Medicine Wolf has been convicted of

         21   making a false statement to law enforcement?

         22   A    I'm not aware of that and I'm sure that there's a context

         23   in which that might be explained.

         24   Q    Are you aware that Medicine Wolf has been -- has pled

14:16    25   guilty to making a false declaration to a federal court?

14:16    1    A    I'm not aware of that.

         2    Q    Would any of those factors affect your opinion of his

         3    credibility?

         4    A    I'd really have to closely examine it and I would have to

14:16    5    reserve judgment until all of the evidence is before me.

         6    Q    So you're saying it might affect your opinion of his

         7    credibility.

         8    A    There's a possibility.  But after knowing him and working

         9    with him as long as we have been, which is now several years, I

14:17   10    would, again, have to reserve judgment, and the amount of

        11    evidence would have to be very compelling.

        12         MR. APPLETON:  No further questions, Your Honor.

        13         THE COURT:  Any redirect?

        14              R E D I R E C T   E X A M I N A T I O N

14:17   15    BY MR. STANLEY:

        16    Q    Just a little clarification.  You were talking on

        17    cross-examination about the labels on the product you currently

        18    receive from Ambaya Gold; is that correct?

        19    A    Yes.

14:17   20    Q    And earlier we had been talking about the labels dating

        21    back as far as the Sacred Health period.

        22    A    Yes.

        23    Q    Now, I was a little unclear.  Did you say there are no

        24    labels or there are no labels only on the products that are to

14:17   25    be rebranded?

14:18   1   A   I'm a little confused in terms of the question.  Please

2   rephrase it.

3   Q   I understood you to say that either some or all of the

4   bottles you receive in shipments from Ambaya Gold currently are

14:18   5   not labeled at all.  Or they may have --

6   A   No, I understand that our company and staff produce the

7   labels in collaboration with Ambaya Gold.

8   Q   You put the labels on the bottles after they get to you?

9   A   I don't believe that that is the manner in which the

14:18   10   business is being conducted.  I was under the impression,

11   although you'll have to forgive me if I'm wrong, that the

12   labels and labeling is done in the Sedona facility and shipped

13   to our distribution --

14   Q   I misunderstood.  I thought you indicated that on the

14:18   15   rebrand -- do you still do the rebranding of some products?

16   A   We do.  We don't carry those products that you mentioned.

17   We have -- those products have been formulated by Medicine Wolf

18   exclusively --

19   Q   I see, okay.

14:19   20   A   -- and the only specific modification to my knowledge is

21   that we have absolutely certainly added a 528 hertz frequency

22   and on occasion when we --

23   Q   I misunderstood about the labels then.

24   A   I'm sorry?

14:19   25   Q   That's okay.  Thank you Mr. -- Dr. Horowitz.

14:19   1           THE COURT:  All right.  Thank you, sir.  That's all.

2           THE WITNESS:  Thank you.  May I leave the Court now?

3           THE COURT:  You may.

4           THE WITNESS:  Thanks a lot.

14:19   5           THE COURT:  Your next witness.

6           MR. STANLEY:  Medicine Wolf.

7           THE COURT:  Sir, would you come to the front of the

8    courtroom, please, to be sworn as a witness.

9           All the way up here, please, to the front.  Then

14:20  10    we're going to go up here.  Come here first, please.

11           THE COURTROOM DEPUTY:  Please state your name for the

12    record.

13           THE WITNESS:  Don Medicine Wolf.

14           THE COURTROOM DEPUTY:  Please raise your right hand.

15                     **DON MEDICINE WOLF,**

16    called as a witness herein, after having been first duly sworn

17    or affirmed, was examined and testified as follows:

18                  D I R E C T   E X A M I N A T I O N

19    BY MR. STANLEY:

14:21  20    Q   Can you state your name, sir.

21           THE COURT:  Let's have you speak from the lecturn, if

22    you would, please.

23    BY MR. STANLEY:

24    Q   Can you state your name, sir.

14:21  25    A   I am Don Medicine Wolf.

14:21    1    Q    Have you ever been known by any other name?

         2    A    Yes, I have.

         3    Q    And what name was that?

         4    A    Frank Dearborn.  My -- it is my adapted -- I have an

14:21    5    adopted nonnative name because I was adopted.

         6    Q    Okay.  You were adopted as a child by an Anglo family?

         7    A    Yes, I was.

         8    Q    All right.  And then after becoming an adult, you reassumed

         9    your Native American name?

14:22   10    A    We were banned from using our Native American names.

        11    Q    Well, you're getting a little ahead of me.

        12    A    Okay.

        13    Q    But the answer --

        14    A    My answer is yes, to your question.

14:22   15    Q    Okay.  And have you sometimes, though, used the Frank

        16    Dearborn name even after you reasserted your right to use the

        17    Medicine Wolf name?

        18    A    That is correct.

        19    Q    And why is that?

14:22   20    A    I am not good in business and some businesses require --

        21    Q    Well, what about when you were a child?  Were you told that

        22    you could not use your medicine -- your --

        23    A    Yes, I was.

        24    Q    -- Native American name for legal purposes?

14:22   25    A    It was banned to have anything to do with Native American

14:22   1   heritage or names or anything.

2   Q   So a Native American name would simply not be recognized on

3   paper?

4   A   That is correct, sir.

14:23   5   Q   All right.  You've taken a lifetime to completely overcome

6   that ancient prejudice of our society; is that correct?

7   A   I probably will never overcome it.

8   Q   What is your occupation?

9   A   I'm a scientist.

14:23   10   Q   Okay.  What kind of science are you engaged in?

11   A   Research scientist concerning the study of life.

12   Q   Okay.

13   A   The survival of all species on this earth is the research

14   that I do.

14:23   15   Q   Do you recall meeting Ambaya Martin?

16   A   Yes, I do.

17   Q   Is that the name she gave you?

18   A   Yes, it is.

19   Q   Did you later learn her real legal name is Pilar G. Martin?

14:24   20   A   Yes, I did.

21   Q   Did she ever explain to you why she used two different

22   names?

23   A   Yes, she did.

24   Q   Well, which name did she use when she introduced herself?

14:24   25   A   She introduced herself as the Divine Mother Ambaya.

14:24   1   Q    Okay.  That was at the Raw Spirit Festival in 2006?

2   A    That is correct.

3   Q    Did you -- as a result of that meeting, did you go to visit

4   Ambaya at her place of residence?

14:24   5   A    Yes, I did.

6   Q    And where was that?  Was that the house on Dry Creek Road

7   in Sedona?

8   A    That is correct.

9   Q    What happened at that house besides the fact that she lived

14:25   10   there?

11         MR. APPLETON:  Objection.  Foundation, calls for

12   narrative.

13         THE COURT:  Overruled.

14   BY MR. STANLEY:

14:25   15   Q    I mean was there -- she was actually conducting a business

16   out of that house also, wasn't she?

17   A    Yes.

18   Q    And what was that business?

19   A    Brain state technology.  NeuroMagic I believe that they

14:25   20   called it.

21   Q    Brain state technology?

22   A    Yes.

23   Q    They use certain devices that manipulated brain waves or

24   supposedly?

14:25   25   A    That is correct.

14:25   1   Q    Did she ever indicate she was concerned about the federal

2   Food and Drug Administration and its approval or disapproval of

3   those devices?

4   A    No --

14:25   5        MR. APPLETON:  Objection.  Foundation.

6        THE WITNESS:  No, she did not.

7        THE COURT:  Excuse me.  Sir, would you wait when

8   there's an objection until I rule on it before you answer,

9   please.

14:26   10       THE WITNESS:  Yes, I will.  I'm sorry, sir.

11   BY MR. STANLEY:

12   Q    Were there several people who came during the day to work

13   at that location in connection with the brain state business?

14   A    Yes, there were.

14:26   15   Q    Very soon or was it on your first visit -- or when? -- that

16   Ambaya invited you to move in with her?

17   A    Probably the second visit.

18   Q    And that was how long after the first visit, roughly?

19   A    I don't really recall.

14:26   20   Q    Was it very long --

21       THE COURT:  Excuse me.

22       THE WITNESS:  No, it wasn't very long.

23       THE COURT:  If you need to pull that mike closer, feel

24   free to do that.  We're having a little trouble hearing you.

14:27   25       THE WITNESS:  Closer.

14:27   1              THE COURT:  Yeah, pull it closer in.

2       BY MR. STANLEY:

3       Q   You need to speak up so everyone can hear you.  Okay.

4       A   I can't tell how I'm talking because of my ears.

14:27   5       Q   Okay, well, you're speaking pretty softly now, so try and

6       speak up and try to keep the microphone right in front of you

7       like I'm doing now and should have been doing all the time, I

8       guess.

9              Okay.  She invited you -- the second visit, which was

14:27   10      not long after the first, she invited you to move in with her;

11      is that correct?

12      A   That is correct.

13      Q   And thereafter you became domestic partners.

14      A   That is correct.

14:27   15      Q   Did she -- who was the one who first talked about branching

16      out or not pursuing the brain state business any more and

17      getting into the herbal supplements field?

18      A   Can you repeat.  I don't understand.

19      Q   Who was the one who suggested dropping the brain state

14:28   20      business and getting into the field of herbal supplements?

21      A   Ambaya.

22      Q   Okay.  Your understanding is that she had some business

23      difficulties with the brain state business?

24      A   That's my understanding.

14:28   25      Q   All right.  And you had told her that -- something about

14:28  1   your knowledge of mineral supplements?  How did that go?

2   A   I explained to her that once upon a time my formulas were

3   all over the world.  This is a true statement.  They were in

4   Russia, Germany, Holland, Canada, North America.  There had

14:29  5   been difficulties, and I would like to bring them back.  I

6   needed a laboratory to do this so I could continue my work,

7   which is basically the survival of the human organism.

8   Q   Okay.  Let me just see if I can clarify some of that.  In

9   the -- at the beginning of the 1990s, you were involved in

14:29  10  distributing products based on formulas that you had devised;

11  is that correct?

12  A   That is correct.

13  Q   And there was a big crackdown by the FDA?

14  A   That is correct.  A sting.

14:30  15  Q   You -- what happened as a result of that?

16  A   I was one of 300 that was --

17  Q   All right.  What happened to you as a result of that?

18  A   I was arrested or detained or charged.

19  Q   Well, did you plead no contest to a charge?

14:30  20  A   I pleaded no contest.

21  Q   And as far as you know, that charge was for distributing

22  misbranded products in interstate commerce?

23  A   The charge to me was misbranding.  Misbranding products

24  against FDA regulations.

14:30  25  Q   All right, I'll flesh that out.  But the misbranding meant

14:30   1   that the products were sold with labels that indicated uses for

2   which the FDA had not granted regulatory approval; is that

3   correct?

4   A    That is true.  Exactly.

14:31   5   Q    Is it your belief that the same conviction would not have

6   been possible under the Dietary Supplement Act of 1993?

7           MR. APPLETON:  Objection, calls for speculation and

8   legal opinion from a nonlegal expert.

9           THE COURT:  Sustained.

14:31   10  BY MR. STANLEY:

11  Q    Did you learn that a federal law called the Dietary

12  Supplement Act of 1993 was later enacted?

13          MR. APPLETON:  Object to the relevance.

14          THE COURT:  Overruled.

14:31   15          THE WITNESS:  How do I --

16          THE COURT:  You can answer.

17  BY MR. STANLEY:

18  Q    The question was simply:  Did you learn that it was later

19  enacted?

14:31   20  A    Some of the stuff that I formulated they say I'm wrong --

21  Q    No, I'm not asking about how it would apply.

22  A    FDA approved them in 1993 under dietary supplement.

23  Q    Okay.  But anyway, you had also signed a consent decree

24  that you would not participate in the production of any

14:32   25  supplements or any kind of materials for human consumption in

14:32   1   interstate commerce for a period of ten years; is that right?

2   A   That is true.

3   Q   Okay.  But that period had passed and Ambaya was looking

4   for a new line of business and you told her about this

14:32   5   situation in your past and your knowledge of these formulas; is

6   that correct?

7   A   Yes, I did --

8           MR. APPLETON:  I object.  Objection.

9           THE COURT:  Hold on, there's an objection.

14:32   10          MR. APPLETON:  Compound question.

11          THE COURT:  Overruled.

12          THE WITNESS:  What do I do?

13          THE COURT:  You can answer.

14          THE WITNESS:  You have to say it again.

14:32   15  BY MR. STANLEY:

16  Q   Do you recall what the question was?  I --

17          THE COURT:  Let's do this.  Let's have you stand up

18  every time you object, Mr. Appleton.

19          MR. APPLETON:  I'm sorry, I was --

14:32   20          THE COURT:  And when you see him stand up to object,

21  don't answer until I rule.

22          THE WITNESS:  Thank you.

23          THE COURT:  Go ahead.

24  BY MR. STANLEY:

14:33   25  Q   And you try to remember the question and I'll try to

14:33  1  remember it, too, because at this point I'll just have to start

2  again.

3       Ambaya was looking for a new line of business and you

4  told her about this situation in your past and your knowledge

14:33  5  of these products and the fact that you believed either because

6  of a change in the law or the expiration of the ten-year period

7  it would be possible for you to be involved in this again; is

8  that correct?

9       MR. APPLETON:  Objection.

14:33  10       THE WITNESS:  Yes, it is correct.

11       MR. APPLETON:  He's asking him to admit to a number of

12  different things and it's a compound question that --

13       THE COURT:  I think the objection is leading.

14       MR. APPLETON:  Okay.

14:33  15       THE COURT:  And you are leading the witness.  I'm

16  going to sustain that objection.

17       MR. STANLEY:  All right.

18       THE WITNESS:  Can I interrupt?  I got to have a drink.

19       THE COURT:  Sure.

14:33  20       Lisa, would you help him get water.

21  BY MR. STANLEY:

22  Q   Can you tell us what you and Ambaya talked about as a

23  potential replacement line of work for her brain state business

24  and why you suggested anything might now be possible?

14:34  25  A   Can you please say that again.

14:34   1   Q   Well, remember when I asked you before and the judge said
        2   that I was trying to testify instead of you testifying.
        3   A   Okay.
        4   Q   Which is probably a good point.  So I'm asking you to tell
14:34   5   us.  We're going back now to 2007.  You had first become a
        6   couple, you and Ambaya had first become a couple.  She was
        7   unhappy with business aspects of the brain state business.  Can
        8   you tell us what conversation, what the substance of your
        9   discussions were, what you told her about a possibility based
14:35  10   on your life experience.
       11           MR. APPLETON:  Object to foundation and form of the
       12   question.
       13           THE COURT:  Overruled.
       14           THE WITNESS:  So I'm talking about putting together
14:35  15   formulas I've had for probably 40 years, to be able to put them
       16   in diet health supplements, but they're extremely advanced in
       17   science that's new to the United States because I use Russian
       18   technology.  Very, very advanced.  I'm one of the very few that
       19   has access to this.  She agreed to that.
14:36  20   BY MR. STANLEY:
       21   Q   Okay.  And that was a business possibility now for you
       22   because the ten years had expired?
       23   A   Yes.
       24   Q   And also because you believed there had been a change in
14:36  25   the law?

14:36   1    A    Yes, that's correct.

2    Q    All right.

3         So you in essence revived, polished up, restated and

4    maybe modernized a bit the formulas that you had been using a

14:36   5    dozen years previously?

6    A    Yes.

7    Q    And what was the idea?  To produce those to sell them under

8    a different label that avoided FDA problems?

9    A    I wanted to be in total compliance.

14:36   10   Q    With the FDA?

11   A    With my government.  And I was dead broke and I needed

12   money.

13   Q    Okay.  And Ambaya was interested in this business?

14   A    Yes, that is correct.

14:37   15   Q    Did you borrow money from friends of yours to give to

16   Ambaya to start this business?

17   A    Thousands of dollars from my friends.

18   Q    And you gave it to Ambaya?

19   A    That is correct.

14:37   20   Q    And she used it to start up.  Were there costs involved in

21   getting the materials and equipment so that you could begin

22   producing this product?

23   A    Yes.

24   Q    And you began producing them out of the house in Sedona?

14:37   25   A    That is correct.

14:37   1   Q    Now, do you recall the product names -- do you recall the
        2   product names that I was reading to Dr. Horowitz a minute ago?
        3   ORME Probiotics and so forth.
        4   A    Pretty -- pretty -- pretty much so.
14:37   5   Q    Were you the one that came up with those trade names for
        6   the products?
        7   A    Yes, I was.
        8   Q    Those products as formulated by you were sold under the
        9   Sacred Health label?
14:38  10   A    That is correct.
       11   Q    Now, what happened to the Sacred Health name?  It didn't
       12   continue to be Sacred Health forever, did it?
       13   A    Without my permission, the name that I love because it's
       14   the beginning of my book, The Road to Sacred Health, she
14:38  15   stopped with it.
       16   Q    Let me ask you, the personal relationship, did there come a
       17   time when Ambaya indicated that she wanted you to marry her?
       18   A    That is correct.
       19   Q    And you declined to do so.
14:39  20   A    She said it would be the only way that I would receive --
       21   Q    I just -- I just asked if you declined that proposal.
       22   A    I declined it, yes.
       23   Q    Did the relationship deteriorate after that?
       24   A    Very much so.
14:39  25   Q    But how was the business going?

14:39   1    A    The business was going, setting outstanding records.

2    Q    At least -- now, you were involved day to day in applying

3    your formulas and procedures and making sure the product got

4    produced and got produced properly, you were keeping track of

14:39   5    the lot numbers and the production records and all that stuff

6    yourself; is that correct?

7    A    Ten to 12 hours a day.

8    Q    All right.  So if there was more product being created and

9    going out the door from month to month, you would be aware of

14:40   10   that?

11   A    Yes, sir.

12   Q    And was that the case?

13   A    Yes, sir.

14   Q    Okay.

14:40   15         What did Ambaya tell you about where the revenue -- or

16   whether that was actually producing any revenue?

17   A    I was always told that there was no money, that everything

18   was broke.  And so therefore the Mexican gardener she had got

19   more money than I did.  There never was anything to give me.

14:40   20   Q    She had a gardener?

21   A    She had a housekeeper.  She had a gardener.  She hired

22   everybody.

23   Q    Did she have any of those things when you met her?

24   A    No, she did not.

14:40   25   Q    Well, the -- did there come a point where you felt the

14:41   1   domestic relationship was no longer viable?

2   A   Yes, sir.

3   Q   Were you financially able to move out of the house?

4   A   No, I wasn't.

14:41   5   Q   Did you ask Ambaya for money?

6   A   Yes, I did.

7   Q   Did she give you any?

8   A   I asked her for that by January 1st of 2010, that I have to

9   pay my bills with at least $750 a week.  I got no money for

14:41   10   leasing my products, but I couldn't continue without something.

11   So at that time I started to receive a check, sometimes I get

12   check, sometimes I don't get the check, I just get whatever

13   money was.  If she owed me 750, maybe I only get 500.  And then

14   that stopped, I think, in -- I think it stopped around April

14:42   15   somewhere.

16   Q   Of 2010?

17   A   That's correct.

18   Q   Having begun in January possibly of 2010.

19   A   Say again, please.

14:42   20   Q   You said that it started in January?

21   A   That's correct.

22   Q   Okay.

23       Now, did some of Ambaya's relatives come to the place

24   you were living in?

14:42   25   A   Yes, sir.

14:42   1    Q    Were there incidents of physical violence?

        2               MR. APPLETON:  Object to foundation, Your Honor.

        3    Time, place, who was present.

        4               THE COURT:  Sustained.

14:42   5               MR. STANLEY:  Well, if he can tell us if there was one

        6    then I will ask him more detail about it, if that's possible,

        7    Your Honor.

        8               THE WITNESS:  I don't understand.  If you could say

        9    again, I'm sorry.

14:43  10    BY MR. STANLEY:

       11    Q    Were you subjected to physical violence or abuse?

       12    A    Verbal.  Not physical.

       13    Q    Just verbal, no physical?

       14    A    Not at that time, but I was subjected to physical abuse by

14:43  15    her new partner.

       16    Q    By her new partner?

       17    A    That is correct.

       18    Q    And who is that?

       19    A    I don't know how to say the man's name.  I think it is

14:43  20    Sherill Jeter (phonetic), I think is what it is.  And one of

       21    the people she had working for her.  I was threatened severely.

       22    Q    But you said there was more than a threat, there was

       23    physical violence?

       24    A    With -- yes, there was.  That's true.

14:43  25    Q    When did she take up with Sherill Jeter?

14:43  1   A   I don't know much about when this happened.

2   Q   Do you know when he first came on the picture?

3           MR. APPLETON:  I'm going to object to the relevance of

4   this line of questioning.

14:44  5           THE COURT:  Overruled.

6           THE WITNESS:  I think he came in June.  I think he

7   came about the 28th of June.

8   BY MR. STANLEY:

9   Q   Not until June of this year?

14:44  10  A   Of this year.  That's when he finally make his appearance.

11  Q   Well --

12  A   Something like that.  June 21st or -- in the month of June.

13  Q   Showing you Exhibit G.

14          THE COURT:  You need to give that to the clerk,

14:45  15  Mr. Stanley, and she'll present it to the witness.  This is

16  Exhibit G to your memorandum, is that right?

17          MR. STANLEY:  Yes.  As the Court instructed, we're

18  using the same identification to the memorandum exhibits and

19  the hearing exhibits.

14:45  20          THE COURT:  All right.

21  BY MR. STANLEY:

22  Q   You need to disregard the blue page in the front because

23  that's just there to keep it separated from the others.

24          Do you recognize the document that's there?

14:46  25  A   Yes, I do.

14:46   1   Q   Do you recall approximately when you first saw that?

        2   A   I think pretty much it was in the month of March.

        3   Q   Of this year?

        4   A   Of this year.

14:46   5   Q   Was that a document that Ambaya showed you or gave to you?

        6   A   Yes.

        7   Q   She wanted you to sign that?

        8   A   That is correct.

        9   Q   And did you seek advice about whether you should sign it or
14:47  10   not?

       11   A   Well, first of all, I don't want to sign it, but I did seek

       12   advice, yes.  I was told no.

       13   Q   Okay.  Do you know that -- the basic nature of this

       14   document, Royalty Agreement?

14:47  15   A   I don't know nothing about it except that -- I'm not very

       16   good --

       17           MR. APPLETON:  Objection, the document speaks for

       18   itself.

       19           THE COURT:  Overruled.

14:47  20           THE WITNESS:  Is it okay?

       21           I'm not very good at understanding these things.

       22   BY MR. STANLEY:

       23   Q   Okay.  Did you understand basically that it would be a

       24   document that would give Ambaya Gold, LLC, which is actually

14:47  25   not the name of an existing LLC, but apparently they convinced

14:48  1    themselves it's a suitable substitute for Ambaya Gold Health

2    Products, LLC --

3              MR. APPLETON:  Object to the comments.

4              THE COURT:  That's not a question, Mr. Stanley.

14:48  5              MR. STANLEY:  I'm sorry, Your Honor.  I haven't seen

6    this before.

7    BY MR. STANLEY:

8    Q   Anyway, assuming there were an Ambaya Gold, LLC, this

9    agreement would grant that LLC the right to use certain

14:48  10   formulas and production methods?

11             MR. APPLETON:  Objection, leading.

12             THE COURT:  Overruled.

13   BY MR. STANLEY:

14   Q   Do you understand that's what the -- if you had entered

14:48  15   into this agreement that would have been its effect?

16   A   I would have lost everything.  I wouldn't sign it because

17   my advice was she was cheating me, threatening me to sign this.

18   I wouldn't do it because I could make more money working for

19   Safeway as grocery clerk.  I would give up --

14:49  20   Q   You don't need to go on.

21   A   I'm sorry.

22   Q   The -- do you have Exhibit N before you now, Mr. --

23   A   Yes, I do, sir.

24   Q   -- Wolf?

14:51  25             Can you read the handwritten name at the bottom.

14:51    1    A    It is signed by Ambaya.

         2    Q    Do you recognize that as her signature?

         3    A    Yes, I do.

         4    Q    Do you see there after the -- in the second sentence of the

14:51    5    body, can you see where it starts "once this" at the end of the

         6    line?

         7    A    You have to tell me again.

         8    Q    "Once this."

         9         THE COURT:  You're talking about the second sentence

14:52   10    of the letter?

        11         MR. STANLEY:  I am.

        12         THE WITNESS:  Okay, yes, I'm with you.

        13         THE COURT:  What's the question?

        14         MR. STANLEY:  I just wanted him to find the place.

14:52   15    BY MR. STANLEY:

        16    Q    Can you read the sentences beginning there?

        17    A    I will --

        18         THE COURT:  I can read the letter.  I don't think we

        19    need to have the witness read it.  Is there a question about

14:52   20    it?

        21         MR. STANLEY:  Yeah.

        22    BY MR. STANLEY:

        23    Q    First of all, Ambaya is saying that you took some formula

        24    books from the Ambaya Gold place of business in this letter?

14:52   25    A    That's correct.

14:52   1   Q   She says, "Once this information becomes part of the public

        2   domain, it loses its trade secret status and you can no longer

        3   license it to anyone."  Do you see that?

        4   A   Yes, I do.

14:53   5   Q   All right.  Well, did she mean by that that you could

        6   license it to someone as long as it was a trade secret?

        7           MR. APPLETON:  Objection, calls for speculation.

        8           THE COURT:  Sustained.

        9   BY MR. STANLEY:

14:53   10  Q   And then the next sentence, "The royalty agreement which is

        11  set up for you to do this then becomes void and you will no

        12  longer have a way we can pay you."  Do you see that?

        13  A   Yes, I do.

        14  Q   Do you know what royalty agreement she might have been

14:53   15  referring to?

        16  A   I never had one.  She refused to give me one.  I go to two

        17  different lawyers, she never signed nothing.

        18  Q   All right.  Well, the one that we have just looked at,

        19  Exhibit N, you did not sign.

14:53   20  A   No, I refused to sign.

        21  Q   Excuse me, Exhibit E.

        22          THE COURT:  G.

        23          MR. STANLEY:  Thank you, Your Honor.

        24  BY MR. STANLEY:

14:54   25  Q   You did not sign.  The Exhibit N, then, was she saying

14:54   1    that -- trying to convince you the royalty agreement was in

        2    effect even though it wasn't?

        3    A    That's what it reads like.  She never give me one.

        4    Q    Can you think of any reason why she would say that, if it

14:54   5    loses its trade secret status you would no longer be able to

        6    license it, if she didn't think you were the one that could

        7    license it?

        8         MR. APPLETON:  Objection, calls for legal conclusion

        9    and speculation.

14:54   10        THE COURT:  Sustained.

        11   BY MR. STANLEY:

        12   Q    Well, okay.  Well, did -- when you refused to sign

        13   Exhibit G, did conditions at the house deteriorate further?

        14   A    Very much so.  It was very threatening.  I tried to get

14:55   15   lawyer to make papers for myself so that she presents me with

        16   this, I need to present one from me, my own way.  She don't

        17   sign.

        18   Q    We're going -- remember to stick close to the microphone,

        19   please.

14:55   20   A    I'm sorry.  She won't let me represent myself and she will

        21   not sign nothing.

        22   Q    Okay.  In what way did the situation at the house

        23   deteriorate?

        24   A    It was very threatening, very abusive.  Nothing but

14:56   25   screaming and yelling and threats, and it was very horrible for

14:56    1    me.  Very much so.

2    Q    When you say nothing but screaming and yelling, Ambaya

3    would raise her voice to you?

4    A    Yes, she was.  Very much so.

14:56    5    Q    And on what subjects would she be doing -- addressing you

6    in this manner?

7    A    I tried to say -- to ask questions why she was stealing my

8    formulas, trademarking them, other people were telling me.  I

9    didn't want it done.  I wanted to have my share, which was

14:56   10    agreement of 50 percent.  She denies me everything.

11           And she knows that my bone structure is very

12    difficult because of chemical poisoning.  So I cannot be

13    falling down.  And she pushed me during the course I lived

14    there.  I break my shoulder.  She's tried to pull me down the

14:57   15    stairs before.

16           She making me sign -- telling me to trust her, she

17    was doing the right thing.  She's stealing everything.

18    Q    Did you finally find friends who would assist you to flee

19    that house?

14:57   20    A    Yes, I did.  And I got good help.  Because I'm handicapped,

21    I cannot lift and my things what I had were taken out of the

22    house and I found a place to stay.

23    Q    Now, had you -- if we can look for a moment again at

24    Exhibit G, at the top of the first page there's a reference to

14:58   25    a --

14:58  1          MR. APPLETON:  Your Honor.

2          MR. STANLEY:  -- Gray Eagle something.

3          MR. APPLETON:  I'm sorry to interrupt, but I wanted to

4    note that people who are observing are continually going in and

14:58  5    out of the courtroom and I don't know whether or not they're

6    having conversations with potential witnesses in the hallway.

7          THE COURT:  Well, do you have reason to think they

8    are?

9          MR. APPLETON:  I suspect that they are.

14:58  10         THE COURT:  I instructed them not to, I'm assuming

11   they're following my instructions.

12         MR. APPLETON:  Thank you, Your Honor.

13   BY MR. STANLEY:

14   Q   Do you see mention of something like Gray Eagle at the top

14:58  15   of that?

16   A   I never heard of that before.

17   Q   I just ask you, do you see that?

18   A   Yes, I do.

19   Q   Okay.  Well, is it Gray Eagle Consulting, LLC?  Is that

14:58  20   what's there?

21   A   Yes, sir.

22   Q   Had you ever heard of Gray Eagle Consulting, LLC?

23   A   No.

24         MR. STANLEY:  Your Honor, there's one exhibit that was

14:59  25   not an exhibit to the petition.  We have shown it to counsel

14:59   1    and added it on our cover, blue covers, as O.

2        THE COURT:  Well, marking it as O won't help because

3    it's not an exhibit to the document in the docket that you've

4    already filed with the others.  If you want to mark it as an

14:59   5    exhibit at this hearing, you need to do that with Lisa.

6        MR. STANLEY:  Can we do that now, Your Honor?

7        THE COURT:  Yes.

8        MR. STANLEY:  I'm suggesting O would be the

9    appropriate marking even though it wouldn't conventionally

14:59  10    probably be what you would use otherwise.

11        We will file it electronically, Your Honor.

12        THE COURT:  No, that's all right, she'll mark it as

13    Exhibit 20 to this hearing.

14        MR. STANLEY:  Okay.  Thank you.

15:00  15        THE COURT:  I'll tell you what.  We're at 3 o'clock.

16    We've been going at this for an hour and a half.  We need to

17    take a break.  How much longer do you think your presentation

18    of direct evidence is going to take, Mr. Stanley?  And I mean

19    of all your witnesses.  We've used about -- you've used about

15:01  20    50 minutes, 45 to 50 minutes so far with your direct

21    presentation.

22        MR. STANLEY:  Yeah.  It should only be about 15 or 20

23    minutes.

24        THE COURT:  With all witnesses?

15:01  25        MR. STANLEY:  Yes.

15:01   1        THE COURT:  Okay.  Why don't we resume at 3:15.

2        MR. STANLEY:  Could we very quickly -- this exhibit,

3    it will only take a minute, and it relates to what we've just

4    seen, if we could --

15:01   5        THE COURT:  Is that going to be the end of your

6    direct --

7        MR. STANLEY:  Yes, Your Honor.

8        THE COURT:  -- with Medicine Wolf?

9        Okay.  Go ahead and finish, then.

15:01  10        MR. STANLEY:  Yes.

11   BY MR. STANLEY:

12   Q   We've just seen that this Gray Eagle Consulting, Limited,

13   is the name that's on the royalty agreement that Ambaya

14   presented to you, Exhibit G.  And you said you'd never heard of

15:01  15   that entity, Gray Eagle Consulting.  I'm showing you -- you're

16   looking at Exhibit 20.  Have you ever seen that document before

17   today?

18   A   No, I have never seen this document.

19   Q   If you can look down in box 4, do you see the boxes are

15:02  20   numbered on the left side?  There's a box 4.  Names and

21   addresses of the board of directors, slash, trustees.  And then

22   to the right of that can you see what's written there.

23   Medicine Wolf, above "name."  And then above "street address,"

24   375 North Stephanie Street, 1411, Henderson, Nevada,

15:02  25   85014-8909.  Do you see that?

15:02   1   A    Yes, I do.

2   Q    Has your address ever been 375 North Stephanie Street,

3   Suite 1411, Henderson, Nevada?

4   A    Never before lived there.

15:03   5   Q    Have you ever authorized anyone to represent that that was

6   your street address?

7   A    I have never done this.

8   Q    Have you ever heard of an entity or person called Doug

9   Ansell or InCorp Services, Inc.?

15:03  10   A    I never hear of this before.

11   Q    Well, do you think it's an odd coincidence that they claim

12   that their address is the same as yours?  Looking at Item 6 --

13          MR. APPLETON:  Objection --

14          MR. STANLEY:  -- gives his addressing as 375 North

15:03  15   Stephanie Street, Suite 1411, Henderson, Nevada.  Do you see

16   that?

17          THE COURT:  What's the objection?

18          MR. APPLETON:  Object to characterization --

19   BY MR. STANLEY:

15:03  20   Q    Have you ever lived at that --

21          THE COURT:  Excuse me, Mr. Stanley, there is an

22   objection pending.

23          MR. STANLEY:  I'm sorry, Your Honor.

24          THE COURT:  What is the objection?

15:03  25          MR. APPLETON:  Object to the characterization and

15:03    1    object to the form of the question as compound.

         2            THE COURT:  Well, it seems to me you're just reading

         3    from the document.  Why don't you ask a question.

         4    BY MR. STANLEY:

15:03    5    Q    My question is, have you ever lived with a Doug Ansell?

         6    A    No, sir, I never have.

         7    Q    This document coincides with the January 2010 time period

         8    you've already told us about; is that correct, Mr. Medicine

         9    Wolf?

15:04   10    A    Yes, sir.

        11    Q    Other than that and the fact that this corporate name turns

        12    up on the document that you're presented as a royalty

        13    agreement, do you have any idea where this -- what the actual

        14    moving force between the incorporation of this entity was?

15:04   15    A    It was a means to cheat me.  That's what it's all about.

        16    All I want to do is be treated fair and give me my fair share.

        17    I want nothing else.  Just to be treated fair.  That's all I

        18    ask.  I'm not suing nobody, I'm not doing nothing.  I just want

        19    my life's work to be recognized like I was promised.  And

15:04   20    that's what she promised me, money for a little house and

        21    horses I could have and enough money --

        22    Q    You've answered my question.

        23    A    I'm sorry.

        24    Q    And you are suing somebody, Mr. Wolf.

15:05   25            THE COURT:  Are you done with your direct examination?

15:05  1           MR. STANLEY:  Pardon?

2           THE COURT:  Are you done --

3           MR. STANLEY:  I'm finished with my direct examination.

4           THE COURT:  All right.  We'll take a break and we'll

15:05  5  resume with cross-examination at 20 minutes past 3:00.

6           (Recess taken from 3:05 to 3:22.)

7           THE COURT:  Mr. Stanley, where's the witness?

8           MR. STANLEY:  He went down the hallway, Your Honor.

9           MR. REZAGHOLI:  Let me go look for him, Your Honor.

15:22  10          MR. STANLEY:  I'm sorry, Your Honor, he decided he

11  needed to use the men's room and he does move a little slowly.

12  Hopefully we'll have him back any moment.

13          THE COURT:  Okay.

14          (Witness entered the courtroom.)

15:26  15          THE COURT:  All right.  Mr. Appleton, your

16  cross-examination, please.

17          MR. APPLETON:  I do have a preliminary matter, Your

18  Honor.  During the break I spoke to our other witness,

19  Mr. Richard Brown, who indicates that during the testimony, one

15:26  20  of the people with the plaintiff, Michelle Groux, who's taking

21  notes during testimony, went out to the hallway and spoke with

22  one of the witnesses.

23          THE COURT:  Well, you can ask that witness about that

24  when that witness gets on the stand.

15:27  25          MR. APPLETON:  Thank you, Your Honor.

15:27   1        THE COURT:  Would you please speak into the mike.

        2        MR. APPLETON:  Yes, sir.

        3              C R O S S - E X A M I N A T I O N

        4   BY MR. APPLETON:

15:27   5   Q   Mr. Medicine Wolf, if you could look at Exhibit Number 7

        6   marked for identification.

        7   A   I don't have Exhibit Number 7.

        8        THE COURT:  Where are your exhibits, sir?  Did you

        9   want them placed in front of the witness?

15:27  10        MR. APPLETON:  Yes, Your Honor.

       11        THE WITNESS:  Okay, I'm at Exhibit Number 7.

       12   BY MR. APPLETON:

       13   Q   Do you recognize what that document is, sir?

       14   A   No, I do not.

15:28  15   Q   It is entitled Certification of Birth, is it not?

       16   A   That's what it is, but I do not recognize it.

       17   Q   Well, can you read English?

       18   A   I do fairly good, yes.

       19   Q   All right.  So you would agree that it reads Certification

15:28  20   of Birth from the state of New Hampshire?

       21   A   That is true.

       22   Q   And in fact it's your birth certificate, isn't it?

       23   A   No, it is not.

       24   Q   It indicates that your true name is Frank Leslie Dearborn,

15:28  25   Junior.

15:28  1    A    That is not so.

2    Q    It indicates that your father is Frank L. Dearborn and your

3    mother is Doris Dearborn, does it not?

4    A    That is --

15:29  5    Q    Does the document state that?

6    A    That is not true.

7    Q    But does the document state that?

8    A    You have that in front of you.  I'm telling you it is not

9    true.  I was adopted.  My real name is Don Medicine Wolf.  And

15:29  10   I can remember, my adoption was later on.  I don't know how old

11   I was.  But this -- I do not recognize this document.  That is

12   true and that's what I speak, the truth.

13   Q    So you're saying that this certification of birth is a fake

14   or fraud?

15:29  15   A    No, I'm not --

16        MR. STANLEY:  There's nothing to connect --

17        THE COURT:  Is there an objection, Mr. Stanley, other

18   than --

19        MR. STANLEY:  There is --

15:29  20        THE COURT:  What's the objection?

21        MR. STANLEY:  Counsel is mischaracterizing the

22   document.  States facts not in evidence.  And besides, Frank L.

23   Dearborn, Junior, might have died five years after his birth.

24        THE COURT:  Mr. Stanley, if you have an objection, an

15:29  25   evidentiary objection instead of argument, why don't you state

15:29  1    that.  What is the evidentiary objection?

       2         MR. STANLEY:  He's mischaracterized the document and

       3    he has stated facts not in evidence in presenting his question.

       4         THE COURT:  All right.  The objection is sustained as

15:30  5    to the argumentative nature of the question.  Do you have any

       6    additional questions on this document?

       7         MR. APPLETON:  Yes, Your Honor.

       8    BY MR. APPLETON:

       9    Q    So would you agree that Frank L. Dearborn and Doris

15:30  10   Dearborn are not the names of Native Americans?

       11   A    They're not the name of Native Americans.

       12   Q    But they're the names of your parents, are they not?

       13   A    No, they're not my parents.

       14   Q    Not even your adoptive parents?

15:30  15   A    They are my adoptive parents.

       16   Q    So they're your parents.

       17   A    They're not my parents.  My parents were divided by the

       18   U.S. government when they broke the tribes up and broke us all

       19   apart because my father was a traditional like me.

15:30  20   Q    What year were you born, sir?

       21   A    I have no absolute record of that.

       22   Q    What your do you think you were born?

       23   A    I have no knowledge of that.  I never have.

       24   Q    You've indicated to some people that you are over 100 years

15:31  25   old, haven't you?

15:31   1   A   I have never indicated that, counselor.  Never.  People ask

2   me my age -- listen to me, because you are out to character

3   assassinate me, not speaking the truth.

4   Q   You heard that from Mr. Stanley, didn't you, during the

15:31   5   break?  You're under oath, sir.

6   A   And I'm speaking the truth, okay.

7   Q   And you heard --

8           THE COURT:  Excuse me.  Mr. Medicine Wolf, answer his

9   question.

15:31   10          THE WITNESS:  What did you ask?

11   BY MR. APPLETON:

12   Q   This character assassination phrase, you heard that from

13   Mr. Stanley during the break --

14   A   No, I did not hear that.

15:31   15   Q   Under oath, that's your testimony?

16   A   I don't know what you're asking.

17          THE COURT:  Let's move on.

18          THE WITNESS:  Please repeat it.

19          THE COURT:  Hold on, Mr. Medicine Wolf.

15:31   20          Mr. Appleton, ask factual questions.  You're not here

21   to make your argument at this point.

22          MR. APPLETON:  Thank you, Your Honor.

23   BY MR. APPLETON:

24   Q   Showing you Exhibit Number 1 for identification.  Do you

15:31   25   recognize what that document is?

15:32   1   A   Are you talking --

2               MR. APPLETON:  Oh, Your Honor, I'm offering Exhibit 7.

3               THE COURT:  Is there objection?

4               MR. STANLEY:  There is an objection.  Lack of

15:32   5   foundation, no indication that it has any connection with this

6   person who is testifying.  The party --

7               THE COURT:  All right, I understand the objection.

8   I'm going to sustain it for lack of foundation.

9   BY MR. APPLETON:

15:32   10   Q   Do you have Exhibit Number 1 before you?

11   A   I guess I do.  I will open it.

12   Q   Now, you represent yourself as a medical doctor, don't you?

13   A   No, I do not.

14               MR. STANLEY:  Your Honor, can we have a set of

15:32   15   exhibits marked with the exhibit numbers?

16               THE COURT:  Have you provided them with numbered --

17               MR. APPLETON:  Well, they're in the order that I'm --

18               THE COURT:  They're not numbered.

19               MR. APPLETON:  But they're not numbered.

15:32   20               THE COURT:  Like mine.

21               MR. APPLETON:  I'm sorry?

22               THE COURT:  Like mine.  Not numbered.

23               MR. APPLETON:  I apologize.

24               THE COURT:  It's the first document in the stack, I

15:33   25   think, Mr. Stanley.

15:33   1           MR. STANLEY:  We weren't aware we had to keep the

        2    stack in order but we will try --

        3           THE COURT:  You can do it, I'm sure.

        4           Go ahead, Mr. Appleton.

15:33   5    BY MR. APPLETON:

        6    Q    You see this document entitled Universal Health Research?

        7    A    Yes, I do.  I see it, yes.

        8    Q    And it indicates below that headline Dr. Don Wolf, M.D.

        9    Ph.D., does it not?

15:33  10    A    Yes, it does.

       11    Q    Gives an address in Sedona?

       12    A    That's correct.

       13    Q    That is referring to you, is it not, sir?

       14    A    I don't know where this document came from.  I have no

15:33  15    knowledge of it and I have never seen it before.

       16    Q    You haven't held yourself out as a medical doctor with

       17    medical license number 203649778?

       18    A    I don't know where that came from.

       19    Q    But I'm asking you if you've ever held yourself out as a

15:34  20    medical doctor.  Yes or no.

       21    A    I didn't -- can you say this again?

       22    Q    Have you ever held yourself out as a medical doctor?  Yes

       23    or no.

       24    A    No.

15:34  25    Q    Well, then, referring you to Exhibit Number 2.

15:34  1   A   Number 2.

2   Q   Do you see what that document is?

3   A   I never saw it before.

4   Q   Well, it's -- at the top it says "The Ma'at Shop," M-A-A-T,

15:34  5   correct?

6   A   I don't even see that.

7   Q   Do you see where says "health support"?

8   A   Yes, I do.

9   Q   It's brought to you by Drunyalo or Drunvalo.

15:34  10  A   Okay.

11  Q   Drunvalo is somebody who you have been in business with,

12  isn't it?

13  A   I was a consulting scientist for him.

14  Q   Okay.  And the very first sentence in the paragraph says,

15:35  15  "Don Medicine Wolf, comma, a medical doctor, who has

16  contributed important discoveries to the field of alternative

17  healing."  You see where it says that?

18  A   Yes, I do.

19  Q   Is it still your sworn testimony, sir, that you have never

15:35  20  held yourself out as a medical doctor?

21  A   That is a difficult question to answer.

22  Q   I'm just asking yes or no.

23  A   Because I don't know what it is you're trying to prove.

24  I've been in the medical field and I have been -- I have

15:35  25  functioned as a medical professional.

15:35   1   Q   So you --

        2   A   I don't know how they're stating this.

        3   Q   So you have held yourself out as a medical doctor, then,

        4   haven't you?

15:35   5   A   No, I haven't.

        6   Q   Well, you just said --

        7   A   The title -- I have been a practitioner and I don't

        8   understand what the title is.

        9   Q   In fact, you're not a medical doctor, are you?

15:36  10   A   Not now and I haven't been in a long time.

       11   Q   Oh, but you used to be?

       12   A   At one time.

       13   Q   You were a medical doctor?

       14   A   Not in this country.

15:36  15   Q   Where did you go to medical school?

       16   A   I'm foreign educated, very well educated, and I practiced

       17   in Mexico.

       18   Q   Give us the name of a medical school.

       19   A   I don't -- I'm not going to answer your question.  I'm not

15:36  20   going to answer anything about it.

       21          THE COURT:  Well, excuse me, sir, but you have to.

       22   You need to respond to his questions.

       23          THE WITNESS:  Cornell is one institute, okay?

       24   BY MR. APPLETON:

15:36  25   Q   You went to medical school at Cornell University?

15:36   1    A    I went to medical school there and Toronto and I also was

2    educated in other countries.

3    Q    And were you licensed as a physician in any state?

4    A    Not in the United States.

15:36   5    Q    Directing your attention to Exhibit Number 4.  Do you see

6    what that document is, sir?  It's kind of a thick one.

7    A    Okay.

8    Q    All right.  You see where it says Frank Leslie Dearborn at

9    the top?

15:37   10   A    Yes, I do.

11   Q    That's your legal name, isn't it?

12   A    No, it is not -- all I know is my name is Don Medicine Wolf

13   and I have an adopted name and that is what that is.  It is an

14   adopted name.

15:37   15   Q    That's the adopted name that you were prosecuted under by

16   the federal government, isn't it?

17   A    That is the name that the government used, yes.

18   Q    That's the same name that you used when you pled guilty to

19   16 counts of a federal indictment, isn't it?

15:37   20   A    I made a -- it is a plea, whatever it was.  And they didn't

21   charge me with 16 things that I can remember.  It was about

22   misbranded, misbranded products.

23   Q    Well, let's look at the document that is marked Number 4

24   for identification.

15:38   25   A    Okay.

15:38   1   Q   If you'll direct your attention to the first page, you'll

2   see where it says "offenses charged."  First page, sir.

3   A   I don't have it down here.

4   Q   Yeah, it's at the top.

15:38   5   A   Okay.  What are you seeing?

6   Q   Do you see where it says "offenses charged"?

7   A   This is page 1?

8   Q   First page of the document.

9       THE COURT:  Why don't you describe for him where you

15:38  10   want him to look, Mr. Appleton.

11   BY MR. APPLETON:

12   Q   Do you see where it says "misbranded drugs into interstate

13   commerce," counts 1, 3, 5 and 7?  Four counts.

14   A   Okay.  Now I have it.

15:39  15   Q   Those are four counts you were charged with misbranded

16   drugs, correct?

17   A   That's correct.

18   Q   You pled guilty to those four counts, didn't you?

19   A   That's correct.

15:39  20   Q   Next, "introduction of unapproved drugs into interstate

21   commerce," counts 2, 4, 6 and 8.  Four counts.  Do you see

22   where that says that?

23   A   Um-hmm.

24   Q   You pled guilty to those four counts, didn't you?

15:39  25   A   I don't -- the way it wound up, that was different.

15:39   1          THE COURT:  You need to speak into the mike, sir.

2          THE WITNESS:  I don't know what the final outcome was

3    because that was a lot of years ago.  So what I don't

4    understand is why are you bringing this stuff out?  That

15:39   5    doesn't make any sense.  That was years and years and years

6    ago.

7          MR. STANLEY:  Your Honor, I just want to --

8          THE COURT:  Hold on.

9          MR. STANLEY:  -- interpose a relevance objection to

15:39   10   this line of questioning.  These offenses are more than ten

11   years old.  So far as I can see it, at this point we've only

12   seen the offenses charged.  But even assuming that we saw the

13   offenses to which this witness was convicted, it's not usable

14   after ten years unless the Court determines that the offense,

15:40   15   nature of the offense, was such that it should be used to

16   impeach the witness, and I don't understand why we need to go

17   into this at this detail.

18         MR. APPLETON:  May I respond, Your Honor?

19         THE COURT:  Hold on just a minute.

15:40   20         The objection, I assume, is under Rule of Evidence

21   609(b)?

22         MR. STANLEY:  Yes, Your Honor.

23         THE COURT:  Your response, Mr. Appleton.

24         MR. APPLETON:  First of all, part of the conviction

15:40   25   was for moral turpitude, which is relevant to credibility.  But

15:40  1    above and beyond that, we're talking about a case where he is

2    the plaintiff, he is attempting to prove to this court that he

3    is somehow the creator of all these brilliant drugs or

4    nutritional supplements, and in fact he has a history of

15:41  5    abusing that role, of introducing into the stream of commerce

6    illegal drugs, drugs that are intended for other purposes,

7    drugs that should only be used with -- or dispensed with a

8    prescription, and they're highly relevant to the charges in

9    this case -- or the allegations which the plaintiff himself has

15:41  10   brought to the Court's attention.

11             THE WITNESS:  That is false --

12             THE COURT:  Hold on.  There's not a question pending,

13   Mr. Medicine Wolf.

14             Under Rule 609(b) there is a ten-year limit on

15:42  15   convictions unless the court determines in the interest of

16   justice that the probative value of the conviction supported

17   by specific facts and circumstances substantially outweighs

18   its prejudicial effect.

19             This is not a jury trial.  I do not believe the

15:42  20   prejudicial effect substantially outweighs the probative

21   value.  In fact, I think probative value does substantially

22   outweigh the prejudicial effects, so I'm going to overrule the

23   objection.

24   BY MR. APPLETON:

15:42  25   Q    Mr. Medicine Wolf, directing your attention to page 2 of

15:43  1    that document, do you see where it says, "introduction of

2    misbranded drugs into interstate commerce," counts 1, 3, 5, 7?

3    A    Yes, I do.

4    Q    You pled guilty to those counts, did you not?

15:43  5    A    I don't know what I -- the answer to that question is I do

6    not know.

7    Q    You don't know or you don't remember or you just --

8         THE COURT:  He said -- he said he didn't know.

9         THE WITNESS:  I do not know.

15:43  10        THE COURT:  That's it.  That's an argumentative

11   question, Mr. Appleton.

12        MR. APPLETON:  I'm sorry, Your Honor.

13   BY MR. APPLETON:

14   Q    Do you see below that where it says, "introduction of

15:43  15   unapproved new drugs into interstate commerce," counts 2, 4, 6

16   and 8?

17   A    No, I don't.

18   Q    Second entry.

19   A    All I know is they're the same problems -- the same

15:43  20   products and formulas that Ambaya Gold has in compliance with

21   the FDA.

22   Q    I'm not asking you about that.  I'm asking you --

23   A    I just told you.

24   Q    -- did you plead guilty to introduction of unapproved new

15:44  25   drugs into interstate commerce?

15:44   1   A   I do not know.

2   Q   Do you see where it says, "possession with intent to

3   distribute human growth hormone," count 9.

4   A   I don't know what page you're on.

15:44   5   Q   Same -- second page, sir.

6   A   Yes, I got it.  Okay.

7   Q   You pled guilty to that, did you not?

8   A   I do not know.

9   Q   Count 10, smuggling, you pled guilty to that, didn't you?

15:44   10   A   I do not know.

11   Q   Structuring of currency transactions, counts 11 through 14.

12   You pled guilty to those, did you not?

13       MR. STANLEY:  Your Honor, I don't understand why this

14   exhibit doesn't speak for itself as well as --

15:44   15       THE COURT:  Mr. Stanley --

16       MR. STANLEY:  -- I made an objection --

17       THE COURT:  Mr. Stanley --

18       MR. STANLEY:  -- the exhibit speaks for itself.

19       THE COURT:  Mr. Stanley, you need to just state the

15:44   20   basis for your objection instead of standing up and starting to

21   argue.  What is the basis for the objection?

22       MR. STANLEY:  The document speaks for itself.

23       THE COURT:  Overruled because the document doesn't

24   indicate whether or not he pled guilty and that's the question

15:45   25   being asked.

15:45   1   BY MR. APPLETON:

2   Q   Directing your attention to the fourth -- I'm sorry, the

3   fifth page of this document.  Would you go to that page, sir.

4   A   I think I have it.  Go ahead.

15:45   5       Go ahead.

6   Q   Okay.  Do you see where it says "false statement," count

7   15?  Second line down.

8   A   I don't.  Is the number on the page or what?

9   Q   No, there really isn't.  Should be the fifth page in that

15:46   10  exhibit.

11  A   Yes, I do.

12  Q   You pled guilty to making a false statement to law

13  enforcement, didn't you?

14  A   Not to my knowledge.  I do not know.  I can't remember that

15:46   15  far back and I have to -- I would have to have help in trying

16  to figure out because the government made an arrangement where

17  I agreed to the misbranding stuff and assets were taken and I

18  was let go.  That's all I know.  I don't remember much about

19  it.

15:46   20  Q   I'll ask you one more question about this item.

21  A   Save your breath.  I do not know.

22       THE COURT:  Well, you don't know that until he asks

23  the question, Mr. Medicine Wolf.

24       THE WITNESS:  Very good.

15:47   25       THE COURT:  Go ahead and ask the question,

15:47   1   Mr. Appleton.

2   BY MR. APPLETON:

3   Q   Third line down says, "false declaration before a court,"

4   count 16.  You pled guilty to that, didn't you?

15:47   5   A   I don't know.

6   Q   And that would have been lying to the federal court,

7   wouldn't it?

8   A   I don't remember and I don't believe I pled guilty to that

9   charge.

15:47   10   Q   In regard to the investigation that involved your criminal

11   prosecution, you had involved yourself in distribution of

12   Laetrile, isn't that correct?

13   A   That's correct.

14   Q   And human growth hormone?

15:47   15   A   Not that I remember.

16   Q   And Carbonylgruppen RH-50, also known as fire ant extract?

17   A   That is correct.  That saved my life and that was

18   administered to me by Dr. Hans Nieper.  And I didn't distribute

19   it.

15:48   20   Q   Who is that doctor?

21   A   That doctor has long crossed over.  He was one of the

22   world's greatest.

23   Q   What year was that?

24   A   I do not recall that now.

15:48   25   Q   Saved your life.  You don't remember?

15:48   1   A   I don't have the accuracy of it.

2   Q   You have held yourself -- in addition to holding yourself

3   out as a medical doctor, you have held yourself out as a

4   naturopath?

15:48   5   A   As a who?

6   Q   As a naturopath?

7   A   Yes.

8   Q   So you're a naturopathic physician?

9   A   At one time I practiced out of this country and in Canada.

15:48   10   Q   Where did you go to naturopathic school?

11   A   I don't recall now.  I do not know.

12   Q   You have held yourself out as a veterinarian.

13   A   That's true.

14   Q   You are a veterinarian?

15:48   15   A   At one time I practiced veterinary medicine.

16   Q   Where did you go to veterinary school?

17   A   Both in Canada and U.S.

18   Q   What school did you go to?

19   A   Cornell.

15:49   20   Q   Cornell veterinarian school?

21       You've also held yourself out as a biochemist.

22   A   I am a research scientist.

23   Q   Do you have any degrees in biochemistry?

24   A   Yes, I do.

15:49   25   Q   From what school?

15:49   1   A   I'm Russian and German educated in science in Moscow.

2   Q   What school in Russia did you go to?

3   A   I just told you Moscow Institute of Science.

4   Q   Do you speak Russian?

15:49   5   A   I did.

6   Q   Do you still?

7   A   Very badly now.  Years have gone by since that happened.

8   Q   *Chto*?

9   A   Say again?  I said years have gone by.  I don't now.

15:50   10   Q   And you speak German as well?

11   A   I did some.

12   Q   But well enough that you could go to school in Germany?

13   A   Yes, that is true.

14   Q   But you don't speak it any more?

15:50   15   A   Not any more.  But I'm very well-known in Germany and

16   Russia.  Very well-known.  The name Medicine Wolf is known

17   throughout much of the world.

18   Q   And you indicate you have a Ph.D in biophysics.

19   A   That is true.

15:50   20   Q   Where did you get your Ph.D?

21   A   I'm Russian and German educated.

22   Q   What schools did you go to?

23   A   Hanover in Germany.

24   Q   I'm sorry?

15:50   25   A   Hanover University in Germany.

15:50  1    Q    Hanover University.

2              You've gone by many aliases, have you not?

3    A    No, I haven't.

4    Q    Directing your attention to Exhibit 8.

15:50  5              MR. APPLETON:  Oh, Your Honor, I'm offering Exhibit 4,

6    which includes 6.  4 and 6 were both produced by the clerk's

7    office in Reno, District of Nevada out of Reno.

8              MR. STANLEY:  4 includes 6?

9              THE COURT:  That's what he said, yes.

15:51  10             MR. STANLEY:  Are they all stapled together?

11             MR. APPLETON:  No.

12             THE COURT:  No.  6 is an affidavit that's two

13   documents later.

14             MR. STANLEY:  May I see the original exhibits?

15:51  15             THE COURT:  What originals are you referring to,

16   Mr. Stanley?

17             MR. STANLEY:  The originals -- I'm assuming that --

18             THE COURT:  Mr. Stanley, where are you going?

19             MR. STANLEY:  -- exhibits are on deposit with the

15:52  20   clerk.

21             THE COURT:  Do you have original copies of these?

22             MR. STANLEY:  The one that Mr. Medicine Wolf has.

23             THE COURT:  But it's a photocopy, right?

24             MR. APPLETON:  No.  It's stamped by the clerk of the

15:52  25   court with District of --

15:52    1              THE COURT:  All right.  Would you retrieve it, Lisa.

         2              You can come up here, Mr. Stanley, to retrieve it, 4

         3    and 6.

         4              MR. APPLETON:  That one doesn't -- the only stamp is

15:52    5    on 4.

         6              MR. STANLEY:  Okay.

         7              MR. APPLETON:  They were issued together, Your Honor,

         8    and --

         9              THE COURT:  That's fine.  Do you have an objection,

15:53   10    Mr. Stanley?

        11              MR. STANLEY:  No objection, Your Honor.

        12              THE COURT:  4 and 6 will be admitted.

        13              (Exhibit 4 and 6 admitted.)

        14    BY MR. APPLETON:

15:53   15    Q    Now, directing your attention to Exhibit Number 8, do you

        16    have that before you?

        17    A    Yes, I do.

        18    Q    I'm going to ask you to affirm or deny whether or not you

        19    have used those following aliases listed there.  Medicine Wolf?

15:54   20    A    I've been named Medicine Wolf.  Those are my names.  I

        21    don't recognize any of the others.  I've never seen this

        22    document before.

        23    Q    Well, let me make a record.  So you have gone by Medicine

        24    Wolf, correct?

15:54   25    A    That is correct.

15:54    1    Q    Are you saying you've never gone by Dawn, D-A-W-N, Medicine

         2    Wolf?

         3    A    That is my true name.  That's the way it's spelled.

         4    Q    So in fact that's a second alias you've used.

15:54    5    A    I don't think it is an alias, it's my name.

         6    Q    You've also gone by Dr. Dawn Medicine Wolf?

         7    A    That's correct.

         8    Q    And Dr. Wolf?

         9    A    That is correct.

15:54   10    Q    And Dr. Medicine Wolf?

        11    A    That is correct.

        12    Q    How about Don M. Wolf?

        13    A    That is correct.

        14    Q    Fran Anthony?

15:54   15    A    I never heard of the others.

        16    Q    Dr. Fran Anthony?

        17    A    I never heard of those names.

        18    Q    Francis St. Germaine?

        19    A    I don't hear of this.

15:54   20    Q    Dr. Francis St. Germaine.

        21    A    I don't have any of these, Counsel.

        22    Q    Ron St. Germaine?

        23    A    No.

        24    Q    Rusty St. Germaine?

15:55   25    A    No.

15:55   1   Q    Donald Rusty Barnett?

2   A    No.

3   Q    Dean Allen Webster?

4   A    No.

15:55   5   Q    Dr. Lee Mandell?

6   A    No.

7   Q    Now, you indicated you never signed the royalty agreement

8   which is Exhibit G to the petition; is that correct?

9   A    Well, I've got to find Exhibit G.

15:55   10   Q    That's in your --

11        THE COURT:  I'm not sure it's still up there.  Is it

12   still up there, Lisa?

13        THE WITNESS:  I have enough paperwork up here I need a

14   secretary.  Here it is, okay.

15:55   15        Thank you.

16        Okay.  I'm good.

17   BY MR. APPLETON:

18   Q    Exhibit G, royalty agreement between Gray Eagle Consulting

19   and Ambaya Gold.

15:56   20   A    Okay.

21   Q    You never signed that document, did you?

22   A    I never saw it.

23   Q    You never saw it?

24   A    To my knowledge.

15:56   25   Q    Well, your testimony in direct examination was that this

15:56   1   was presented to you.

2   A   It was.  Yes.  I never signed it.  I'm sorry.  I didn't

3   make it clarity on that real good.  I never signed it.

4   Q   But your case is relying upon statements made in this

15:56   5   royalty agreement, isn't it?

6   A   Say it again, please.

7   Q   Your case, where you're the plaintiff and you brought a

8   claim against my clients, it relies on certain representations

9   made in this agreement; isn't that correct?

15:56   10          MR. STANLEY:  Objection, argumentative.

11          THE COURT:  Overruled.

12          THE WITNESS:  I just want to get my fair share out of

13   this business.  That's all I want.

14   BY MR. APPLETON:

15:56   15   Q   And that's what this process is for, is to determine truth.

16   And so in the process of determining such, I'm asking if you

17   are relying upon statements made in the royalty agreement to

18   base your claims.

19   A   I do not know what is in this royalty agreement.  I do not

15:57   20   know what it is.  All I know is I did not sign it.

21   Q   This -- you allege that my client, Ambaya Martin, was

22   physically violent with you; is that correct?

23   A   That's what I said.

24   Q   When did that happen?

15:57   25   A   I do not know the dates.

15:57   1   Q    Where was it?

2   A    Sometimes in the house where I was living and sometimes at

3   work.

4   Q    That was the house that was owned by Ambaya Martin?

15:57   5   A    That is correct.

6   Q    Where you lived for free for three and a half years?

7        MR. STANLEY:  Objection, argumentative.

8        THE COURT:  Sustained.

9        THE WITNESS:  That is not a good argument --

15:58   10       THE COURT:  Sustained.

11       Excuse me, sir.

12       THE WITNESS:  -- to stay for free, she charged me

13   $2500 a month.

14       THE COURT:  Excuse me, sir.  When there is an

15:58   15   objection, don't answer until I rule.

16       Objection sustained.

17   BY MR. APPLETON:

18   Q    You didn't file any police reports about this alleged

19   incident, did you?

15:58   20   A    Not this particular incident in the house, but I did in the

21   business.

22   Q    A police report?

23   A    That is correct.

24   Q    Alleging physical violence?

15:58   25   A    That is correct.

15:58   1   Q   Which police report -- or police agency did you file it

2   with?

3   A   Sedona police station.

4   Q   Do you remember when you filed that report?

15:58   5   A   I do not know.  I do not remember.

6   Q   You indicated that you didn't make any money, you made less

7   money than her Mexican gardener.  Is that what your testimony

8   was?

9   A   That is what Rich Brown told me one day.  Rich Brown knew

15:58   10   the business because he started it.  He said the gardener is

11   making more money than me, and that was a true statement.

12   Q   Well, in fact, over the three and a half years you were

13   involved with Ambaya Martin you received over $118,000 from her

14   didn't you?

15:59   15   A   That is false.

16   Q   And you were able to live without paying any rent or

17   overhead in her home; isn't that correct?

18   A   No, it is not correct.

19   Q   Now, you were also cited by the state of Texas in 2009 for

15:59   20   putting into the stream of commerce mislabeled dietary

21   supplements, weren't you?

22   A   No.

23   Q   Are you certain?

24   A   Never heard of this.  I don't know what you are talking

15:59   25   about.  I would have to see some evidence to back up what you

87

15:59  1   are saying.

2   Q    And you indicated that you are a scientist who's been

3   working for 40 years on these formulas; is that correct?

4   A    Approximately.  Some of those formulas I have spent just

16:00  5   about my life's work on.

6   Q    And in Exhibit Number 5 that's in front of you, if you

7   could take a look at that.

8           Do you recognize what that document is?

9   A    I don't.  No.

16:00 10   Q    Do you see where it says, "Financial Affidavit" at the top?

11   A    Yes.

12   Q    In fact, that's the financial affidavit that you filed with

13   the federal court when you were being prosecuted, isn't it?

14   A    I do not know this.

16:01 15   Q    Isn't that your signature at the bottom that says Frank K.

16   Dearborn?

17   A    It doesn't look like my signature.

18   Q    And doesn't it also state at the top employment that you

19   were working as a carpenter for $10 an hour?

16:01 20   A    That can't be me.  I don't --

21   Q    But this document does say that, doesn't it?

22   A    I don't know what it says.  I have never seen it before and

23   I don't work for anybody.  I have never worked for anybody.

24   Especially as a carpenter for $10 an hour.  So I don't know who

16:01 25   has this and it's not my name.  That is not my signature.

16:01   1   Q    Now, you've been working on these formulae for all these

2   years.  Why was it that you didn't market them prior to meeting

3   up with Ambaya?

4   A    They have been marketed.

16:01   5   Q    They have been marked before?

6   A    You gave me a document, counselor -- is it okay to call you

7   counselor?  Good.  You gave me a document that said Drunvalo

8   Melchizedek.

9   Q    Right.

16:02  10   A    My products were marketed in Holland, Belgium, Mexico,

11   Germany and Canada and he was the one that marketed my

12   formulas.  And in fact I wrote a research document or research

13   book on it way before Ambaya ever knew of me at all.

14   Q    What's the title of that book, sir?

16:02  15   A    It's just Nano Technologies.

16   Q    When was that published?

17   A    I think that I had it put together in -- maybe in 2004.

18   Whatever it is, I have a copy of it with me here.

19   Q    Okay.  So let me try to understand, then.  You have all

16:02  20   these formulas, you've got a distributor that you're working

21   with who is doing well for you internationally, this Drunvalo.

22   Why are you not marketing these formulas that you say you

23   brought to Ambaya through Drunvalo?

24   A    Drunvalo got indicted by a -- he received -- he had a

16:03  25   serious problem with FBI and FDA.  And the company Advanced

16:03  1   Nano Technologies, which is my formulas, were sold to a very

2   good friend of mine to maintain my formulas.  They're still

3   maintained and in existence today.

4   Q    Well, let me ask you this.

16:03  5   A    Go ahead.

6   Q    There's a company called Ancient Earth Agricultural

7   Research, LLC.  Do you recognize that name?

8   A    I certainly do.

9   Q    That is your corporation, isn't it?

16:03  10  A    That is correct.  It's mine and a friend of mine also, and

11  somehow in the course --

12  Q    Well, let me ask you.

13  A    Go ahead.

14  Q    That was incorporated in 2005?

16:04  15  A    I don't know when it was done.

16  Q    Frank L. Dearborn as a member and Joanne Murray as a

17  member; is that correct?

18  A    Who?

19  Q    Joanne Murray?

16:04  20  A    I don't know this.  I would have to see the document and

21  the information.  I don't remember anyone by that name.

22  Q    So that's another company that you're operating under,

23  correct?  Yes or no?

24  A    Say again.

16:04  25  Q    That's another company that you're operating under.

16:04   1    A    I don't know how you mean operate.

2    Q    Doing business.

3    A    Yes.  Yes, okay.

4    Q    2005 until the present, correct?

16:04   5    A    That's correct.

6    Q    That's your own company, correct?

7    A    No, it is not my own company.  I sold the company to a

8    really good friend of mine two years ago and I didn't know that

9    the documentation of that has to be turned in to the state, and

16:05  10    that's being done.

11    Q    Okay.  So assuming that you sold it in 2008, but you

12    haven't filed anything with the Corporation Commission to

13    establish that, have you?

14    A    It never made any money.

16:05  15    Q    Is that no?

16    A    You have to say again.

17    Q    You did not file any documentation with the Arizona

18    Corporation Commission --

19    A    Not yet, no.

16:05  20    Q    Okay.  So you've got these great drugs that you say that

21    you brought to Ambaya -- not drugs, I'm sorry, I misused the

22    term.  Nutritional supplements.  Why aren't you distributing

23    them through Ancient Earth Agricultural Research?

24    A    That was set up as a firm to receive donations.  Not to

16:05  25    distribute or sell product through or whatever.  It was set up

16:06  1    to receive donations so research of my work could continue.

2    Q    Okay.  Let me ask you about Medicine Wheel Creations, LLC.

3    Are you familiar with that name?

4    A    I remember it, yes.  Yes.

16:06  5    Q    That's one of your LLCs, isn't it?

6    A    Well, it was a person that I had met that wanted to

7    distribute my products and they formed an LLC.  It did not work

8    out good and it went defunct.

9    Q    But that's another outlet for these supplements that you

16:06  10    indicate that you've created.

11    A    It was hoped it would turn out to be that.

12    Q    So it's your contention that you have -- that you worked

13    for 40 years creating these formulae, that they're your

14    proprietary property, correct?

16:07  15    A    No, you are incorrect.

16    Q    Okay.

17    A    You are so incorrect it's pathetic.  One of those formulas

18    I spent my life's work on and that is leonardite or humic shale

19    and I have been roughly 40 some-odd years on that one formula

16:07  20    alone.

21    Q    Is that one of the formulae that you are claiming has been

22    taken from you by my client?

23    A    That is one of them, yes.

24    Q    So I'm still trying to understand.  If you've got these

16:07  25    other companies that are your own companies, why aren't you

16:07   1   distributing your own formulas through your own companies and

2   not relying upon Ambaya to do so?

3   A    My job is in the laboratory.  I closed basically everything

4   down to just a little research lab and when I met Ambaya, if

16:08   5   that will enlighten you, she wanted to distribute them.  If I

6   were to recreate them, she would distribute and give me 50

7   percent.

8   Q    Is there a document in writing that reflects that?

9   A    She refused to sign any.  I've made two legal attempts to

16:08   10   do that.

11   Q    So you have no written agreement?

12   A    That is correct.

13   Q    And why did you never attempt to patent or trademark your

14   inventions?

16:08   15   A    You would have to ask her, Counselor, I do not know.

16   Q    No, I'm asking why you, who allege that you came up with

17   these formulae and they were your proprietary property, that

18   you never made an effort to trademark or patent or otherwise

19   protect any interests or rights in those formulae.

16:09   20   A    One, I did not know how to do that.  Two, I didn't have the

21   money.  And, three, I didn't think that I needed to.  Today, I

22   feel different.  I've been ripped off and stolen and cheated

23   over the years.  I now am making everything I have thanks to a

24   wonderful donor, everything I have ever done is being patented.

16:09   25            MR. APPLETON:  I have no further questions, Your

16:09    1    Honor.

         2                THE COURT:  Any redirect, Mr. Stanley?

         3                MR. STANLEY:  Briefly, Your Honor.

         4                R E D I R E C T   E X A M I N A T I O N

16:09    5    BY MR. STANLEY:

         6    Q    You've just been asked why you didn't patent your

         7    inventions or your developments before and you've answered you

         8    didn't have the money, you didn't know how to do it yourself,

         9    and you didn't realize it might be necessary.

16:10   10                As for not having the money, not knowing how to do it

        11    yourself, would that apply also to the marketing of your

        12    formulas before you met Ambaya?

        13    A    Yes.

        14    Q    Ambaya is a lot younger than you, correct?

16:10   15    A    Say again.

        16    Q    She's a lot younger than you?

        17    A    Absolutely.  Much younger.

        18    Q    She has a lot of business get up and go, as evidenced by

        19    her attempt to make a go of the brain states operation.

16:10   20    Correct?

        21    A    That's correct.

        22    Q    Where a lot of people were working for her already even

        23    though it was a problematical business proposition?

        24    A    That's correct.

16:10   25    Q    She knew how to do things like put things on the Internet

1    and she told you that.

2    A    That's correct.

3    Q    Now, to the best of your knowledge is an Arizona LLC

4    anything but a piece of paper?

5    A    It doesn't mean anything to me.

6    Q    So having an LLC wouldn't enable you to have a website or

7    mail a postage -- mail a flyer --

8    A    No, it doesn't.  No.

9            MR. STANLEY:  No further questions.

10           THE COURT:  All right.  Thanks.  You can step down,

11   Mr. Medicine Wolf.

12           All right.  We have just over a half hour left,

13   Mr. Stanley.  Do you have additional witnesses you wish to

14   call?

15           MR. STANLEY:  Yes, Your Honor.

16           THE COURT:  Your witness, Mr. Stanley.

17           MR. STANLEY:  I call Sabrina Barnett.

18           THE COURT:  All right, ma'am, would you please come to

19   the front of the courtroom, all the way up here, to be sworn as

20   a witness.

21           All the way up front, please.

22           THE COURTROOM DEPUTY:  Please state your name and

23   spell your last name for the record.

24           THE WITNESS:  My name is Sabrina Barnett.  My last

25   name is spelled B-A-R-N-E-T-T.

16:13    1          MR. REZAGHOLI:  Is there a switch you need to flip to

         2   activate the monitors?

         3          THE COURT:  What are you intending to do with the

         4   monitors?

16:13    5          MR. STANLEY:  We're playing a DVD this witness will

         6   authenticate, about a minute and a half of a DVD.

         7          THE COURT:  Have you marked the DVD as an exhibit?

         8          MR. STANLEY:  I don't believe we have, Your Honor.

         9          THE COURT:  Have you given a copy to defense counsel?

16:13   10          MR. STANLEY:  I'm not sure we have one.

        11          We have an extra copy, Your Honor.

        12          THE COURT:  All right.  It needs to be marked as an

        13   exhibit if you're intending to play it.

        14          MR. STANLEY:  Okay.  The very one we're going to play

16:14   15   or -- we would need to take out of the machine --

        16          THE COURT:  Well, if it's the same one, then we just

        17   need to have a copy marked.

        18          MR. STANLEY:  Sure.  I'm sorry it wasn't done, Your

        19   Honor.

16:15   20          THE COURT:  Okay.  We're marking this as Exhibit 21,

        21   Mr. Stanley.  Tell me what it is you propose to do with it.

        22          MR. STANLEY:  We will have this witness give us an

        23   introduction.  This witness -- the DVD is an interview of

        24   Ambaya Martin taken by Sabrina Barnett and we intend to play

16:15   25   about a minute and a half of it because there's a statement

16:15   1   made by Ambaya Martin that is quite inconsistent with her

2   position in this litigation.  So we want a little bit of

3   introduction and then play it and then have Ms. Barnett say

4   that was a truthful reproduction of what happened on that

16:15   5   occasion.

6           THE COURT:  Mr. Appleton.

7           MR. APPLETON:  I would object to its introduction and

8   use.  I can't cross-examine the CD.  I have no idea what's on

9   there.  If in fact there's something on that CD that cannot be

16:16   10  elicited from this witness, then that's a different matter, but

11  I don't know why this witness can't just testify.

12          THE COURT:  Well, without your having shown in advance

13  to the defense whatever it is you intend to present,

14  Mr. Stanley, I don't think there is the ability on the part of

16:16   15  defense counsel to determine whether or not they think it is

16  admissible or not.  How long is the CD --

17          MR. STANLEY:  We haven't seen anything that was

18  presented --

19          THE COURT:  Well, that's fine.  You could have

16:16   20  objected on that basis as well.  But the problem is you can't

21  hand it to him and have him look at it now.

22          MR. STANLEY:  He'll see it when we play it, of course.

23          THE COURT:  Well, obviously.

24          MR. STANLEY:  Otherwise may we present it as an offer

16:16   25  of proof?

16:16    1          THE COURT:  What you can do is you can lay the

         2  foundation you think that makes it admissible through the

         3  witness and then I'll see if Mr. Appleton has an objection.

         4          MR. STANLEY:  All right.  Thank you, Your Honor.

16:17    5          THE COURT:  Mr. Stanley, come to the lecturn, please.

         6          MR. STANLEY:  I'm sorry.

         7                    **SABRINA BARNETT,**

         8  called as a witness herein, after having been first duly sworn

         9  or affirmed, was examined and testified as follows:

        10               D I R E C T   E X A M I N A T I O N

        11  BY MR. STANLEY:

        12  Q   Can you state your full name, please, ma'am?

        13  A   My name is Sabrina Barnett.

        14  Q   What is your occupation?

16:17   15  A   I've been modeling and being a hostess for years.  I've

        16  lived in New York City and Paris, Milan, London.

        17  Q   All right.  And so you do production of videotape, video

        18  presentations and interviewing in that role?

        19  A   I have, yes.

16:17   20          MR. APPLETON:  Objection, leading.

        21          THE COURT:  Overruled.

        22  BY MR. STANLEY:

        23  Q   All right.  Now, in 2007, were you asked -- involved in

        24  potentially producing or participating in the production of a

16:17   25  concert to be held in Sedona known as Live H2O?

16:17    1    A    It was October 2008 and, yes, I was.

         2    Q    And now, was Sacred Health going to be a participant or

         3    sponsor or involved in some such capacity with this Live H2O

         4    concert?

16:18    5    A    Absolutely.  Absolutely.

         6    Q    So it was in that capacity that you were involved and you

         7    did interviews that were taped or taken down on DVD of Don

         8    Medicine Wolf and of Ambaya Martin at that time, correct?

         9    A    That is correct, sir.

16:18   10    Q    Okay.  And during the interview with Ambaya Martin, she

        11    made statements about the products that were being sold by

        12    Sacred Health and the formulas for them and what the source and

        13    origin of those formulas was to you --

        14    A    Yes, she did.

16:18   15    Q    -- during the course of that interview, did she not?

        16    A    Yes.  She actually said in the interview, which is why I

        17    brought the DVD and I thought it was so important, she looked

        18    me in the face and she said to me, "These are not my formulas,

        19    these are all Medicine Wolf's work, his life's work."  That is

16:19   20    in the DVD.  You don't have to believe me.  I have flown in on

        21    my own account.  I do not work for her.  I'm not a work for

        22    hire.  I have no other agenda but the truth.

        23    Q    Okay.

        24         MR. STANLEY:  With that foundation, Your Honor, we'd

16:19   25    like to present a minute and a half of the DVD.  If counsel

16:19   1   wants to argue -- analyze it, see if we forged it somehow --

2          THE COURT:  You can just move it into evidence.

3          Objection?

4          MR. APPLETON:  I'm objecting on the grounds that any

16:19   5   or all of that testimony could come in through this witness.

6          THE COURT:  Overruled.

7          All right.  Lisa --

8          Have you connected to the system?

9          MR. STANLEY:  Yeah, we were showing it on the monitors

16:19   10   before.

11          There we go.

12          (Video played.)

13          MR. STANLEY:  That's all we need to present.

14          THE WITNESS:  There's a lot more but that is the most

16:20   15   important.

16          THE COURT:  There's no question pending, ma'am.

17          Are there any further questions, Mr. Stanley?

18          MR. STANLEY:  Yes, Your Honor, to ask her if she's

19   seen it and if that was an accurate reproduction of the

16:20   20   interview that was conducted by her at that time.

21          THE WITNESS:  Is that a question for me, sir?

22          THE COURT:  Yes.

23          THE WITNESS:  Thank you.

24          Yes.  It is exactly unedited and it goes on a lot

16:21   25   longer.

16:21  1        MR. STANLEY:  Thank you.

2        THE WITNESS:  In exactly the way in which it is, raw.

3        THE COURT:  All right.

4        Any cross-examination?

16:21  5        MR. APPLETON:  Just briefly, Your Honor.

6                C R O S S - E X A M I N A T I O N

7   BY MR. APPLETON:

8   Q   Ms. Barnett, do you have any financial interest in any of

9   the current business operations of Medicine Wolf?

16:21  10  A   Zero.

11  Q   So you're not helping to finance him?

12  A   I'm not, like most of the other people on your side, no.

13        THE COURT:  Just answer the question, please,

14  Ms. Barnett.  What's the answer to the question?

16:21  15        THE WITNESS:  No, sir, I have no business with

16  Mr. Medicine Wolf.

17  BY MR. APPLETON:

18  Q   So is it possible that Ambaya could have been deceived by

19  Medicine Wolf?

16:21  20  A   Absolutely not.  She actually controlled everything, from

21  my guestimations.

22  Q   Could it be that you are deceived by Medicine Wolf?

23  A   No, he's an innocent man, sir.  Don't you see that?  You're

24  an intelligent man.

16:21  25        THE COURT:  Excuse me, ma'am, you're not here to argue

16:21   1   with him you're here to testify under oath.

2           THE WITNESS:  I'm sorry.  You're right, sir.  I

3   apologize.

4           THE COURT:  Answer the question.

16:22   5   BY MR. APPLETON:

6   Q   So would it make any difference if you found out that

7   Medicine Wolf is in fact not a Native American?

8   A   Actually, no, because I interviewed him and I know how

9   intelligent this man is.

16:22  10   Q   Would it make any difference if you found out he was

11   holding himself out to have professional licenses that he does

12   not legally or legitimately have?

13   A   Sir, again, I will stay true to myself.  I interviewed the

14   man and I know the knowledge that he has and the formulas that

16:22  15   he has are his intellectual property.  That much I can tell you

16   from the goodness of my heart.  I interviewed them both.  She

17   stumbled through the whole interview.  He was elegant and

18   eloquent and you could tell who he was.

19   Q   And did he disclose to you his criminal convictions?

16:22  20   A   For helping people?

21   Q   Did he disclose to you his criminal convictions?

22   A   It's not a secret.

23   Q   Yes or no?

24   A   Yes.

16:22  25   Q   He did?

16:22    1    A    Yes, it's not secret.

         2    Q    It doesn't make any difference in his credibility with you?

         3    A    His credibility was just --

         4    Q    Does it make any difference --

16:23    5    A    Sir.

         6    Q    -- as to his cred- -- does it make --

         7    A    No.

         8    Q    -- any difference to you regarding his credibility that he

         9    has criminal felony convictions?

16:23   10    A    No.

        11    Q    All right.

        12         MR. APPLETON:  No further questions, Your Honor.

        13         THE COURT:  Any redirect, Mr. Stanley?

        14         MR. STANLEY:  None, Your Honor.

16:23   15         THE COURT:  All right.

        16         Thanks Ms. Barnett, you can step down.

        17         THE WITNESS:  Please, can I say one other thing?

        18         THE COURT:  No.  Please step down.  Thank you.

        19         THE WITNESS:  I have formulas with her name and his

16:23   20    name on it.

        21         THE COURT:  The lawyer is the one who is asking the

        22    questions, Ms. Barnett.

        23         MR. STANLEY:  Our last witness is Kristen Wakeman and

        24    Kris Rezagholi will be handling her examination.

16:23   25         THE COURT:  All right.

16:23   1              Ma'am, would you please come all the way to the front

       2    of the courtroom to be sworn as a witness.

       3              THE WITNESS:  Sure.  Where am I going?

       4              THE COURT:  All will way around to the front.

16:24   5    Actually, right here, please.

       6              THE COURTROOM DEPUTY:  Please state your name and

       7    spell your last name for the record.

       8              THE WITNESS:  Kristen Wakeman.  W-A-K-E-M-A-N.

       9              THE COURTROOM DEPUTY:  How do you spell your first

16:24  10    name?

      11              THE WITNESS:  K-R-I-S-T-E-N.

      12                          **KRISTEN WAKEMAN,**

      13    called as a witness herein, after having been first duly sworn

      14    or affirmed, was examined and testified as follows:

      15                  D I R E C T   E X A M I N A T I O N

      16    BY MR. REZAGHOLI:

      17    Q    Ma'am, can you please state your name for the record.

      18    A    Kristen Wakeman.

      19    Q    And what is your education?

16:25  20    A    I don't understand the question.

      21    Q    Do you have any college degrees?  Do you have --

      22    A    No, I don't have college degree.

      23    Q    What is your profession?

      24    A    I'm a business manager for a water company in Sedona,

16:25  25    Arizona.

16:25   1   Q    Did you used to work for Ambaya Pilar Martin?

2   A    Yes.

3   Q    When did you work for her?

4   A    I worked for her starting in May of 2008.

16:25   5          THE COURT:  Excuse me, ma'am, can you pull the mike up

6   a little higher and speak directly into it so everybody can

7   hear you.

8          THE WITNESS:  Is this better?

9          THE COURT:  Yeah, actually push it a little bit away

16:25   10   so you can talk right into.  Thank you.  Go ahead.

11          THE WITNESS:  I worked for Ambaya starting in May of

12   2008 and I'm not sure of the exact date that I last worked for

13   her, but it was mid 2009.

14   BY MR. REZAGHOLI:

16:25   15   Q    And why did you leave?

16   A    There was a lot of conflict going on in the business.  I

17   also didn't have enough time.  Many, many, many reasons.

18   Q    Describe conflict.  Can you get into that a little more?

19   A    There seemed to be a lot of conflict between Medicine Wolf

16:26   20   and Ambaya.

21   Q    How would you describe Ambaya's treatment of Medicine Wolf?

22   A    It seemed to go back and forth.  I know that Medicine Wolf

23   spent a lot of time in the lab.  So she would cook meals for

24   him, she would -- I think as far as the business, she would

16:26   25   take care of what I would call the front end of the business,

16:26    1    the books.  And Medicine Wolf would work in the lab and that

         2    sort of thing.  And then also they argued a lot.  That took

         3    place.  So it's difficult to say how that would translate into

         4    how she treated him.

16:26    5    Q    Okay.  As part of your job working for Ambaya, did you

         6    handle the books and financial records of the -- of her

         7    businesses?

         8    A    Yes.

         9    Q    Would you know if Ambaya paid taxes, paid her bills?

16:27   10    A    I do know she paid her bills.  I do know that she -- I

        11    don't know personally because I didn't file the taxes, but she

        12    did pay federal taxes.  She did not pay state sales tax.  That

        13    was an area that --

        14              MR. APPLETON:  I'm going to object to the relevance.

16:27   15              THE COURT:  What is the relevance of this question?

        16              MR. REZAGHOLI:  The relevance, Your Honor, is I seek

        17    to establish that Ms. Martin has set up multiple business

        18    entities for the purposes of shielding her assets from

        19    creditors, and, more importantly, Mr. Medicine Wolf.

16:27   20              THE COURT:  I'm not understanding what relevancy the

        21    state taxes have to that.

        22              MR. REZAGHOLI:  It was going to lead to a question

        23    regarding whether she then -- what actions she took to address

        24    that problem.

16:27   25              THE COURT:  All right.  Overruled.  Go ahead.

16:28     1                THE WITNESS:  Um --

          2                MR. REZAGHOLI:  Hold on.

          3                THE WITNESS:  Okay.

          4       BY MR. REZAGHOLI:

16:28     5       Q    Did Pilar ever discuss ownership of her businesses with

          6       you?

          7       A    Yes.

          8       Q    What did she say when she had those discussions?

          9       Specifically, did she ever tell you who owned the business?

16:28    10       A    Yes.

         11       Q    And who was that owner?

         12       A    Well, there were multiple businesses.

         13       Q    Let's start with Sacred Health.

         14       A    Okay.  Sacred Health, from my understanding, is it was an

16:28    15       LLC and she was the owner on paper, but it was discussed that

         16       it was her and Medicine Wolf were both co-owners of that

         17       business.

         18       Q    And Pilar discussed that with you?

         19       A    Yes.

16:28    20       Q    Did Pilar ever discuss formulations -- excuse me, let's go

         21       back again.

         22                Ambaya Gold Health Product, LLC.  Did Ambaya ever

         23       discuss the ownership of that company?

         24       A    Yes.

16:29    25       Q    And what was that discussion?

16:29  1  A   Well, there was a lot of discussion so I'm not sure where

2  to start.   There were multiple reasons over several months of

3  discussions that took place.   The primary reason there was --

4  before Sacred Health there was also a company called Brain

16:29  5  State Technologies.   And Brain State Technologies had multiple

6  bank accounts.   And there was also Sacred Health.

7           Brain state was a business that I believe Ambaya

8  owned with her son Zack, and I don't know if she had any other

9  partners.   But there were bank accounts that were used for

16:29  10  transactions with that company.   And then there was also

11  Sacred Health.

12           And Sacred Health, there were multiple discussions

13  for why forming new corporations.   There were tax issues, that

14  employees' taxes weren't done correctly.   There -- I don't

16:29  15  know prior to me coming on board if 1099s were filed or not

16  for that.   Then --

17           MR. APPLETON:   Your Honor --

18  BY MR. REZAGHOLI:

19  Q   Let me just stop you there.

16:30  20           MR. APPLETON:   -- at this point I'm going to object to

21  this line of questioning, again on grounds of relevance and

22  simply it appears to be an attempt to prejudice the Court.

23           THE COURT:   Overruled.

24           Go ahead.

16:30  25           THE WITNESS:   So between Brain State and Sacred

16:30   1   Health, there were questions of tax liabilities, there was also

2   questions of multiple bank accounts.  The -- there was not

3   correct accounting done, there was cash taken in that was

4   applied to making payments for repairs on the house, things

16:30   5   like that.  So it was discussed -- and there was also -- there

6   was a consultant that Ambaya had and he did not like the name

7   Sacred Health --

8               MR. APPLETON:  Object to the narrative, Your Honor.

9               THE COURT:  Sustained.

16:30  10               Please proceed by question and answer.

11               MR. REZAGHOLI:  Sure, Your Honor.

12   BY MR. REZAGHOLI:

13   Q    You said that there was a consultant.

14   A    Yes.

16:31  15   Q    Please describe what that consultant did for Ambaya Martin.

16   A    I'm not entirely sure.  He gave Ambaya Martin periodic --

17   periodically gave her business advice.

18   Q    Let me ask you a specific question.  I don't think you

19   answered it yet.  The ownership of Ambaya Gold, was that ever

16:31  20   discussed with you?

21   A    Yes.  That's what I was -- I know --

22   Q    And who was the owner of Ambaya Gold?

23   A    From what I understand, from a paper standpoint, Ambaya.

24   From meetings that I was in with many of the people in this

16:31  25   room, it was Ambaya and Medicine Wolf both.

16:31  1    Q    Did Ambaya ever discuss with you the ownership of the

2    intellectual property of the business?  Or specifically the

3    formulations?

4    A    Not directly, no.

16:31  5    Q    Which way did she discuss it with you?

6    A    From a business standpoint of how product would be priced,

7    from a standpoint of it was Medicine Wolf's formulations, from

8    what I understood, and how he would be paid for that.  So it

9    was cost of goods, basically, from an accounting standpoint.

16:32  10   And to determining cost of goods part of that would be the

11   percentage of what Medicine Wolf would have gotten paid for

12   that.

13   Q    In your approximately two years that you were at the

14   company, did you ever once witness Ambaya Martin meaningfully

16:32  15   contribute to the development of any of the products at the

16   company?

17   A    That would be a very difficult question for me to answer

18   because -- meaningfully as in formulations of the product?

19   Q    Sure.

16:32  20   A    No, not that I know of.  I mean they were Medicine Wolf's

21   formulas.  From a marketing standpoint, picking labels and

22   marketing the product, yes.

23   Q    Did Ambaya ever seek out your advice as far as structuring

24   business -- we'll start with that, structuring the business?

16:33  25   A    Yes.

16:33    1    Q    What was that exchange?  Can you describe that, please.

2    A    There were several exchanges.  What would be the best way

3    to form a LLC, form a corporation.  There were questions of

4    Medicine Wolf, if Medicine Wolf had said that he didn't want to

16:33    5    be part of the business, there was a lot of debt that was

6    incurred on the part of Ambaya and he had expressed that he was

7    concerned about that.

8         So there were questions of should there be a parent

9    corporation and should that be co-jointly owned between

16:33   10    Medicine Wolf and Ambaya.  Should there be subsequent other

11    corporations that were involved.  And that took place over

12    several months.  So that's what I'm saying, it is difficult to

13    answer directly.

14    Q    Did she ever seek out your advice as far as handling the

16:33   15    ownership of the intellectual property of the company?

16    A    No.

17    Q    You were handling the books and records of the company,

18    that's correct?

19    A    Yes.

16:34   20    Q    So you would have seen payments being made to Medicine

21    Wolf?

22    A    Yes.

23    Q    Did you see anything near $118,000 being transferred to

24    Medicine Wolf?

16:34   25    A    No, not that I know of.

16:34   1   Q    Were you aware as the record keeper of the company who was

2   an employee and who was not an employee of the company?

3   A    Yes.

4   Q    Was Medicine Wolf an employee of the company?

16:34   5   A    No, not that I was aware of.

6   Q    Was he an independent contractor?

7   A    No.

8   Q    Was he an owner of the company?

9   A    That was my understanding.

16:34   10          MR. REZAGHOLI:  One second, Your Honor.

11          THE COURT:  You can just push the mute button,

12   Counsel.

13          MR. HUDSPETH:  Sorry.

14          MR. REZAGHOLI:  Couple final questions.

16:35   15   BY MR. REZAGHOLI:

16   Q    Based upon the way the books and records were kept, could

17   you not accurately keep track of the revenues derived from a

18   particular product and the cost of goods sold from a particular

19   product?

16:35   20   A    No.

21          MR. REZAGHOLI:  No further questions, Your Honor.

22          THE COURT:  Cross-examination.

23          MR. APPLETON:  I'll be brief, Your Honor.

24

25

C R O S S - E X A M I N A T I O N

BY MR. APPLETON:

Q    Ms. Wakeman, do you have any formal training in bookkeeping or accounting?

A    I've taken accounting courses but I don't have a degree in it.

Q    Where have you taken courses?

A    At the University of Hawaii at Manoa.

Q    How long did you take courses?

A    Year and a half.

Q    You didn't get an associate's degree?

A    No, I did not.  My primary course of study was computer science.

Q    You worked primarily at night for Ambaya, didn't you?

A    No.  I actually typically would work -- I would come in there anywhere between 1 and 3 o'clock and then, yes, I would work into the night as well.

Q    And how often did you observe activities in the lab?

A    Directly being in the lab?  Or people going in and out of the lab?  Can you clarify your question?

Q    Well, you indicated you didn't see Ambaya doing much work in the lab; is that correct?

A    That wasn't my inference of his question.  How I inferenced his question was that was I aware that she participated in the formulations.

16:36  1   Q    And you weren't aware?

2   A    No, I --

3   Q    That doesn't mean she didn't participate, does it?

4   A    No, it does not.

16:36  5   Q    All right.  And you made a statement that you had heard

6   Medicine Wolf say that he didn't want the liability of the

7   companies; isn't that correct?

8   A    No, he didn't want her debt.  That was what his concerns --

9   Q    He didn't want the debt of the companies either, did he?

16:37  10   A    No, that wasn't what he inferred.  Ambaya had a great

11   amount of debt that the company --

12   Q    In setting up this business she had incurred debt, correct?

13   A    No.  She had debt that existed prior to setting up of the

14   business.

16:37  15   Q    How do you know she didn't incur debt setting up the

16   businesses?

17   A    Because I saw where the money went and I saw the flow and I

18   saw her numerous credit cards that existed prior to the

19   formation.

16:37  20   Q    And you didn't see approximately 50 checks made out to

21   Medicine Wolf from Ambaya?

22   A    There were checks.  Here's an interesting thing, there were

23   checks --

24   Q    I'm not asking for some observation.

16:37  25        THE COURT:  Let her answer the question, please.

16:37   1        THE WITNESS:  There were checks that were made out to

2    Medicine Wolf and they went to pay for -- like he would go and

3    purchase things for repairs on the house, for maintenance on

4    the house.

16:38   5    BY MR. APPLETON:

6    Q    Were you with him when he did that?

7    A    Was I with him?  No, but he brought back the receipt and

8    gave it to me and showed me.  So, no, I wasn't with him, but it

9    was looking and seeing where expenses went and what they were

16:38  10    attributed to, so --

11    Q    So it's your testimony that statements that Ambaya may or

12    may not have made have greater relevance to ownership of a

13    company than the documents actually filed with the state?

14    A    I'm sorry, I don't understand your question.

16:38  15    Q    You said on paper Ambaya owned Sacred Health.

16    A    That's my understanding.

17    Q    Okay.  And so is it your testimony that if she makes a

18    statement that is somewhat contrary to that that somehow that

19    statement has greater weight than the actual filings with the

16:39  20    state?

21        MR. REZAGHOLI:  Objection, calls for legal conclusion.

22        THE COURT:  Overruled.

23        THE WITNESS:  I would say that her statements have

24    much more weight than a document that's filed, because a

16:39  25    document is an inert piece of paper that sits there and anyone

16:39  1    can file any sort of business, including myself.  But if I
       2    bring on someone else who is a partner and I say to them,
       3    "You're my partner," and -- to me, that carries much more
       4    weight.
16:39  5    BY MR. APPLETON:
       6    Q    Okay.  Is there something improper about having multiple
       7    bank accounts?
       8    A    No.
       9         MR. APPLETON:  No further questions, Your Honor.
16:39 10         THE COURT:  Any redirect?
      11         MR. STANLEY:  No, Your Honor.
      12         MR. REZAGHOLI:  No, Your Honor.
      13         MR. STANLEY:  I'm sorry.
      14         THE COURT:  Thanks Ms. Wakeman, you can step down.
16:40 15         Any further evidence, Mr. Stanley?
      16         MR. STANLEY:  Yes, Your Honor.  I would like to read
      17    some brief passages into the record from the transcript of
      18    the --
      19         MR. APPLETON:  Objection, Your Honor.
16:40 20         THE COURT:  Let him finish, please, Mr. Appleton.
      21         MR. STANLEY:  An evidentiary hearing was held
      22    yesterday morning in the Yavapai County Superior Court in the
      23    case of Ambaya Pilar Martin versus Wesley Deuel.  And there are
      24    some passages of that testimony that I would like to read into
16:40 25    the record since that witness chooses not to testify.

16:40  1          MR. APPLETON:  Well, Your Honor, my client has not

2     chosen not to testify at all.  And that would be improper

3     testimony by the attorney.  And I don't know what he's reading

4     from --

16:40  5          MR. STANLEY:  Well, I call Ambaya Martin.

6          THE COURT:  Gentlemen, don't talk at the same time.

7          What were you saying at the end, Mr. Appleton?

8          MR. APPLETON:  First of all, he assumes that my client

9     is not going to testify.  I don't know where he gets that

16:41  10    assumption.  It's not accurate.  Secondly, to simply read out

11    of a transcript is not appropriate manner of getting testimony

12    into evidence.

13          THE COURT:  All right.  Your response, Mr. Stanley.

14          MR. STANLEY:  Well, actually, her prior inconsistent

16:41  15    statements or her prior sworn statement in anything, her prior

16    testimony under oath can come in, period, as long as it's

17    relevant.  And whether I read it or we simply put the

18    transcript in and I identify the passages that are relevant, I

19    guess it doesn't make a lot of difference.  And if she's going

16:41  20    to testify, then counsel's quite right, I may use it to

21    cross-examine her, as well as present it as her prior

22    testimony.

23          THE COURT:  Well, tell me what evidence rule you're

24    relying upon for the proposition that it can come in in its own

16:41  25    right.

16:42  1        MR. STANLEY:  Well, without consulting the rules, I

2   wouldn't be able to give you the rule number, Your Honor.  The

3   prior recorded statement of a party is not hearsay and

4   therefore I don't know what the objection to presenting it in

16:42  5   would be.

6        THE COURT:  Well, Rule 801(d)(2)(A), Mr. Appleton,

7   says that a statement offered against a party that is the

8   party's own statement either in an individual or representative

9   capacity is not hearsay.

16:42 10        MR. APPLETON:  Oh, I agree it's not hearsay.  But the

11   rules also say, or at least the surrounding common law that

12   preceded the Federal Rules of Evidence, was that a witness has

13   to be confronted about their statement initially prior to

14   impeaching them with it.

16:43 15        THE COURT:  Well, that's for a witness, not for a

16   party.

17        MR. APPLETON:  Well —

18        THE COURT:  All right.  I don't want you to take the

19   time to stand and read it.  We're already about 45 minutes

16:43 20   beyond the time I'd allowed for this hearing.

21        MR. STANLEY:  Yes, Your Honor.

22        THE COURT:  How much of this testimony do you think I

23   should consider, Mr. Stanley?

24        MR. STANLEY:  Unfortunately they didn't number the

16:43 25   lines, so it makes the arithmetic in terms of lines a little

16:43   1   bit difficult.  There's about -- all together I would say it is

2   probably about six pages, and I have the pages identified and I

3   can provide that list very easily, the list of pages.

4       THE COURT:  Have you provided Mr. Appleton with a copy

16:43   5   of the transcript?

6       MR. STANLEY:  I'm doing so now.  I got it this

7   morning.  Of course the hearing happened yesterday.  And I got

8   the transcript by e-mail late last night from the court

9   reporter.

16:44   10      THE COURT:  All right.  And do you have a copy for me?

11      MR. STANLEY:  I do.

12      THE COURT:  Bring it forward with -- you need to

13   bring -- you need to identify in some way the portions you want

14   me to read.

16:44   15      MR. STANLEY:  I will do so, Your Honor.  I also --

16   this is not the -- does not have the official certification of

17   the court reporter but it does have her e-mail message to me

18   saying that the certified -- official certified original is

19   coming in the mail.

16:44   20      And if I can identify the portions that are relevant

21   on direct examination, page 9 -- do you have that highlighted?

22      THE COURT:  Just give me pages, if you can.

23      MR. STANLEY:  All right.  I'll give you pages, then.

24   Pages 9 and 10.

16:45   25      MR. APPLETON:  These pages are not numbered.

16:45   1          MR. STANLEY:  Yes, they are.  It's at the upper left.

2          THE COURT:  Page 9 and 10.

3          MR. STANLEY:  24 and 25.  Actually 24 through 27, and

4   29 through 31.  Those are the pages, Your Honor.

16:45   5          THE COURT:  Okay.

6          Do you have any other evidence that you wish to

7   present, Mr. Stanley?

8          MR. STANLEY:  No, Your Honor.

9          THE COURT:  All right.

16:45   10         Mr. Appleton.

11         MR. APPLETON:  Well, I haven't had a chance to review

12  what these statements are, but if the Court wishes to go ahead

13  and facilitate this, the proceedings, to go ahead and get it

14  over with --

16:45   15         THE COURT:  Well, we're at 15 minutes to five and we

16  need to conclude this today.  So I don't think we ought to just

17  be reading them into the record.  I can read those pages.

18         MR. APPLETON:  Okay.

19         THE COURT:  Do you have evidence you wish to present?

16:45   20         MR. STANLEY:  Excuse me, Your Honor, if I could.

21         THE COURT:  Mr. Stanley, speak into the mike, please.

22         MR. STANLEY:  I'm sorry.  I thought -- I don't want to

23  be accused of trying to influence the Court improperly, and I

24  had highlighted particular sentences of my copy, and I thought

16:46   25  I was retaining that.  Now I see that what -- I have the un--

16:46   1    one of the unhighlighted copies.

2            THE COURT:  Mine is not highlighted.

3            MR. STANLEY:  So I believe -- would you exchange that

4    with me, Counsel.  Thank you.

16:46   5            THE COURT:  All right.  Mr. Appleton, do you wish to

6    present any evidence?

7            MR. APPLETON:  I can put my client on, but prior to

8    that I would make a motion for directed finding.

9            THE COURT:  I don't think there is such a motion in a

16:46  10    preliminary injunction hearing, Mr. Appleton.

11           MR. APPLETON:  All right.  I would put Ambaya Martin

12    on.

13           THE COURT:  All right.  Ma'am, would you come up to

14    the front to be sworn, please.

16:46  15           THE COURTROOM DEPUTY:  If you would raise your right

16    hand, please.

17                           **AMBAYA MARTIN,**

18    called as a witness herein, after having been first duly sworn

19    or affirmed, was examined and testified as follows:

20              D I R E C T   E X A M I N A T I O N

21    BY MR. APPLETON:

22    Q    Ambaya --

23           MR. APPLETON:  Your Honor, I would ask the Court to

24    take into consideration her prior testimony in the TRO hearing.

16:47  25           THE COURT:  Yeah, I heard that testimony and I have

16:47   1   reviewed my notes of it before today's hearing.

2            MR. APPLETON:  I'll try not to repeat, Your Honor.

3   BY MR. APPLETON:

4   Q   So you heard testimony from Kristen Wakeman in regard to

16:47   5   ownership of Ambaya Gold.  What was your understanding of the

6   ownership of that company?

7   A   I own Ambaya Gold.  I'm the only LLC member.

8   Q   Did you ever represent to Medicine Wolf that he was a part

9   owner?

16:47   10  A   No, not of the LLCs.

11  Q   Okay.  And let me ask you about the other corporations that

12  are defendants -- or LLCs that are defendants in this case.  Is

13  the same true of those corporations?

14  A   Okay.

16:48   15  Q   Yes or no?

16  A   Oh, I didn't understand the question.

17  Q   Who is the owner of those corporations, those LLCs?

18  A   I'm the owner of the LLCs.

19  Q   Has any legal document been filed that made Medicine Wolf a

16:48   20  part owner?

21  A   No.

22  Q   Why was -- among other reasons, what did Medicine Wolf

23  convey to you in regard to his participation in these LLCs?

24  A   He did not want his name anywhere in any legal paper.  He

16:48   25  told me that he did not have a legal name.  He told me he did

16:48  1    not want any liability anywhere.  He was very afraid of the

2    government.

3    Q    So he didn't want -- he affirmatively represented to you he

4    did not want to be part of these companies?

16:49  5    A    Absolutely.

6    Q    And what was your understanding about the formulas that he

7    had brought to you?

8    A    He told me he brought and worked on these formulas his

9    whole life, and I believe that they were his because he told me

16:49  10   they were.  But I now find out that they're not.

11   Q    And how did you find that out?

12   A    When he brought this case over, we have been doing some due

13   diligence to look at some of the formulas and where they may

14   have originated, and they did not originate with him.

16:49  15   Q    Were you misled in any way by Medicine Wolf?

16   A    I was misled in every way there is to be misled.

17   Q    Can you briefly cite what those are to the court?

18   A    First of all, he told me he was Native American.  I find

19   out now that he is not.  Second of all, he told me that his

16:49  20   wife and three children had died.  He has wife that is living,

21   is not dead.  And he has a child that is living and is not

22   dead.  He told me that he was a medical doctor, that he had a

23   Ph.D in biophysics in -- that he had a Ph.D in biochemist.

24   That he was homeopath, a naturopath and veterinarian.  And I

16:50  25   believed him because obviously he must be very well read and,

16:50   1   yes, he has a lot of good retention and knowledge, and I

2   believed him.

3   Q    And as far as the formulas he brought to you, what have you

4   subsequently discovered about them?

16:50   5   A    The formulas he brought, two of the bases that we use are

6   fulvic and humic.  They have been in existence for thousands of

7   years.  They have been used in this country for at least 106

8   years.  There are several people using this and they're

9   definitely not his.

16:51   10   Q    Have you paid any money to Medicine Wolf?

11   A    I have paid lots of money to Medicine Wolf.  And I think

12   the total when we put 2007, 2008, 2009 and 2010 --

13   Q    You're talking about the years 2007, 2008, 2009, '10?

14   A    We add it all together it comes up to $118,000 he has

16:51   15   received, mostly in cash because he -- if I would give him a

16   check, I would cash it for him, or sometimes I would just go to

17   the bank and get the cash.  Every week he has gotten money from

18   me.

19   Q    And you -- mostly you wrote checks to support those cash

16:51   20   disbursements, correct?

21   A    Well, last six months I wrote a check for everyone and then

22   he wrote the check -- or he endorsed the checks, yes.

23   Q    But didn't you write checks in 2007, 2008 --

24   A    Yes.

16:51   25   Q    -- 2009?

16:51  1   A    I wrote checks in 2007, 2008 and we have copies back there.

2   Q    And the sum is over $118,000?

3   A    Yes, it is.

4   Q    You also provided living for Medicine Wolf?

16:52  5   A    On top of that he has lived very nicely in my home for

6   three and a half years that we were together.

7   Q    Did he pay you any compensation for that?

8   A    No, he did not.

9   Q    You took care of individual expenses for him?

16:52  10   A    Yes, I did.

11   Q    You bought him hearing aids?

12   A    I bought him hearing aids.  I bought him a car.  I bought

13   all the food.  I bought the clothes.  I bought everything.

14   Q    He took significant amounts of supplements that you had

16:52  15   produced?

16   A    Plus the supplements, yes.

17   Q    How much did he take?

18   A    About 300 to 400 a month, probably.  He takes an awful lot

19   of supplements.

16:52  20   Q    When he left the business what did he take with him that

21   belonged to your business that did not belong to him?

22   A    The formula book that is the record of the last six months

23   of the formulas that we produced, he took.  And he also took

24   the workbooks from the lab, and he later returned those after

16:53  25   copying them.

16:53   1    Q    Did he take client lists?

       2    A    He took client lists, he took -- through the man that was

       3    working with us in the -- through the computer, yes.

       4    Q    He took distributor lists?

16:53   5    A    Distributor lists.

       6    Q    Vendor lists?

       7    A    Yes.  All of information regarding --

       8    Q    He set up a competing business to operate doing the same

       9    thing that you do, didn't he?

16:53  10    A    Yes, he did.

      11            MR. APPLETON:  No further questions, Your Honor.

      12            THE COURT:  Cross-examination.

      13                 C R O S S - E X A M I N A T I O N

      14    BY MR. STANLEY:

16:53  15    Q    You said you're the owner of Ambaya Gold; is that correct?

      16    A    That's correct.

      17    Q    Well, that's kind of understating it, isn't it, Ms. Martin?

      18            MR. APPLETON:  Object.  Argumentative.

      19            THE COURT:  What's the question?

16:54  20    BY MR. STANLEY:

      21    Q    Well, you are in fact Ambaya Gold and Ambaya Gold is you.

      22    A    No.  Ambaya Gold is the name of my corporation --

      23    Q    Hold on.

      24            THE COURT:  No.  No, you need to let her answer the

16:54  25    question, Mr. Stanley.

16:54  1          MR. STANLEY:  I'm sorry.

2     BY MR. STANLEY:

3     Q    Go ahead.

4     A    My name is Pilar G. Martin.  Sometimes I'm known as Ambaya

16:54  5     Pilar Martin.  The name of my corporation is Ambaya Gold Health

6     Products, LLC.

7     Q    Ambaya, you adopted that name for yourself in adult life;

8     is that correct?

9     A    No, that name was my spiritual name given to me by

16:54  10    spiritual teacher in 1984.

11    Q    You were not an adult in 1984?

12    A    Yes.

13    Q    So you did adopt it --

14    A    Okay, I adopted it when it was given to me, yes.

16:54  15    Q    You liked it?

16    A    Yes, I liked it.

17    Q    It means divine mother?

18    A    It is a Sanskrit word that means divine mother, one that

19    encompasses --

16:55  20    Q    And that's how you introduced yourself to the plaintiff, as

21    divine mother?

22    A    No, I did not.

23    Q    Okay.  Anyway, you were asked under oath yesterday --

24          MR. APPLETON:  Page and line.

16:55  25          MR. STANLEY:  Page 26, there are no line numbers.

16:55   1   Page 26 a little below the middle.

2   BY MR. STANLEY:

3   Q        "Ambaya Gold Health Products, LLC," question mark.

4            "Answer:  Yes.

16:55   5            "Question:  That is a limited liability company?

6            "Answer:  Yes, it is.

7            "Question:  It's a distinct legal person from you?

8            "Answer:  It is me.  Only me."

9            Do you recall giving that testimony under oath

16:55   10   yesterday, Ms. Martin?

11   A   I'm very clear of the distinctions, and yes, I was probably

12   confused about whatever I said as far as -- because I know very

13   clearly that the LLC is not me the person, but they are tied

14   together because I am responsible and I, as Pilar Martin, I'm

16:56   15   the only liable one for the LLC.

16   Q   Okay.  You said Medicine Wolf represented to you that he

17   didn't want to be on any corporate papers or to have his name

18   on any company because he was very afraid of the government.

19   A   And because he -- yes.  And --

16:56   20   Q   Is that what you said?

21   A   Yes, that's what I said.

22   Q   Okay.  So but otherwise you would have put his name on the

23   company?

24   A   At the very beginning?  Yes.  When I was believing all of

16:56   25   this?  Yes, absolutely.

16:56  1    Q    Okay.  And what you were believing was that he's a Native
       2    American and he wasn't married or he didn't have children or he
       3    did or things like that, right?  Things that have nothing to do
       4    with the formulas and their commercial --
16:57  5    A    I was deceived.
       6    Q    Do that --
       7    A    I have been deceived deeply.  I have been deceived, I have
       8    been betrayed.  I do not --
       9    Q    You've felt that way from the time he turned down your
16:57  10   proposal of marriage, haven't you?
       11   A    No, I have not.
       12   Q    All right.
       13   A    And that is not true.
       14   Q    They aren't his -- excuse me.  You say these formulas were
16:57  15   not his.
       16   A    Were what?
       17   Q    The formulas aren't his.  Somebody else invented them
       18   already.
       19   A    That's correct.
16:57  20   Q    So they aren't Ambaya Gold's either, are they?
       21   A    We manufacture products by putting things together.  Did I
       22   invent the base products?  Absolutely not.
       23   Q    Pardon?
       24   A    I did not invent the base products.  We put ingredients
16:57  25   together and make our own formulations.  I did not invent the

16:57  1    base products.

2    Q    Well, now, yeah, I mean obviously when one makes a product,

3    one gets ingredients from somewhere or components from

4    somewhere that have to be used in the process somehow.  And

16:58  5    then when one uses them in the process, whether they're

6    directly or indirectly -- whether they directly go in or

7    indirectly are used, components, ingredients, materials are

8    used to produce a product.  That is pretty familiar, wouldn't

9    you say?

16:58  10   A    Yes.

11   Q    Okay.  And it's not only the products but how you put them

12   together, the order you put them together, like baking a cake.

13   You don't just get the list of ingredients at the top of the

14   recipe and dump them into a bowl and say here, folks, here's

16:58  15   your cake, do you?  Do you?

16   A    No, you don't.

17   Q    Okay.  So if ingredients that happen to be used in some of

18   these formulas had been sold in this country for 150 years as

19   you say you know to be the case, it wouldn't have anything to

16:59  20   do with anything, would it?  It was a completely meaningless

21   statement, wasn't it?

22          MR. APPLETON:  Object to the form of the question,

23   misstates the evidence.

24          THE COURT:  Sustained.

25

BY MR. STANLEY:

Q    What was the significance of that statement?  If some products --

A    That --

Q    -- one of the ingredients is one of his formulas has been used in commerce for 150 years, that has nothing to do with whether or not the formula, all of the products, all of the ingredients, all of the methods that are part of the formula have a commercial value, does it?

          MR. APPLETON:  Object to the form the question --

          THE WITNESS:  The significance is --

          THE COURT:  Hold on just a minute.

          What's the objection?

          MR. APPLETON:  Form.

          THE COURT:  Overruled.

          THE WITNESS:  The significance is he told me he made this bases.  He did not.

BY MR. STANLEY:

Q    Now, did I understand you to say we have -- when you said you've reviewed what you paid him and it amounts to more than $118,000, did I understand you to say we have copies right here?

A    My attorney and I.  We have some copies.

Q    Those exhibits have been presented in this hearing today?

A    No.

17:00     1    Q   For what reason have they not been presented in this

          2    hearing today?

          3               MR. APPLETON:  Objection, Your Honor.  I haven't had

          4    an opportunity to do that and we're on a very strict time limit

17:00     5    so I was just trying to save time.

          6               MR. STANLEY:  Counsel is answering the question for

          7    the witness.

          8               THE COURT:  Well, he was, I think, objecting that

          9    he -- she didn't know the answer.  But I'll let her answer

17:00    10    that.

         11               THE WITNESS:  Yes, we haven't had enough time to put

         12    it all, but it's -- I have it, if the judge would like to see

         13    it.

         14               MR. STANLEY:  No further questions.

17:01    15               THE COURT:  Any redirect?

         16               MR. APPLETON:  No, Your Honor.

         17               THE COURT:  All right.  You can step down.

         18               MR. APPLETON:  No further testimony.

         19               THE COURT:  All right.

17:01    20               We're right at 5 o'clock.  Why don't I give you five

         21    minutes, Mr. Stanley, to give me your closing thoughts and

         22    then I'll give Mr. Appleton five minutes for the same purpose.

         23               MR. STANLEY:  Thank you, Your Honor.

         24               I believe we've done what we said we were going to

17:01    25    do.  There are a lot of uncontested facts.  The existence of

17:01  1   this business, Sacred Health, Ambaya Gold, its commercial

2   value based on the formulas that somebody's using.

3       I said there were some facts that should not be

4   contested based on the statements of the principal defendant

17:01  5   herself.  Those are that the formulas and procedures exist and

6   have commercial value, and that will be seen clearly from the

7   transcript of yesterday's testimony.

8       That they were created and devised by Don Medicine

9   Wolf.  That will be seen from the transcript of yesterday's

17:02  10  testimony.

11      It is true in the transcript she says she was

12  involved.  I don't know to what extent she was involved.

13  We're agreeing there was a partnership here.  Don Medicine

14  Wolf contributed something that was essential.  She

17:02  15  contributed, as I've said, business get up and go, time,

16  energy, knowledge of how to do things.  There was a

17  partnership that created an ongoing entity that is of value.

18      I think that clearly is what the Court has to see is

19  the probability of success on the merits.

17:03  20      What we are asking in the form of order that we're

21  going to present is not that they -- that the plaintiff be

22  shut down, that the defendants be shut down, but that we have

23  accounting in place so that when it's determined that Don Wolf

24  is entitled to half of the profits or 25 percent of the

17:03  25  profits or whatever from the sale of the products that he

17:03 1 devised, we will have a means of establishing that.

2    Based on the testimony of the witness Kristen

3 Wakeman, you can see that as things are we would not be

4 able -- even once that finding is made, we could not show what

17:03 5 that dollar amount is.

6    So what we are requesting is that accounting be put

7 in place and subject to review so that we will know what the

8 appropriate amounts of profit, net and gross, would be.

9 Because if we shut this business down for two years, Your

17:04 10 Honor, there would be a substantial economic loss.  We could

11 say we in fact could immediately compete, are competing, as

12 they have said, and would benefit from shutting them down, but

13 we could not possibly post a bond.  They could probably show

14 that that would cost them a couple of million dollars and we

17:04 15 couldn't post that bond.

16    So that's why we're suggesting that what they

17 request -- the relief we're requesting is that accounting be

18 put in place, and also with respect to the dilution problem,

19 we've heard that these names, these trade names, are out

17:04 20 there, they are associated with Medicine Wolf, and if they

21 start being misproduced, produced badly, corners cut or for

22 whatever reason, whether it is economic or just lack of

23 understanding, if they're -- if they go out and are not

24 effective, have a bad commercial -- a bad customer acceptance

17:05 25 record, then that will hurt Medicine Wolf and hurt his ability

17:05  1   to go forward with his business.

2          And the fact that his -- his name is of value and he

3   should be able to trade on it in business without negative

4   effects from -- from bad association -- association with bad

17:05  5   products is shown by the fact of the trademark application,

6   which was Exhibit -- is Exhibit I to the petition, and was

7   discussed in the testimony in the TRO hearing, she has applied

8   for the trademark in the name of Medicine Wolf.  She

9   recognizes the commercial value of that name herself.

17:06  10          And that is what we want to protect with the second

11   part of the relief in our proposed order, which would be

12   simply to say that they decide with respect to each of the

13   nine identified products that were sold by Sacred Health and

14   are now being sold by Ambaya Gold, that they either are going

17:06  15   to say, okay, it's a nonconforming product, we -- on their

16   advertising say this is not a Medicine Wolf product, we do not

17   use the formula of Medicine Wolf for this product, say that

18   clearly in their advertising, then they can make it however

19   they want.  Make it out of pure sugar or whatever.

17:06  20          But if they are not going to say that, there is going

21   to continue to be an association with the plaintiff in the

22   public mind or in the mind of the trade as Dr. Horowitz

23   testified, then we need to have some procedures in place so

24   that we can have samples, so that we can know -- have access

17:07  25   to the laboratory records of production, so that we can know

17:07    1   if there is a deviation from the Medicine Wolf formulations

2   and procedures, we can then ask the Court for further

3   injunctive relief.  Something we would have no means of

4   knowing or monitoring without that limited relief, which we're

17:07    5   asking.

6            So that is what I believe we've shown, likelihood of

7   success on the merits, and the balance of the burdens, given

8   the limited relief we're asking, would be in favor of the

9   plaintiff.  And I believe that's the showing we need to make.

17:07   10            THE COURT:  Mr. Stanley, you referred a minute ago to

11   a proposed order?

12            MR. STANLEY:  Yes.

13            THE COURT:  What are you referring to?

14            MR. STANLEY:  I'm referring to this document, which

17:07   15   hasn't been filed electronically for the same -- oh, it has

16   been.  It has been uploaded.  Our proposed order.

17            THE COURT:  Are you talking about the notice of the

18   amended proposed order?

19            MR. STANLEY:  Yes.

17:08   20            THE COURT:  As I read that proposed order, it asks

21   that the defendants be enjoined and restrained from selling,

22   marketing, or otherwise distributing any of the products --

23            MR. STANLEY:  That's alternative --

24            THE COURT:  -- identified on Exhibit A.

17:08   25            MR. STANLEY:  That's alternative one, Your Honor.

17:08   1    We're not asking you to check the alternative one box.

2            THE COURT:  So you're saying you are not requesting

3    alternative one?

4            MR. STANLEY:  We're not, we're requesting only

17:08   5    alternative two.

6            THE COURT:  Alternative two says that there should be

7    an accounting.

8            MR. STANLEY:  Not in the sense of -- there's the

9    equitable action of accounting and then there's the business

17:08   10   process of accounting.  The business process is what we're

11   talking about.

12           THE COURT:  So you want me to order that an accountant

13   of some type agreed upon between the parties keep track of the

14   money in this business and give you monthly reports.

17:09   15           MR. STANLEY:  The revenue from the nine identified

16   products as well as the associated cost of goods sold, yes,

17   Your Honor.

18           THE COURT:  I don't see anything in this proposed

19   order about the second element of relief you just mentioned,

17:09   20   which is ordering them not to use -- or to say affirmatively

21   that they're not using his name or alternatively give you

22   product samples to test.

23           MR. STANLEY:  It is not, Your Honor.  The form that

24   was uploaded is an earlier draft from which that language was

17:09   25   omitted.

17:09    1        THE COURT:  All right.  So I don't have your proposed

         2  order?

         3        MR. STANLEY:  You do not.  We can rectify that very

         4  quickly, but that is the intent.  Alternative two has two

17:09    5  paragraphs and the second paragraph was not in this draft when

         6  it was apparently prepared for uploading.

         7        THE COURT:  Mr. Appleton.

         8        MR. APPLETON:  Your Honor, the plaintiffs have utterly

         9  failed to meet their burden of proof.  What they've added is

17:10   10  the testimony of Medicine Wolf and the testimony of people who

        11  have talked to Medicine Wolf.  They're -- in no way have they

        12  added anything from the TRO hearing to establish that he

        13  created these formulas, that they're anything other than base

        14  formulas or formulas that were in the marketplace or in the

17:10   15  public domain.

        16        So what the Court is presented with is Medicine

        17  Wolf's testimony saying, "Yes, they are, they're mine, I

        18  created them."  And of course the Court had ample opportunity

        19  to observe his demeanor and his responses, and he is lacking

17:10   20  in credibility, utterly.

        21        I would tend to suggest to the Court that he has

        22  misrepresented himself under oath to this Court.  He says he

        23  has degrees from Russian schools and German schools.  He used

        24  to speak Russian and German but no longer does.

17:11   25        He said, "I never held myself out as a medical

doctor," then he says "yes, I did.  I went to the Cornell
University's medical school."  Obviously we're going to
contact Cornell and ask for their records and I'm certain that
we're going to find that he never attended their medical
school.

        He's held himself out as having all types of
professional licenses, which he doesn't have, which he can't
prove.  He wouldn't admit his criminal convictions.  He's
totally lacking credibility, and that is what the plaintiff's
case is resting upon.

        There is nothing scientific put before this Court to
establish that he has any ownership.  He's been working on
these formulas allegedly for 40 years.  He has a number of
companies set up prior to coming in contact with Ambaya that
he owns, he's working, that distribute drugs -- or nutritional
supplements.  Why, if he had these products prior to meeting
with Ambaya, why didn't he market them?  It doesn't make any
sense.  It's not credible.

        The reason they exist now is because of Ambaya,
because of her work, her input, her financing, her staff, her
facilities.  She has created and marketed them.

        As Medicine Wolf stated himself under oath, he didn't
have the expertise to do any of this stuff.  Well, it didn't
exist.  Maybe he had an idea.  He hasn't even proven that.
But even if he brought this idea to Ambaya and Ambaya ran with

17:12   1   it, made it, made it occur, created a product, marketed it,

2   distributed it, and is now making money from it, that's

3   because of her efforts.  And that is why he's going after

4   this.

17:12   5        The -- his admission is that he never signed, never

6   wanted to sign the royalty agreement.  And yet -- and he says

7   he doesn't believe in the royalty agreement, and yet the

8   plaintiffs are resting part of their case on allegations in

9   the royalty agreement.

17:13  10        There's no evidence of poor production values.  They

11   just have thrown it out there, oh, maybe she's making bad

12   product, and maybe Medicine Wolf's name is associated with it.

13   The only testimony that Medicine Wolf's name is associated

14   with, the testimony of Leonard Horowitz, and when asked, well,

17:13  15   did any of these labels have his name?  No.  Well, maybe

16   there's a little picture of an Indian.  That's as close as it

17   gets.

18        They certainly have the burden of proof.  They

19   haven't met the burden of proof.  They haven't established

17:13  20   here's a guy who claims that he created these documents -- I'm

21   sorry -- these formulae.  He never attempts to trademark or

22   patent them.  It's because they didn't exist before.

23        We had testimony in the temporary restraining order

24   hearing about the fact that these are natural known substances

17:14  25   that he brought or substances that were already in the

17:14  1   marketplace.  He tried to pass them off as his own.  It fits

2   with the type of testimony that he gave today.  He wasn't

3   being honest with this court, and yet he wants this court to

4   grant him relief.

17:14  5          Based on that, and of course on the hardships that

6   would inure to the defendants should a preliminary injunction

7   be issued, it totally weighs in favor of the defendant.  We

8   submit that they will not prevail on the underlying case.

9   They have not proven so.  They're not entitled to preliminary

17:14  10  injunction.  We would ask that it be denied.  Thank you, Your

11  Honor.

12         THE COURT:  Well, Mr. Appleton, I would assume you

13  would agree that in light of the fact that they have withdrawn

14  the request that the defendants be enjoined from operating, the

17:15  15  hardship balance has changed somewhat.

16         MR. APPLETON:  Somewhat, Your Honor.  But still I

17  would indicate, first of all, the plaintiff has no skin in the

18  game, so to speak.  He has no investment in these products, in

19  the marketing or distribution.  He has set up a competing

17:15  20  business.  And you did hear the testimony, which has not been

21  contradicted, that he took private distributor lists, client

22  lists, vendor lists, and the formulas from my client.  And he's

23  attempting to use those in his new business.  So --

24         THE COURT:  Well, let me ask you specifically, what

17:15  25  would be the hardship of the accounting that plaintiff has

17:15   1   requested?

2           MR. APPLETON:  Well, it certainly imposes an

3   additional level of bookkeeping.  And certainly if the

4   plaintiff had sustained its burden of proof on that -- on the

17:16   5   facts that are subject to the preliminary injunction, maybe

6   they would be entitled to it, but we submit that they've

7   utterly failed to meet their burden of proof.

8           An accounting can be done at such time as a trial is

9   held, if in fact there is a trial in this case.  But to simply

17:16   10  grant them a preliminary injunction based on the facts and

11  evidence before this court, we would submit would not be just.

12          THE COURT:  All right.  I understand the positions of

13  both of the parties.  I will take this matter under advisement

14  and get you a written decision.  Thank you.

17:16   15          MR. STANLEY:  Your Honor, we'll be uploading the

16  other -- the complete form of order, proposed form of order as

17  soon as we get back to the office.  I just wanted to let the

18  Court be aware of that.

19          THE COURT:  That's fine.  All right.  Thank you.

17:16   20          (End of transcript.)

21                          *  *  *  *  *

22

23

24

25

# **C E R T I F I C A T E**

I, PATRICIA LYONS, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control, and to the best of my ability.

DATED at Phoenix, Arizona, this 28th day of January, 2011.

s/ Patricia Lyons, RMR, CRR
Official Court Reporter